# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

JENNIFER HARDING, JASMINE POGUE, OMEGA TAYLOR, LOUISIANA STATE CONFERENCE OF THE NAACP, and POWER COALITION FOR EQUITY AND JUSTICE,

*Plaintiffs*,

v.

JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana, and KYLE ARDOIN, in his official capacity as Secretary of State of Louisiana.

*Defendants*.

Case. No. 3:20-cv-00495-SDD-RLB

## FIRST AMENDED COMPLAINT

Plaintiffs Jennifer Harding, Jasmine Pogue, Omega Taylor, Louisiana State Conference of the NAACP ("Louisiana NAACP"), and Power Coalition for Equity and Justice ("PCEJ"), (collectively "Plaintiffs") by and through their undersigned attorneys, file this Complaint for injunctive and declaratory relief against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following:

### PRELIMINARY STATEMENT

1.       On March 11, 2020, the World Health Organization ("WHO") declared a global pandemic due to COVID-19.[1]  That same day, the Governor of Louisiana, John Bel Edwards, declared a statewide public health emergency and implemented measures to prevent large

---

[1] *See* World Health Org. (WHO) (@WHO), Twitter (Mar. 11, 2020, 12:26 PM), https://twitter.com/WHO/status/1237777021742338049 ("We have therefore made the assessment that #COVID19 can be characterized as a pandemic."); Dr. Tedros Adhanom, WHO Director-General's opening remarks at the media briefing on COVID-19, WHO (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

gatherings and close non-essential businesses.[2] More than four months later, conditions in the United States and the state of Louisiana have worsened substantially and remain in a state of emergency caused by the ongoing pandemic.

2.    Less than two months into Louisiana's reopening and the roll-back of the state's protective measures, the rate of new COVID-19 cases climbed precipitously.[3] In July, the number of active infections in the state more than doubled.[4] As of the date of this filing, Louisiana has reported over 116,280 cases and 3,835 deaths.[5] Indeed, since this Court's June 22, 2020 Order dismissing without prejudice Plaintiffs' prior action, the rate of new cases in Louisiana has soared dramatically[6]: While it is too soon to be certain whether the number of new cases have plateaued, if they have they have done so--in the words of Governor Edwards, "at a really high number."[7] On July 29, 2020, the governor also announced that Louisiana is now number one in the country in per-capita cases of COVID-19.[8]

---

[2] *See* Press Release, Office of the Governor, Gov. Edwards Declaration of Public Health Emergency in Response to COVID-19 (Mar. 11, 2020), https://gov.louisiana.gov/index.cfm/newsroom/detail/2400.

[3] *Louisiana Coronavirus Map and Case Count*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/louisiana-coronavirus-cases.html (last updated July 30, 2020).

[4] Louisiana Coronavirus, Worldometer, https://www.worldometers.info/coronavirus/usa/louisiana/ (last updated July 30, 2020).

[5] La. Dep't of Health, *Coronavirus (COVID-19)*, http://ldh.la.gov/coronavirus/ (last visited Aug. 1, 2020).

[6] *Louisiana Coronavirus Map and Case Count*, N.Y. TIMES, *supra* note 3.

[7] Sam Karlin, *John Bel Edwards said Louisiana coronavirus cases may be plateauing—but at a 'really high number,'* THE ADVOCATE (July 28, 2020), https://www.theadvocate.com/baton_rouge/news/coronavirus/article_06904936-d122-11ea-ba80-37555176f8af.html.

[8] David Gray, *Louisiana is now No. 1 in the nation in cases per capita, Gov. Edwards says*, THE LIVINGSTON PARISH NEWS (July 30, 2020), https://www.livingstonparishnews.com/coronavirus/louisiana-now-no-1-in-the-nation-in-cases-per-capita-gov-edwards-says/article_4defdba0-d1b0-11ea-9b0d-4f28ecfd95d8.html.



Graphic: *Louisiana Coronavirus Map and Case Count*, N.Y. TIMES

3.     By June 20, the first day of early voting for Louisiana's 2020 Presidential Preference Primary Election, Louisiana had one of the highest rates of COVID-19 transmission in the country.[9]  By July 11, Election Day, Louisiana had one of the highest new case rates in the world.[10]  Governor John Edwards said on July 8 that all progress against the coronavirus had been lost, and that Louisiana has "a statewide pandemic.  It is no longer one or two regions."[11]  Currently, Louisiana's death rate from the virus is, per capita, the sixth highest in the country,[12] and the total number of cases, per capita, is the highest in the country. [13]  On July 22, the state saw

---

[9] David Leonhardt, *Graph: World's Worst Outbreaks*, N.Y. TIMES (July 8, 2020), https://www.nytimes.com/2020/07/08/briefing/arizona-mary-trump-facebook-your-wednesday-briefing.html?login=email&auth=login-email.

[10] *Id*.

[11] Madeline Holcombe, et al., *Louisiana governor says progress against coronavirus has been wiped out in past three weeks*, CNN (July 2, 2020), https://www.cnn.com/2020/07/08/health/us-coronavirus-wednesday/index.html.

[12] United States Coronavirus, Worldometer, https://www.worldometers.info/coronavirus/country/us/ (last visited July 31, 2020).

[13] *Id*.

the largest single day increase in COVID-19 deaths and hospitalizations since May 1.[14]  Notably, recent findings reported by the Centers for Disease Control and Prevention ("CDC") showed that the actual number of coronavirus infections in the U.S. is 2 to 13 times higher than the reported cases.[15]  These estimates were based on a study of antibodies in blood samples drawn from 10 geographic regions, including Louisiana.  The findings indicate that in Louisiana the estimated number of infections was 16 times higher than the reported case counts.[16]

4.    There is consensus amongst government agencies and medical experts that a vaccine for COVID-19 will not be available before the November and December elections.[17]  Nor is there any realistic prospect of protection via herd immunity by that date.[18]

5.    In April, Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Diseases, stated that he "can't guarantee" in-person voting will be safe in November.[19] Since then, the spread of the virus and the number of infections has only increased.

---

[14] Emily Woodruff, *Coronavirus infections in Louisiana were 16 times higher than case counts showed, CDC says*, THE TIMES-PICAYUNE (July 22, 2020), https://www.nola.com/news/coronavirus/article_14150de4-cc63-11ea-b50c-abe0272549f7.html; *see also* Emma Discher, *Louisiana coronavirus: 2,700 cases reported; hospitalizations hit highest number in 2 months,* THE NEW ORLEANS ADVOCATE (July 22, 2020), https://www.nola.com/news/coronavirus/article_20f38fe0-c920-11ea-9e11-fb294daa6a7e.html.

[15] Apoorna Mandavilli, *Coronavirus Infections Much Higher Than Reported Cases in Parts of the U.S., Study Shows*, N.Y. TIMES (July 21, 2020), https://www.nytimes.com/2020/07/21/health/coronavirus-infections-us.html?searchResultPosition=1

[16] Ctrs. for Disease Control & Prevention (hereinafter "CDC"), *Interactive Serology Dashboard for Commercial Laboratory Surveys, Louisiana*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/commercial-labs-interactive-serology-dashboard.html (last visited July 28, 2020); Emily Woodruff, *supra* note 14.

[17] U.S. Dep't of Health and Human Serv. Press Off., *Fact Sheet Explaining Operation Warp Speed*, (June 16, 2020), https://www.hhs.gov/about/news/2020/06/16/fact-sheet-explaining-operation-warp-speed.html; Gisela Crespo, *US gets reality checks on COVID-19 vaccine, duration of symptoms,* CNN (July 24, 2020), https://www.cnn.com/2020/07/24/health/us-coronavirus-friday/index.html.

[18] Apoorna Mandavilli, *supra* note 15.

[19] Jason Silverstein, *Fauci says he "can't guarantee" in-person voting in November will be safe*, CBS NEWS (Apr. 13, 2020), https://www.cbsnews.com/news/coronavirus-fauci-says-he-cant-guarantee-in-person-voting-in-november-will-be-safe/.

6.      Still in the face of the ongoing and worsening pandemic, Defendants have failed to take action to allow for safe and accessible voting and protect the right to vote during the upcoming November and December elections.  In particular, Defendants have failed to extend even basic modifications to Louisiana elections laws, which, based on the progression of the pandemic in April, Defendants agreed were necessary to protect Louisiana's voters and their right to vote for the July and August 2020 elections.

7.      In the context of the COVID-19 pandemic, certain provisions of Louisiana law (collectively, "the Challenged Provisions") unduly burden the right to vote, including provisions that impose limitations on absentee by mail ballots and in-person early voting.

8.      First, Plaintiffs challenge the State's maintenance of statutory limitations on who can vote by absentee ballot (the "Excuse Requirement") during the November and December elections and continued community transmission of COVID-19.  The Excuse Requirement restricts voting by mail by requiring that voters identify one of a limited number of narrow excuses to be eligible to cast a ballot safely from home.  Defendants have defined Louisiana's Excuse Requirement so that none of the listed absentee "excuses" apply to the hundreds of thousands of voters who will be forced to risk exposure to COVID-19 to vote in person in the November 2020.

9.      Maintaining the Excuse Requirement, while the COVID-19 pandemic continues to threaten the health and safety of all Louisiana's residents, violates the fundamental right to vote because voters who do not have a qualifying excuse, including Plaintiffs and members and constituents of organizational Plaintiffs, and desire to exercise their right to vote will be compelled to endure unacceptable health risks (and to increase the health risk to the community). Additionally, the burdens imposed by the Excuse Requirement will fall with particular severity and disproportionately on Black Louisianans—who make up a disproportionate rate of the

COVID-19 cases and deaths—as well as on voters who are at higher risk of being infected by COVID-19, including those with underlying medical conditions and disabilities.

10.    Second, Plaintiffs challenge Defendants' reduction of the number of early voting days from thirteen under during the July and August elections to seven for the November and December elections, and the constitutionality of the state's early voting provisions to the extent that they limit the extension of the early voting period.

11.    Reducing early voting from 13 days to seven days for the November and December elections will require a larger number of voters to vote in-person during this constrained schedule and to congregate; thus, unduly burdening the fundamental right to vote by exposing voters to intensified health risks.  For voters who must vote in person because they are not eligible to vote absentee due to the Excuse Requirement, such as Plaintiff Jennifer Harding, early voting reduces the health risks of doing so by reducing the number of voters at the polling places at any given time, making social distancing more achievable.

12.    Acknowledging that "[t]he emergency conditions created by COVID-19, as well as the efforts necessary to contain its spread, will affect all 2,988,813 of Louisiana's registered voters as well as the 3,934 precincts located at 2,058 polling places across the State,"[20] Defendants previously acted to modify Louisiana's election procedures, including the Challenged Provisions, for the July and August elections.  Initially, on April 15, 2020, Defendant Secretary of State Ardoin proposed an emergency election plan that would have substantially expanded access to absentee voting by making eligible any voter who was "[u]nable to appear in public due to concern of

---

[20] Secretary of State Emergency Election Plan for the July 11, 2020 Presidential Preference Primary and August 15, 2020 Municipal General Elections in the State of Louisiana (Apr. 20, 2020), https://www.sos.la.gov/OurOffice/PublishedDocuments/Revised%20Emergency%20Election%20Plan%20for%20PPP%20and%20Mun%20General%20Rev.%204-20.pdf.

exposure to or transmission of COVID-19."[21]  Although the initial plan was blocked from proceeding to the full legislature for a vote, on April 27, a revised and more limited emergency election plan was ultimately approved and implemented by Defendants (the "Emergency Plan").[22]

13.    In particular, Defendants modified the Excuse Requirement by creating five narrow COVID-19-related excuses a voter could use to request an absentee mail-in ballot, expanded early voting from seven to thirteen days before election day, and included explicit provisions to equip polling locations and election workers with protective gear and sanitization supplies to prevent against the spread of the virus.[23]

14.    The factors that caused Defendants to develop and implement the Emergency Plan for the July and August elections in light of COVID-19 still will be in full force and effect during the November and December elections.  Indeed, the risks for the presidential general election, when Louisiana voters have historically turned out in high density, will be *more* acute.  In-person voters—both during early voting and on Election Day—will have to wait in line, including indoors, in close proximity with other individuals, sometimes for hours, before they can vote.  And in such crowded conditions some polling places may be unable to accommodate necessary social distancing.  Maintaining the unqualified Excuse Requirement and reducing the early voting period for the November and December elections, therefore, unreasonably burdens the fundamental right

---

[21] Secretary of State Emergency Election Plan for the July 11, 2020 Presidential Preference Primary and August 15, 2020 Municipal General Elections in the State of Louisiana (Apr. 14, 2020), https://house.louisiana.gov/Agendas_2020/Apr_2020/Emergency%20Election%20Plan%20for%20PPP%20and%20Mun%20General%20Rev.%204-13.pdf.

[22] Secretary of State Emergency Election Plan for the July 11, 2020 Presidential Preference Primary and August 15, 2020 Municipal General Elections in the State of Louisiana (Apr. 20, 2020), *supra* note 20.

[23] State of Louisiana Official Absentee Ballot Application: COVID-19 Emergency Application (last updated April 2020), https://www.sos.la.gov/OurOffice/PublishedDocuments/COVID-19%20VR2%20Absentee%20by%20Mail%20Application%20(Rev.%204-20)%20Ver.%201.pdf.

to vote of Louisianans by requiring them, among other things, to breach the social distancing necessary to protect their and their community's health from transmission of COVID-19, and unnecessarily endangers poll workers and other election officials.

15.    As of August 3, 2020, Defendants have failed to implement any measures—including, even the extension of the limited measures included in the Emergency Plan—to alter the Challenged Provisions in order to mitigate the impact of COVID-19 during the November and December elections.

16.    In fact, on July 28, Plaintiffs Power Coalition for Equity and Justice, the Louisiana NAACP, and dozens of other civil rights and civic engagement advocacy organizations sent Secretary of State Ardoin a letter requesting that he take a number of steps to ensure voters could safely participate in the November and December 2020 elections, including the expansion of absentee mail-in voting eligibility to all voters or the extension of the Emergency Plan.[24] The Secretary of State did not respond to this letter.

17.    Defendants failure to act with respect to the November and December 2020 elections constitutes an undue burden the right to vote in violation of the First and Fourteenth Amendments, Title II of the Americans with Disabilities Act ("ADA"); and further, will disproportionately burden Black Louisianans in violation of Section 2 of the Voting Rights Act ("VRA").  Accordingly, Plaintiffs respectfully request that the Court  enjoin Defendants from enforcing the Challenged Provisions for all upcoming 2020 elections in Louisiana or, at the very least, request that the Court require Defendants to re-establish the baseline (albeit inadequate) protections afforded to voters under the Emergency Plan.

---

[24] Press Release, Power Coalition for Equity & Justice, et al., Advocates Reach Out to Sec. of State Ardoin About Emergency Election Plan for the Fall (July28, 2020), http://powercoalition.org/advocates-reach-out-to-sec-of-state-ardoin-about-emergency-election-plan-for-the-fall/.

## JURISDICTION AND VENUE

18.    This action arises under the First and Fourteenth Amendments to the U.S. Constitution and the Voting Rights Act, and is brought under 42 U.S.C. §§ 1983 and 1988 and 52 U.S.C. § 10301 to seek injunctive and declaratory relief for violations of constitutional rights under color of state law.  This Court therefore has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

19.    This Court has personal jurisdiction over Defendants, who are sued in their official capacities as state officials.  The violations complained of concern their conduct in such capacities.

20.    Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

21.    Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendants reside in this judicial district, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to Plaintiffs' claims occurred there.

## PARTIES

22.    Plaintiff Jennifer Harding is a 42-year-old community organizer from Baton Rouge, Louisiana.  She is a U.S. citizen and lawfully registered Louisiana voter.  Ms. Harding lives with her husband and their son, who soon will begin fifth grade.  Her nuclear family has been socially distancing since schools closed in Louisiana in order to protect their own health and the health of others.  Ms. Harding has both child and parental care responsibilities.  Her 72-year-old father, 71-year-old mother, and 93-year-old grandmother live together close by and require various levels of assistance.  Her father has Parkinson's disease, her mother has limited mobility due to post-polio syndrome, and her grandmother has been diagnosed with dementia. While Ms. Harding does not live with her parents and grandmother, she is responsible for completing tasks that they cannot easily perform, including taking out the trash, cleaning, and managing their medications.  During visits to their home, she has taken extreme precautions to

maintain distance and use sanitary practices.  She is aware of the potential of undetected and asymptomatic infection and has reasonable fear that she could expose her at-risk family to COVID-19 if she does not continue to maintain extreme social distancing.  If able, she would vote by absentee ballot in order to decrease her risk of virus exposure at her polling location.  According to this Court in the separate action it previously ruled on, because of Ms. Harding's status as a caretaker for family members who are "subject to a medically necessary quarantine or isolation order as a result of COVID-19," Ms. Harding likely would be eligible to vote absentee under the Emergency Plan's COVID-19 related excuses.[25]  *See* June 22 Ruling at 18 (recognizing that "the state's expanded Virus-related excuses appear to accommodate that preference").  That exemption, however, has not been extended to the November and December elections.  As a result, to cast a ballot in these elections, Louisiana law requires that Ms. Harding jeopardize her health and the health of her family and community by voting in person.  Because voting in person in the November election would force Ms. Harding to subject herself, her family, and her community to a substantial and concrete risk of death or severe illness, it is impossible or extremely impractical for her to vote in person.

23.     Plaintiff Jasmine Pogue is a 33-year-old Black woman who was recently diagnosed with asthma.  She is a U.S. citizen and lawfully registered Louisiana voter.  She lives with her husband and six-year-old daughter in Baton Rouge, Louisiana.  Ms. Pogue's asthma is environmentally induced, triggered by allergens and other pollutants.  She also has a history of upper respiratory infections, and last contracted one in mid-March of this year.  Ms. Pogue and her

---

[25] Secretary of State Emergency Election Plan for the July 11, 2020 Presidential Preference Primary and August 15, 2020 Municipal General Elections in the State of Louisiana (Apr. 20, 2020), *supra* note 20; Attempts by Plaintiffs' counsel to confirm that the State regarded Ms. Harding and Ms. Pogue as eligible to vote by absentee ballot under the Emergency Plan were inconclusive, where Defendant Ardoin's and the State's counsel refused to clarify or confirm the State's view of the law and its applicability to Plaintiffs Harding and Pogue.

family have been engaging in strict social distancing to avoid all unnecessary risk of exposure to COVID-19.  Ms. Pogue has difficulty breathing and requires an inhaler when experiencing an asthma attack.  Ms. Pogue is aware of the disproportionate rates of infection and death among Black Louisianans and especially individuals with respiratory concerns.  Voting in person—her only option to participate in the November and December elections if the Challenged Provisions remain in effect—requires Ms. Pogue to risk severe and potentially fatal injury to her health.  If the Challenged Provisions remain in effect, Ms. Pogue will have to vote at a polling place where she will have to stand for an extended period of time in the same place and will be unable to remain socially distanced due to crowding.  According to the Court, "based on her asthma and history of respiratory infections, Pogue qualifies for an absentee ballot on the basis of 'chronic lung disease,' which is one of the explicitly enumerated qualifying conditions" [under the Emergency Plan]. June 22, 2020 Order at 19.  That exemption, however, has not been extended to the November and December elections, forcing Ms. Pogue to risk severe illness and potential death in order to exercise her vote.  Because voting in person in the November and December elections would force Ms. Pogue to subject herself to a substantial and concrete risk of death or severe illness, it is impossible or extremely impractical for her to do so.

24.     Plaintiff Omega Taylor is a 56-year-old Black woman who lives in Hammond, Louisiana.  She is a U.S. citizen, a lawfully registered Louisiana voter, and the Youth and College State Advisor for the Louisiana NAACP.  Ms. Taylor has diabetes, high blood pressure, and other medical conditions that put her at high risk of severe complications from COVID-19.  She lives with her husband, who is over 65 years old and therefore also at heightened risk.  Ms. Taylor is aware of the disproportionate rates of infection and death among Black Louisianans and especially among individuals with underlying medical conditions and comorbidities and older adults.  She

does not want to expose herself, her husband, or others in her community to a severe or deadly disease.  For these reasons, Ms. Taylor has been very cautious in avoiding contact with others and has engaged in social distancing to prevent any unnecessary risk of exposure to COVID-19. Further, Ms. Taylor's regular polling place is a small fire station that serves as the consolidated voting location for three precincts.  Because of the fire station's limited interior space, it will be impossible for Ms. Taylor to practice social distancing and vote safely there in the November 2020 election.  If able, Ms. Taylor would vote by absentee ballot in order to decrease the risk of exposing herself and her husband to the virus.

25.     Plaintiff Louisiana State Conference of the National Association for the Advancement of Colored People (the "Louisiana NAACP") is a state subsidiary of the National Association for the Advancement of Colored People, Inc.  For decades, the Louisiana NAACP has worked towards its mission to ensure the political, educational, social, and economic equality of all persons and to eliminate race-based discrimination.

26.     Among the Louisiana NAACP's central objectives are eliminating racial discrimination in the democratic process and ensuring the protection of voting rights and equitable political representation.  Its work includes efforts to register, educate, and advocate on behalf of Black voters throughout Louisiana.

27.     The Louisiana NAACP has thousands of members across the state.  Many of the organization's members are Black, and a substantial number of them have medical conditions, like asthma, hypertension, and diabetes, that put them at higher risk of infection or death from COVID-19.  Under such circumstances, many of the Louisiana NAACP's members would, if eligible, seek to vote by absentee mail in ballot during the November and December elections. If the Challenged Provisions are maintained for the November and December 2020 elections, many of the Louisiana

NAACP's most vulnerable members will not be eligible to vote by absentee mail-in ballot under any of the limited number of existing excuses.

28.     Additionally, as a direct result of the maintenance of the Challenged Provisions for the upcoming elections, the Louisiana NAACP has diverted its limited resources to monitor and investigate the impact of the Challenged Provisions on its members given COVID-19's disproportionate impact on Black Louisianans, and has advocated for modifications of the Challenged Provisions.  The organization has spent money and resources on obtaining masks and sanitization products to provide its members so that their individual members are prepared to vote in-person if required to do so. As part of its efforts, the organization estimates that it will require about 300 volunteers to spend approximately 480 hours at over 30 branches throughout the state to hand out 40,000 to 45,000 masks and hand sanitizers.

29.     Louisiana NAACP has also spent money and resources on advertising and virtual canvassing and public education for community members in response to widespread concerns among its members about the health risks of congregating at polling places when voting in-person.

30.     Plaintiff the Power Coalition for Equity and Justice ("PCEJ") is a nonpartisan, nonprofit statewide civic engagement table in Louisiana that works to build grassroots power, advocate for community-centered policies, and increase voter participation.  PCEJ focuses on voter registration and re-enfranchisement.  In anticipation of the 2020 cycle, a substantial portion of PCEJ's resources were also prioritized for efforts to increase Census participation.  PCEJ advances its mission with the support of full-time staff, community volunteers, and a team of nonprofit and advocacy organizations.  In 2019, PCEJ engaged with 465,406 infrequent and semi-frequent voters of color through hundreds of thousands of doors knocked, phone calls, and text messages totaling

over 1.2 million contact attempts.  PCEJ also routinely provides rides to the polls and rapid response voter support on election days.

31.    Since the COVID-19 pandemic began, PCEJ has had to shift its focus, and its resources, from registration, re-enfranchisement, and Census outreach, to focus on educating voters of the state's new and changing vote by mail requirements—activities outside of PCEJ's general activities.  For example, time allocated to answering questions regarding eligibility to vote by mail went from a small portion of PCEJ's voter education work to a constant and complicated effort. These questions have represented almost half of all inquiries PCEJ has fielded in recent months and have distracted from other efforts to register voters, drive Census participation, and train and recruit volunteers.  In the absence of Defendants' guidance regarding the Emergency Plan during the July and August elections, time that would have otherwise been spent developing educational materials regarding the Census, voting rights restoration for the formerly incarcerated, and voter registration, has been reallocated to developing and correcting multiple versions of documents describing how absentee voting qualifications have evolved and reverted during the pandemic.  Because Louisiana has now reinstated the Challenged Provisions by refusing to extend the terms of the Emergency Plan to the November and December elections, PCEJ now needs to educate voters regarding the state's shifting requirements.  After voters were required to learn and interpret five pandemic-specific qualifications for mail balloting in July and August, they will now need to be re-educated that this no longer is the case in the fall and winter.  Similarly, while early voting was extended for the primary, it has not been extended for the general election and new timelines will apply.  Educating voters as to all of these changing rules, dates, and deadlines will require PCEJ to divert resources from its registration and re-enfranchisement activities.

32.     Due to the documented and anticipated shortage of poll workers during the pandemic,[26] PCEJ has launched new efforts to encourage its members and constituents to sign up to serve as a poll workers.  PCEJ has identified poll worker shortages as a risk factor for polling site closures, as well as long lines and congestion during early and Election Day voting hours, which exacerbate the threat of COVID-19 transmission.  Accordingly, PCEJ has diverted volunteer recruitment efforts from PCEJ's own Election Day "Get Out the Vote" ("GOTV"), rides to the polls, and election monitoring efforts to instead steer potential volunteers to work as government-paid poll workers.  If the Challenged Provisions were not in effect, the threat of long lines and congestion at polling sites would be mitigated and PCEJ would not be forced to steer its own volunteers to instead work as poll workers or spend numerous hours developing outreach materials to promote this new call to action.

33.     Defendant John Bel Edwards is the Governor of Louisiana and is being sued in his official capacity.  Under the Louisiana Constitution, he is "the chief executive officer of the state," and must "faithfully support the constitution and laws of the state and of the United States," as well as ensure that "the laws are faithfully executed."  La. Const. art. IV, § 5(A).  Like other executive officers of the State, Defendant Edwards is required to uphold the U.S. Constitution, including the Fourteenth and Fifteenth Amendments to it, as part of the execution of his gubernatorial duties and responsibilities.  4 U.S.C. § 101.  His authority to protect public health

---

[26] *See, e.g.*, Rob Masson, *Voting officials take precautions ahead of Saturday election,* FOX 8 (July 9, 2020) https://www.fox8live.com/2020/07/09/voting-officials-take-precautions-ahead-saturday-election/ (citing the Orleans Clerk of Court Arthur Morrell stating that "over 2 dozen commissioners to come down with the virus and others have chosen not to participate."). Blake Paterson, *Here's what Baton Rouge is doing to keep Saturday's election safe from coronavirus*, THE ADVOCATE (July 10, 2020), https://www.theadvocate.com/baton_rouge/news/coronavirus/article_380be82a-c200-11ea-a37d-e719d52e7c7a.html (citing that East Baton Rouge Clerk of Court's election administrator said that the Parish was "operating at their 'bare minimum' number of poll workers.").

during the pandemic in connection with elections was exercised by his order postponing the primary elections.[27]

34.    Defendant Robert Kyle Ardoin is the Louisiana Secretary of State and is being sued in his official capacity.  The Secretary of State is the "chief election officer of the state."  La. Const. art. IV, § 7; La. R.S. 18:421.  Defendant Ardoin is responsible for, among other things, preparing and certifying the ballots for all Louisiana elections, promulgating all election returns, and promulgating and publishing all laws enacted by the legislature.  La. Const. art. IV, § 7; La. R.S. 18:18; 18:421.  Defendant Ardoin promulgated the Emergency Plan for the July and August elections pursuant to the authority granted to him under Ls. R.S. 18:401.3.  Since the July Primary, Defendant Ardoin has declined to extend the terms of the Emergency Plan to the November and December election.

## STATEMENT OF FACTS

## I.    The COVID-19 Pandemic

### A.    The Known Health Consequences of COVID-19

35.    COVID-19 is the respiratory infection caused by the novel coronavirus SARS-CoV-2.  It transmits through respiratory droplets, which are spread primarily through close in-person contacts.[28]  It may also spread when individuals touch their mouth, nose, or eyes after touching a surface that has the virus on it.[29]

---

[27] La. Exec. Dep't Proclamation No. 28 JBE 2020 (Mar. 13, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/modified/28-JBE-2020-Special-Elections-COVID19-Postponement.pdf.

[28] CDC, Coronavirus Disease 2019 (COVID-19): *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last updated July 16, 2020).

[29] *Id*.

36.    There is also growing evidence that the virus-carrying respiratory particles can remain suspended in the air for hours in indoor spaces.[30]  As of July 9, 2020, the World Health Organization ("WHO") has also confirmed that "droplets carrying the coronavirus may be airborne and people who spend long periods in crowded settings with inadequate ventilation may be at risk of becoming infected.[31]

37.    Medical professionals continue to identify new effects of COVID-19, including lung, heart, and brain damage.[32]  The novel coronavirus can severely damage lung tissue, cause permanent loss of respiratory capacity, and damage tissues in the kidney, heart, and liver.[33]  It may trigger strokes and seizures, leading to serious brain impairments.[34]  It is lethal at its worst.

38.    The virus can be spread by symptomatic, asymptomatic, and pre-symptomatic individuals, which means that only isolating those who are symptomatic will not slow the spread of COVID-19.[35] The health effects of COVID-19 vary by patient and demographic subgroup. Eighty percent of COVID-19 deaths in the United States have occurred among people aged 65 and

---

[30] Jamie Ducharme, *After Push From Experts, World Health Organization Says It's Possible COVID-19 Spreads by Air*, TIME (July 9, 2020), https://time.com/5865080/who-airborne-transmission-covid-19/.

[31] N.Y. Times, *Under Pressure from Scientists Globally, the W.H.O. Acknowledges That the Virus Can Linger in the Air Indoors*, N.Y. TIMES (July 9, 2020), https://rb.gy/ba45tu.

[32] Jacqueline Howard, *COVIID-19's impact on the heart: Two new studies suggest 'the plot thickening'*, CNN (July 28, 2020), https://www.cnn.com/2020/07/28/health/covid-heart-damage-two-studies/index.html.

[33] CDC, Coronavirus Disease 2019 (COVID-19): *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last updated June 30, 2020).

[34] *See* Roni Caryn Rabin, *Some Coronavirus Patients Show Signs of Brain Ailments*, N.Y. TIMES (Apr. 1, 2020), https://www.nytimes.com/2020/04/01/health/coronavirus-stroke-seizures-confusion.html.

[35] Nathan W. Furukawa, et al., *Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic*, 26 CDC EMERGING INFECTIOUS DISEASES (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article#:~:text=Recent%20epidemiologic%2C%20virologic%2C,symptoms%20never%20develop)..

older. [36]  While older age groups face heightened risks of death, people of all ages have been infected and killed by COVID-19. The CDC has now explained that the risk of COVID-19 increases steadily with age.[37]

39.    The CDC has identified certain preexisting medical conditions that pose a higher risk of COVID-19 infection for people across all ages, such as cancer, chronic kidney disease, serious heart disease, COPD (chronic obstructive pulmonary disease), a compromised immune system, obesity, type 2 diabetes, and the newly added sickle cell disease, an inherited blood disorder that disproportionately affects Black Americans.[38]

**B.    COVID-19's Impact**

40.    The rapid spread of COVID-19 has triggered a global health crisis of unprecedented consequence.  By April 2020, the United States became the epicenter of the pandemic, surpassing other nations in both instance and concentration of infection.[39]  By July 30, 2020, there were over 4 million cases in the United States, and more than 154,000 deaths caused by COVID-19.[40]  Due to testing shortages, false negatives, and asymptomatic individuals, the actual numbers of cases

---

[36] CDC, Coronavirus Disease 2019 (COVID-19): *Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[37] *Id.*

[38] CDC, Coronavirus Disease 2019 (COVID-19): *Groups at Higher Risk of Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited July 28, 2020); Lena H. Sun & Joel Achenbach, *CDC chief says coronavirus cases may be 10 times higher than reported*, WASH. POST, (June 25, 2020), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/.

[39] David Smith, *US Surpasses China for Highest Number of Confirmed COVID-19 Cases in the World,* THE GUARDIAN (Mar. 27, 2020), https://www.theguardian.com/world/2020/mar/26/coronavirus-outbreak-us-latest-trump.

[40] United States Coronavirus, Worldometer, https://www.worldometers.info/coronavirus/country/us/; CDC, Coronavirus Disease 2019 (COVID-19): *Cases in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited July 30, 2020).

and deaths likely are much higher than reported.[41]   Data show that in Louisiana, the estimated number of infections was 16 times higher than the reported case counts.[42]

41.     According to the CDC, rates of the virus are "increasing in most regions" of the United States.[43]   Rates are climbing fastest amongst states that reopened major sectors of their economy such as restaurants and retail.[44]   Most important, the rates of new infections have risen most precipitously in states that have sought to reopen their economies.[45]

42.     A growing number of states (24 as of July 30, 2020), including Louisiana, are pausing or reversing their plans to reopen.[46]   On July 8, Dr. Fauci recommended that states with increasing rates of the virus "should seriously look at shutting down."[47]

43.     The sweeping health consequences of COVID-19 have had a ripple effect across the entire healthcare system.   This surge of COVID-19 patients has triggered shortages in

---

[41] Andrew Joseph, *Actual Covid-19 case count could be 6 to 24 times higher than official estimates, CDC study shows*, STAT (July 21, 2020), https://www.statnews.com/2020/07/21/cdc-study-actual-covid-19-cases/; Apoorva Mandavilli, *supra* note 15.

[42] CDC, *Interactive Serology Dashboard for Commercial Laboratory Surveys, Louisiana*, *supra* note 16.

[43] Florida and South Carolina were among the first states to reopen and as of July 9, 2020, were among the states leading the current surge of COVID-19 infection.   In contrast, the states that bore the brunt of cases in March and April but were slower to reopen have seen significant decreases in reported cases since.   Average daily cases in New York are down 52 percent since it reopened in late May and down 83 percent in Massachusetts.   CDC, Coronavirus Disease 2019 (COVID-19): *Cases in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited July 30, 2020).

[44] Lazaro Gamio, *How Coronavirus Cases Have Risen Since States Reopened*, N.Y. TIMES (July 9, 2020) https://www.nytimes.com/interactive/2020/07/09/us/coronavirus-cases-reopening-trends.html?action=click&module=Top%20Stories&pgtype=Homepage.

[45] *Id*.

[46] Jasmine C. Lee, et al., *See How All 50 States Are Reopening(and Closing Again)*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html (updated July 31, 2020).

[47] Kim Bellware, et al., *As coronavirus hospitalizations climb, Trump sidelines health advisors*, WASH. POST (July 9, 2020), https://www.washingtonpost.com/nation/2020/07/09/coronavirus-live-updates-us/.

healthcare staff, hospital beds, medical equipment, and personal protective equipment ("PPE").[48]
The CDC estimates that approximately 20% of those who are infected with COVID-19 require
hospitalization.[49]

    44.    The pandemic also has had devastating economic impacts.  Over 40 million people
have filed for unemployment insurance since the crisis hit.[50]

    45.    Experts have identified techniques that are effective in decreasing the transmission
rate of COVID-19.  Officials and public health experts have encouraged the practice of social
distancing through avoiding close in-person contacts, avoiding large gatherings, wearing masks in
public, and frequent and thorough handwashing.[51]

    46.    It is fully apparent that the virus will not soon disappear.[52]  As early as April 22,
2020, the lead member of the White House's COVID-19 Task Force, Dr. Fauci, flatly stated that
"[w]e will have coronavirus in the fall. . . .  I am convinced of that because of the degree of
transmissibility that it has, the global nature."[53]  He has not retreated from that view, and recently

---

[48] *See* Christi A. Grimm, Principal Deputy Inspector General, *Hospital Experiences Responding to the COVID-19 Pandemic: Results of the National Pulse Survey March 23–27, 2020 (OEI-06-20-00300)*, U.S. Dept. of Health & Human Servs., Office of Inspector General (Apr. 2020), https://oig.hhs.gov/oei/reports/oei-06-20-00300.pdf.

[49] CDC, Coronavirus Disease 2019 (COVID-19): *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19), supra* note 33.

[50] Tony Romm, *Americans have filed more than 40 million jobless claims in past 10 weeks, as another 2.1 million filed for benefits last week,* WASH. POST (May 28, 2020),
https://www.washingtonpost.com/business/2020/05/28/unemployment-claims-coronavirus/; Lance Lambert, *Over 44.2 million Americans have filed for unemployment during the coronavirus pandemic*, FORTUNE (July 11, 2020), https://fortune.com/2020/06/11/us-unemployment-rate-numbers-claims-this-week-total-job-losses-june-11-2020-benefits-claims/.

[51] Lisa Lockerd Maragakis, M.D., M.P.H , *Coronavirus, Social and Physical Distancing and Self-Quarantine*, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social distancing-and-self-quarantine (last updated July 15, 2020).

[52] *See* Sarah Zhang, *A Vaccine Reality Check*, THE ATLANTIC (July 24, 2020), https://www.theatlantic.com/health/archive/2020/07/covid-19-vaccine-reality-check/614566/.

[53] Video: *'We Will have Coronairus in the Fall,' Fauci Says*, N.Y. TIMES (Apr. 22, 2020), https://www.nytimes.com/video/us/politics/100000007102807/coronavirus-fall-fauci.html.

said that U.S. is still "knee-deep" in the first wave of COVID-19 and that health officials see "an end in sight" to the pandemic.[54]  Even the President has warned that the pandemic will "get worse before it gets better."[55]

47.     The cycle of reopening increased viral spread, and subsequent re-closing of local economies will continue until a vaccine is developed and readily available.[56]  Dr. Fauci testified before the Senate that "the idea of having treatments available, or a vaccine" by this fall "would be something that would be a bit of a bridge too far."[57]

**C.      The COVID-19 Pandemic in Louisiana, the Current Spike in Cases, and the Reversal of the State's Reopening Plan**

48.     Louisiana is among the states hit hardest by the COVID-19 pandemic.[58]  Indeed, cases of COVID-19 are again on the rise, which has prompted a reversal of the state's attempted reopening.[59]

49.     On March 11, at the beginning of the pandemic and with cases of the virus on the rise, Governor Edwards issued Proclamation No. 25 JBE 2020, declaring a State of Emergency for

---

[54] Robert King, *Fauci says U.S. "still knee-deep in the first wave" of COVID-10 as daily cases top 50k*, FIERCE HEALTHCARE (July 6, 2020), https://www.fiercehealthcare.com/hospitals/fauci-clarifies-u-s-not-midst-new-covid-19-wave-as-daily-cases-top-50k; Berkeley Lovelace Jr., *Dr. Anthony Fauci warns the coronavirus won't ever be eradicated*, CNBC (July 22, 2020), https://www.cnbc.com/2020/07/22/dr-anthony-fauci-warns-the-coronavirus-wont-ever-be-totally-eradicated.html.

[55] Lovelace Jr.*, supra note 54.*

[56] Dr. David Nabarro, a WHO Special Envoy on COVID-19, has warned that the virus will continue to pose a serious threat to Americans until a vaccine is developed, stating: "We think it's going to be a virus that stalks the human race for quite a long time to come until we can all have a vaccine that will protect us and that there will be small outbreaks that will emerge sporadically and they will break through our defenses." Devan Cole, *Fauci admits earlier Covid-19 mitigation efforts would have saved more American lives*, CNN (Apr. 12, 2020), https://www.cnn.com/2020/04/12/politics/anthony-fauci-pushback-coronavirus-measures-cnntv/index.html.

[57] Dr. Anthony Fauci & CDC Director Senate Testimony Transcript May 12 at 52:25, Rev (May 12, 2020), https://www.rev.com/blog/transcripts/dr-anthony-fauci-cdc-director-senate-testimony-transcript-may-12

[58] Janet Mcconnaughey, *Louisiana crosses threshold of 100k confirmed virus cases*, SFGATE (July 23, 2020), https://www.sfgate.com/news/article/Louisiana-crosses-threshold-of-100K-confirmed-15429638.php .

[59] *Louisiana Coronavirus Map and Case Counts,* N.Y. TIMES, *supra* note 3.

Louisiana.[60]    Two days later President Donald Trump proclaimed a National Emergency concerning COVID-19.[61]    Through early March, Governor Edwards enacted increasingly expansive measures to prevent large gatherings and close non-essential businesses. [62]

50.    On March 13, upon the recommendation of Secretary of State Ardoin, Governor Edwards issued Proclamation No. 28 JBE 2020, which rescheduled the April 4, 2020 presidential preference primary election to June 20, 2020 and the May 9, 2020 municipal general election to July 25, 2020. [63]    It delegated responsibility to the Secretary of State, Commissioner of Elections, Parish Boards of Election Supervisors, Clerks of Court, Registrars of Voters, and any others charged with conducting elections in Louisiana to "do every act necessary to conduct the elections."[64]

51.    On March 22, Governor Edwards issued Proclamation No. 33 JBE 2020, a statewide Stay-at-Home order requiring "all individuals within the state of Louisiana . . . to stay home unless performing an essential activity," cancelling public gatherings of more than 10

---

[60] La. Exec. Dep't Proclamation No. 25 JBE 2020 (Mar. 11, 2020), https://gov.louisiana.gov/assets/ExecutiveOrders/25-JBE-2020-COVID-19.pdf.

[61] Proclamation No. 9994, 85 Fed. Reg. 15337 (Mar. 18, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[62] On March 13, Governor Edwards issued Proclamation No. JBE 2020-27, which, among other things, banned public gatherings of more than 250 people and closed all K-12 public schools statewide until at least April 13, 2020. La. Exec. Dep't Proclamation No. JBE 2020-27 (Mar. 13, 2020), https://gov.louisiana.gov/assets/ExecutiveOrders/27-JBE-2020-COVID-19.pdf. On March 16, Governor Edwards issued Proclamation No. JBE 2020-30, which, among other measures, banned public gatherings of more than 50 people, closed or limited the operations of certain, "non-essential" businesses (e.g., casinos, bars, restaurants, gyms, etc.) statewide until at least April 13, 2020; La. Exec. Dep't Proclamation No. JBE 2020-30 (Mar. 16, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/modified/30-JBE-2020-Public-Health-Emergency-COVID-19.pdf.

[63] La. Exec. Dep't Proclamation No. 28 JBE 2020, *supra* note 27.

[64] *Id.*

people, and expanding the definition of "non-essential" businesses.[65]  It directed individuals in Louisiana to "maintain a distance of six feet from one another and abide by the 10-person limitation on gathering size.[66]  It ordered residents to limit movement outside the home, until at least April 13, 2020, except for the purpose of visiting essential businesses, obtaining non-elective medical care, performing their job at essential businesses, visiting family, exercising, and going to a place of worship.[67]  On Aril 14, upon the recommendation of Secretary of State Ardoin, Governor Edwards issued Proclamation No. 46 JBE 2020, further postponing or rescheduling all elections scheduled to be held in the State.  The June 20, 2020 presidential preference primary election in Louisiana was rescheduled for July 11, 2020.  The July 25, 2020 municipal election was rescheduled for August 15, 2020.[68]

52.    On April 27, 2020, an Emergency Plan for the July 11, 2020 and August 15, 2020 elections was approved by the full Louisiana State House (passing 62–39) and State Senate (passing 31–8).  As explained in further detail below, this plan (1) extended the early voting period from seven to thirteen days; and (2) created five new excuses, or grounds for requesting an absentee ballot related to COVID-19.[69]

---

[65] La. Exec. Dep't Proclamation No. JBE 33 2020 (Mar. 22, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/JBE-33-2020.pdf.

[66] Id.

[67] Id.

[68] La. Exec Dep't Proclamation No. 46 JBE 2020 (Apr. 14, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/46-JBE-2020-Elections-Rescheduled.pdf.

[69] Secretary of State Emergency Election Plan for the July 11, 2020 Presidential Preference Primary and August 15, 2020 Municipal General Elections in the State of Louisiana (Apr. 20, 2020), *supra* note 20.

53.    On April 27, Governor Edwards announced that Louisiana's Stay-at-Home order would be extended until at least May 15 in order to continue to slow the spread of the disease, officially implementing the extension on April 30.[70]

54.    After reaching a peak of 2,278 new cases on April 13, and a peak of 129 deaths on April 14, the spread of the virus decreased substantially throughout the period of the Stay-at-Home Order.[71]

55.    On May 14, however, Governor Edwards signed Proclamation No. 58 JBE 2020, to move Louisiana to "Phase One" of the state's reopening plan, "The Roadmap to a Resilient Louisiana," the next day, May 15.[72]  The order lifted the statewide Stay-at-Home order and allowed more businesses including restaurants, barber shops, and retail, to open at reduced capacity and while following safety measures including social distancing and face covering.[73]

56.    On June 4, 2020, Governor Edwards signed Proclamation 74 JBE 2020, moving Louisiana to Phase Two of reopening, a step which included allowing places of worship and many businesses, including restaurants and barbershops, to open at 50% capacity while observing social distancing and other safety measures.[74]

---

[70] La. Exec. Dep't Proclamation No. 52 JBE 2020 (Apr. 30, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/52-JBE-2020-Stay-at-Home-Order.pdf.

[71] *Louisiana Coronavirus Map and Case Count,* N.Y. TIMES, *supra* note 3.

[72] Press Release, Office of the Governor, *Gov. Edwards Signs Order Moving Louisiana to Phase One on May 15 COVID-19* (May 14, 2020), https://gov.louisiana.gov/news/PhaseOne.

[73] La. Exec. Dep't Proclamation No. 58 JBE 2020 (May 14, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/58-JBE-2020.pdf.

[74] La. Exec. Dep't Proclamation No. 74 JBE 2020 (June 4, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/74-JBE-2020-State-of-Emergency-COVID-19-Resilient-Louisiana-Phase-2.pdf.

57.     Within weeks, the rate of new cases climbed rapidly.  Throughout May and June, the seven-day average of new cases in Louisiana never exceeded 500 cases, and was usually closer to 400 cases.[75]  Since July 1, the seven day average has consistently remained above 1,000 cases a day; and has, at times, climbed higher than 2,000 cases a day.[76]  The peak 7-day moving average of new daily cases, 2,267 (July 26), is over 40% higher than the previous peak.[77]

58.     The ongoing pandemic has slowed—indeed, has completely stopped—Louisiana's re-opening plans.  On June 22, 2020, Governor Edwards announced that Louisiana was unable to move on from Phase 2 of the State's reopening plan due to failures to flatten the curve.[78]  At the time of the Governor's decision, the state has had over 50,000 cases and over 3,000 deaths resulting from COVID-19.[79]

59.     On July 11, 2020, the state's Presidential Preference Primary and Municipal Primary Election Day, in response to the growing number of cases in the state, Governor Edwards issued Proclamation 89 JBE 2020, "COVID-19 Public Health Emergency Additional Phase 2 Mitigation Measures," which, among other things, mandated mask wearing in public, closed all bars, and reduced permissible crowd sizes to no more than 50 people in any single indoor space,

---

[75] *Louisiana Coronavirus Map and Case Count,* N.Y. TIMES, *supra* note 3; *see also* Emma Discher, et al., *Louisiana coronavirus: State reports over 2,000 more case for fourth day in a row*, NOLA.COM (July 17, 2020), https://www.nola.com/news/coronavirus/article_533e7a30-c83c-11ea-bce4-fbd7db69f971.html..

[76] *Louisiana Coronavirus Map and Case Counts,* N.Y. TIMES, *supra* note 3.

[77] *Id.*

[78] *See* Press Release, Office of the Governor, *Gov. Edwards Issues Order Keeping Louisiana in Phase Two, Encourages Louisianans to Mask Up* (June 25, 2020), https://gov.louisiana.gov/index.cfm/newsroom/detail/2573.

[79] *See Gov. Edwards Says Louisiana Will Not Move Into Phase 3*, WDSU (June 29, 2020), https://www.wdsu.com/article/watch-live-gov-john-bel-edwards-addressing-phase-three-reopening-decision/32933858#.

or in any outdoors space where individuals will be in close proximity and unable to social distance.[80]  The crowd size limitation does not apply to essential businesses and operations.[81]

60.    On July 21, 2020, due to the ongoing spike in COVID-19 cases and deaths across the state and the rise in hospitalizations, Governor Edwards announced that "Louisiana is not ready to move to Phase Three" and that he would further extend Phase Two of the state's reopening, including the statewide mask mandate and other mitigation measures.[82]   On July 23, when the governor signed the order extending Phase Two, he announced that Louisiana had surpassed 100,000 known COVID-19 cases, and stated "COVID-19 is very prevalent throughout our state, and it is more widespread than ever before."[83] On July 30, he signaled that the state would remain in Phase Two and that based on current data, should not expect any major changes to the reopening plan.[84]

---

[80] La. Exec. Dep't Proclamation No. 89 JBE 2020 (July 11, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/89-JBE-2020.pdf.

[81] *Id*.

[82]  Press Release, Office of the Governor, *Gov. Edwards Will Extend Current Phase Two Order, With Current Mask Mandate, Gathering Size Limit and Bar Restrictions* (July 21, 2020), https://gov.louisiana.gov/index.cfm/newsroom/detail/2605

[83] Press Release, Office of the Governor, *Gov. Edwards Signs Order Extending Phase Two and the Statewide Mask Mandate as Louisiana Surpasses 100,000 Known COVID-19 Cases* (July 23, 2020), https://gov.louisiana.gov/index.cfm/newsroom/detail/2609

[84] Sam Karlin, *Looser Louisiana coronavirus restrictions are unlikely in the coming weeks, John Bel Edwards says*, THE ADVOCATE (June 30, 2020), https://www.theadvocate.com/baton_rouge/news/coronavirus/article_b97356fe-d2a5-11ea-b4fe-ef446db6e151.html.

61.     As of July 30, 2020, over 3,800 Louisianans had died from COVID-19.[85]  Louisiana has had the highest number of cases per million residents of any U.S. state.[86]  Cases have been on an upward trajectory through late June and July.[87]

### D.     COVID-19's Disproportionate Impact on Black People in Louisiana

62.     As the COVID-19 pandemic has spread across the country, it has taken a devastating toll on Black people, who make up a disproportionate number of confirmed cases and deaths resulting from the virus.[88]  Nationwide data from the CDC shows that Black residents of the U.S. have been three times as likely to become infected with COVID-19 than white residents, and nearly twice as likely to die from the virus as white people.[89]  Additionally, as of July 18, 2020, the CDC reports that age-adjusted COVID-19 associated hospitalization rates by race by and ethnicity reveal that non-Hispanic Black people have a rate approximately 5 times that of non-Hispanic white people.[90]

63.     Indeed, the CDC has recognized that "[l]ong-standing systemic health and social inequities have put many people from racial and ethnic minority groups at increased risk of getting sick and dying from COVID-19."[91]  Specifically, the CDC identifies some of the many racial

---

[85] La. Dep't of Health, *Coronavirus (COVID-19)*, *supra* note 5.

[86] David Leonhardt, *Graph: World's Worst Outbreaks*, N.Y. TIMES, *supra* note 9.

[87] *Louisiana Coronavirus Map and Case Counts,* N.Y. TIMES, *supra* note 3.

[88] Richard A. Oppel, Jr., et al., *The Fullest Look Yet at the Racial Inequity of Coronavirus*, N.Y. TIMES (July 5, 2020), https://www.nytimes.com/interactive/2020/07/05/us/coronavirus-latinos-african-americans-cdc-data.html; *see also* The COVID Tracking Project, *The COVID Racial Data Tracker*, https://covidtracking.com/race (last visited July 30, 2020).

[89] *Id*.

[90] CDC, Coronavirus Disease 2019 (COVID-19): *Data Visualization*, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/data-visualization.htm (last updated July 24, 2020).

[91] CDC, Coronavirus Disease 2019 (COVID-19): *Health Equity Considerations and Racial and Ethnic Minority Groups*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html (last updated July 24, 2020).

inequities in social determinants of health that put racial and ethnic minority groups at increased risk of getting sick and dying from COVID-19, including systemic discrimination in "health care, housing, education, criminal justice, and finance" that "can lead to chronic and toxic stress and shapes social and economic factors"; limited healthcare access and utilization; working conditions; inequities in education, income, and wealth; and housing and living conditions.[92]

64.    In Louisiana, racial disparities in infections and deaths resulting from the coronavirus have been particularly acute.[93] On April 6, Governor Edwards announced that initial data categorizing deaths resulting from COVID-19 by race showed that Black people comprised 70% of deaths, despite making up only 32% of Louisiana's population.[94] The Governor called this alarming statistic "a disturbing trend and one that deserves our attention," and announced the creation of the Louisiana COVID-19 Health Equity Task Force to explore "how health inequities are affecting communities that are most impacted by the coronavirus."[95]

65.    Since April 2020, data updated weekly by the Louisiana Department of Health has continually indicated that the COVID-19 death rate remains disproportionately high for Black people at over 50% and as high as 70%.[96] As of July 30, the state Department of Health reported that the death rate among Black Louisianans was 50.29%.[97] Further, Louisiana Department of

---

[92] *Id.*

[93] Louisiana COVID-19 Health Equity Taskforce, *July COVID Taskforce Subcommittee* Reports, 12, 62 (July 2020), http://www.sus.edu/assets/sus/LAHealthEquityTaskForce/JULY-COVID-Task-Force-Subcommittee-Reports.pdf.

[94] Gordon Russell & Sam Karlin, *Coronavirus disparity in Louisiana: About 70% of victims are black, but why?*, nola.com (Apr. 6, 2020), https://www.nola.com/news/coronavirus/article_d804d410-7852-11ea-ac6d-470ebb61c694.html.

[95] Press Release, Office of the Governor, *Gov. Edwards Announces Creation of COVID-19 Health Equity Taskforce* (Apr. 10, 2020), https://gov.louisiana.gov/index.cfm/newsroom/detail/2457.

[96] La. Dep't of Health, *Coronavirus (COVID-19)*; *supra* note 5.

[97] *Id.*

28

Health data reporting COVID-19 deaths and cases by race and parish[98] show that of the 30 parishes with more than 25 total deaths, all but 3 reflect Black death rates disproportionate to their share of the parish population. For example, in Ascension Parish, Black residents only make up 24% of the parish population but 56% of the COVID-19 deaths. In the same 30 parishes, all but 2 reflect Black COVID-19 case rates disproportionate to the Black percentage of the parish population.[99] These figures mirror trends reflecting significant racial inequity in the levels of COVID-19 cases and deaths throughout the country.[100]

66.     The stark racial disparities reflected in COVID-19's effects on Louisiana's residents are a manifestation of longstanding discrimination and socioeconomic inequities in the state.[101] According to 2018 American Community Survey 1-Year estimates, in Louisiana, 30% of all Black residents compared to 12% of all white residents live in poverty; the unemployment rate is 9.9% for Black residents compared to 4.5% for white residents; per capita income for Black residents is $17,491, compared to $33,856 for white residents; 19% of Black residents have not finished high school compared to 10.8% of white residents; 7.8% of Black residents had no health insurance compared to 6.2% of white residents, and 15% of Black residents lacked a vehicle compared to 4.7% white residents.[102]

---

[98] Only parishes with 25 or more total deaths are included in the data. La. Dep't of Health, *Coronavirus (COVID-19)*, Deaths and Cases by Race and Parish, http://ldh.la.gov/Coronavirus/ (last visited July 30, 2020).

[99] *Id*.

[100] Richard A. Oppel Jr. et al., The Fullest Look Yet at the Racial Inequity of Coronavirus, N.Y. TIMES (July 5, 2020), https://www.nytimes.com/interactive/2020/07/05/us/coronavirus-latinos-african-americans-cdc-data.html

[101] Louisiana COVID-19 Health Equity Taskforce, *July COVID Taskforce Subcommittee* Reports, *supra* note 93.

[102] U.S. Census Bureau, 2010-2018 American Community Survey 1-Year Estimates: *Selected Social Characteristics of the United States: Louisiana* (2018), https://data.census.gov/cedsci/table?q=s0201&tid=ACSSPP1Y2018.S0201&y=2018&t=400%20-%20Hispanic%20or%20Latino%20%28of%20any%20race%29%20%28200-299%29%3A451%20-%20White%20alone,%20not%20Hispanic%20or%20Latino%3A453%20-%20Black%20or%20African%20American%20alone,%20not%20Hispanic%20or%20Latino%3ARace%20and%20Ethnicity&hidePreview=true&moe=false&g=0400000US22.

67.     Together with race and class biases that impact access to healthcare, these racially disparate socioeconomic conditions contribute to adverse health conditions and outcomes that predispose Black people to contracting COVID-19.  According to statistics from the Louisiana State Health Department, the number of deaths from asthma, heart disease, diabetes, and severe obesity are higher for Black people than for whites.[103]  The CDC has cited higher rates of chronic conditions among racial and ethnic minority groups as a factor that influences the disproportionate impact of COVID-19 on the Black population.[104]

68.     Racial disparities in employment and access to transportation also make it more difficult for Black people to take measures that mitigate the risks posed by COVID-19, including engaging in social isolation or working from home.  In Louisiana, 29.9% of Black people 16 years and over who are employed work in service industry occupations compared to only 14.8% of white people, and only 24.7% are in management and business positions, positions more likely to facilitate remote work, as compared to 39.3% of white people, thus, Black people face a higher degree of exposure to COVID-19 both at their workplace and in transit.[105]

69.     The COVID-19 pandemic has both exposed and exacerbated deep-rooted and systemic inequalities faced by Black people throughout the country, and in Louisiana in particular.

**E.     The COVID-19 Pandemic and Voting**

70.     The CDC has issued specific guidance concerning safe voting practices during the COVID-19 pandemic to prevent spread of the coronavirus.  In particular, the CDC has warned of

---

[103] La. Dep't of  Health, Community Partnerships & Health Equity, *Minority Health Indicators*, http://ldh.la.gov/index.cfm/page/672.

[104] CDC, Coronavirus Disease 2019 (COVID-19): *Health Equity Considerations and Racial and Ethnic Minority Groups*, *supra* note 91.

[105] U.S. Census Bureau, 2010-2018 American Community Survey 1-Year Estimates: *Selected Social Characteristics of the United States: Louisiana* (2018), *supra* note102.

the high risk of COVID-19 transmission when elections are only in-person on a single day.[106] Further, it recommends that states "offer alternative voting methods that minimize direct contact and reduce crowd size at polling locations."[107]

71.  While COVID-19 spreads rapidly in crowds, like those at congested polling sites, there is no evidence that it spreads through the mail.[108]

72.  Across the country, voters and election workers have already fallen victim to COVID-19 through contacts made at in-person polling sites.  Most recently, a poll worker who worked in a polling place in Piedmont, Alabama, during the July 14 primary runoff election, tested positive for COVID-19 and was hospitalized just days after the election.[109]  After Florida's March 17 primary, two Broward County poll workers tested positive for COVID-19, one of whom was handling driver's licenses as part of the identification verification process.[110]  Chicago officials later reported that a poll worker died of COVID-19 after working at the polls on March 17, with

---

[106] CDC, Coronavirus Disease 2019 (COVID-19): *Considerations for Election Polling Locations and Voters: Interim guidance to prevent spread of coronavirus disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated June 22, 2020).

[107] *Id*.

[108] CDC, Coronavirus Disease 2019 (COVID-19): *Frequently Asked Questions*, https://www.cdc.gov/coronavirus/2019-ncov/faq.html (last updated July 15, 2020).

[109] Eddie Burkhalter, *Piedmont poll worker in Tuesday's runoff tests positive for COVID-19, hospitalized*, ALABAMA POLITICAL REPORTER (July 20, 2020), https://www.alreporter.com/2020/07/20/piedmont-poll-worker-in-tuesdays-runoff-tests-positive-for-covid-19-hospitalized/.

[110] Anthony Man, *Two Broward poll workers, including one who handled voters' driver licenses, test positive for coronavirus*, S. FLA. SUN SENTINEL (Mar. 26, 2020), https://www.sun-sentinel.com/coronavirus/fl-ne-broward-elections-poll-workers-coronavirus-20200326-wmgy775dvjc5jis2oagxlpmule-story.html.

officials identifying individuals with confirmed coronavirus cases at additional polling locations.[111]

73.     Just weeks later, in-person voting proceeded in Wisconsin, where voters in Milwaukee and Green Bay waited in multi-hour lines.[112] Following that election, a contact-tracing analysis conducted by the Wisconsin Department of Health found that 52 persons who voted under these conditions tested positive for COVID-19, and economists have found a "statistically and economically significant association between in-person voting and the spread of COVID-19 two to three weeks after the election."[113] Importantly, these statistics and images may represent a *mild* version of the outcome for Louisiana voters, because the risks of COVID-19 in Wisconsin's in-person primary were muted by Wisconsin's no-excuse absentee ballot laws, which enabled more than one million Wisconsin's residents to vote safely from home.[114]

74.     Expanded access to voting by mail for all voters also helps to reduce lines and crowds at polling sites by allowing some people who would otherwise vote in person to vote by mail. Indeed, meaningful opportunities to vote in person are still necessary for many voters, including but not limited to people who are homeless, disabled, have limited English proficiency,

---

[111] *See* Mary Ann Ahern, *Poll Worker at Chicago Voting Site Dies of Coronavirus, Election Officials Say*, NBC CHICAGO (Apr. 13, 2020), https://www.nbcchicago.com/news/local/chicago-politics/poll-worker-at-chicago-voting-site-dies-of-coronavirus-election-officials-say/2255072/.

[112] Devi Shastri, *In-person voting was likely a 'disaster' for Wisconsin's efforts to flatten coronavirus curve, national experts say*, MILWAUKEE J. SENTINEL (Apr. 8, 2020), https://www.jsonline.com/story/news/politics/elections/2020/04/08/coronavirus-wisconsin-election-likely-hurt-effort-flatten-curve/2961718001/.

[113] Chad D. Cotti et al., *The Relationship Between In-Person Voting, Consolidated Polling Locations, and Absentee Voting on COVID-19: Evidence from the Wisconsin Primary* at 1–2, NATIONAL BUREAU OF ECON. RESEARCH (May 2020), https://www.nber.org/papers/w27187.pdf.

[114] Wisconsin Elections Comm'n, *I Want to Vote Absentee* (last visited July 31, 2020), https://www.elections.wi.gov/voters/absentee; Laurel White, *More Than 1M in Wisconsin Vote By Mail, But Full Election Turnout Still Unclear*, WISCONSIN PUB. RADIO (Apr. 8, 2020), https://www.wpr.org/more-1m-wisconsin-vote-mail-full-election-turnout-still-unclear.

or are illiterate and need accessible voting machines and personal assistance, who will continue to rely on in-person voting to participate in the democratic process.

75.    The CDC recommendations also address best practices for in-person voting during the COVID-19 pandemic, including sanitizing surfaces and maintaining 6 feet of distance between individuals, and further, recommends offering "early voting or extended hours," in order to minimize contact and reduce crowd size at polling locations.[115]  Maximizing options for voters, including expanding access to absentee voting and extending the in-person early voting period, ensures less congestion at polling sites, while maintaining inclusive access to the franchise.

76.    The majority of states, that is, 34 and the District of Columbia, already offer all eligible voters a vote-by-mail ballot option.[116]  Of the 16 states that require an excuse to vote absentee by mail, several have expanded the scope of absentee eligibility in recognition of the extensively documented threat that the pandemic continues to pose to the public and in response to the well-founded health and safety concerns of qualified voters.[117]

---

[115] CDC, Coronavirus Disease 2019 (COVID-19): *Considerations for Election Polling Locations and Voters: Interim guidance to prevent spread of coronavirus disease 2019 (COVID-19)*, *supra* note 106.

[116] The Brennan Ctr. for Just., Research & Reports: Preparing Your State for an Election Under Pandemic Conditions, https://www.brennancenter.org/our-work/research-reports/preparing-your-state-election-under-pandemic-conditions (last updated July 29, 2020).

[117] Kate Rabinowitz & Brittany Renee Mayes, *At least 76% of American voters can cast ballots by mail in the fall*, WASH. POST (July 22, 2020), https://www.washingtonpost.com/graphics/2020/politics/vote-by-mail-states/

77.    For    example,    Arkansas,[118]    Alabama,[119]    Delaware,[120]    Massachusetts,[121]    New

Hampshire,[122] Virginia,[123] and West Virginia[124] have, via varying interpretations, expanded the

scope of existing state election laws establishing absentee ballot eligibility for illness, injury, or

disability to now include all qualified voters concerned about or taking preventative measures

because of the COVID-19 pandemic.  Courts have similarly removed the burdens of witness and

notary requirements for absentee ballots within the context of the pandemic.[125]  Additionally, 39

---

[118] *See* THV11 Digital, *You can vote by absentee ballot in Arkansas due to coronavirus this November*, THV11
(July 2 2020), https://www.thv11.com/article/news/health/coronavirus/absentee-ballot-voting-arkansas-
coronavirus/91-6c512d44-80f8-45d2-9bfa-d516e84977b6 ("Governor Asa Hutchinson announced Thursday[, July
2] during his daily coronavirus briefing that anybody in Arkansas could vote by absentee ballot in the November
elections if they have a health concern related to COVID-19. Hutchinson made this announcement after Arkansas
Secretary of State John Thurston said that current laws allow the ability to vote with an absentee ballot due to the
pandemic."); *see also* Fox16 News, *Statement from Arkansas Secretary of State John Thurston on absentee ballots
in November because of COVID-19*, Fox16 News (June 25, 2020), https://www.fox16.com/news/local-
news/statement-from-arkansas-secretary-of-state-john-thurston-in-absentee-ballots-in-november-because-of-covid-
19/.

[119] Ala. Legis. Servs. Agency, *Absentee Voting During State of Emergency-General Election 2020, 17-11-3(e)* (July
17, 2020), https://www.sos.alabama.gov/sites/default/files/proposedRules/820-2-3-.06-.04ER.pdf;; *see also* Ala.
Code § 17-11-3(a)(2).

[120] *See* House Bill 346, An Act to Amend Title 15 of the Delaware Code Relating to Voting By Mail for the 2020
Non-Presidential Primary, General, and Special Elections (July 1, 2020),
https://legis.delaware.gov/BillDetail?legislationId=48136.

[121] An Act Relative to Voting Options in Response toCOVID-19, 191st General Court of the Commonwealth of
Mass., ch. 115 (2020), https://malegislature.gov/Laws/SessionLaws/Acts/2020/Chapter115 .

[122] Memorandum from the Sec'y of State and Att'y General to New Hampshire Election Officials re: Elections
Operations During the State of Emergency at 2 (Apr. 10, 2020) https://www.nhpr.org/sites/nhpr/files/202004/covid-
19_elections_guidance.pdf.

[123] HB1, *An Act to amend and reenact §§ 24.2-416.1, 24.2-452, 24.2-612, 24.2-700, 24.2-701, 24.2-701.1, 24.2-
702.1, 24.2-703.1, 24.2-703.2, 24.2-705.1, 24.2-705.2, 24.2-706, 24.2-709, and 24.2-1004 of the Code of Virginia,
relating to absentee voting; no excuse required (approved April 11, 2020),* https://lis.virginia.gov/cgi-
bin/legp604.exe?201+ful+CHAP1149.

[124] W. Va. Sec'y of State Mac Warner, Admin. Law Div., Notice Of An Emergency Rule (Mar. 20, 2020),
http://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId=53039&Format=PDF.

[125] *See League of Women Voters of Va. v. Va. State Bd. of Elections*, F. Supp. 3d, No. 6:20-cv-00024, 2020 WL
2158249, at *8 (E.D. Va. May 5, 2020) (approving order enjoining enforcement of absentee ballot witness
requirement, noting "[n]otwithstanding the proffered steps which could be taken to mitigate the risks to health in
(continued…)

states and the District of Columbia offer a period of in-person early voting, with an average length of 19 days.[126] Some states, including Montana[127] and Texas,[128] have expanded early voting opportunities for the November general election to reduce congestion at polling sites on Election Day.

## II. Voting Processes in Louisiana and Necessary Modifications to Mitigate Undue Burden on the State's Voters During the COVID-19 Pandemic

78.     Three major elections are scheduled to take place in Louisiana between August and the end of the calendar year, including major statewide and federal elections.  The elections are currently scheduled to take place on August 15, 2020 (Municipal General Election), November 3, 2020 (Presidential General and Open Congressional Primary Election), and December 5, 2020 (Congressional and Open General Election).[129]

79.     On July 11, Louisiana held its Presidential Primary Election.  Over 500,000 people voted.[130]  Of those, nearly 40% cast their ballots prior to Election Day—about 19% chose to vote

---

having somebody witness one's absentee ballot, many would be dissuaded from exercising their vote both on account of the remaining health risks and required steps to mitigate them"); *League of Women Voters of Okla. v. Ziriax*, No. 118765, 2020 WL 2111348, at *1 (Okla. May 4, 2020) (barring use of notary requirement for absentee ballots).

[126] National Conference of State Legislators, State Laws Governing Early Voting (Aug. 2, 2019), https://www.ncsl.org/research/elections-and-campaigns/early-voting-in-state-elections.aspx.

[127] Office of the Gov. of Montana, Directive Implementing Executive Orders 2-2020 and 3-2020 and providing for measures to implement the 2020 June primary election safely (Mar. 25, 2020), http://governor.mt.gov/Portals/16/Directive%20on%20Elections.pdf?ver=2020-03-26-102626-610

[128] Patrick Svitek, *Gov. Greg Abbott extends early voting for November election by six days, starting Oct. 13*, TEXAS TRIBUNE (July 27, 2020),  https://www.texastribune.org/2020/07/27/texas-greg-abbott-early-voting-november/.

[129] *See* 2020 Elections Calendar, La. Sec. State, https://www.sos.la.gov/ElectionsAndVoting/PublishedDocuments/ElectionsCalendar2020.pdf (last visited July 30, 2020); *see also* La. Sec. of State, Get Election Information, https://www.sos.la.gov/ElectionsAndVoting/GetElectionInformation/Pages/default.aspx (last visited July 30, 2020).

[130] Statewide Post Election Statistical Report,, La. Sec. of State, 7/11/2020, https://electionstatistics.sos.la.gov/Data/Post_Election_Statistics/Statewide/2020_0711_sta.pdf.

by absentee mail-in ballot and 20% chose to vote in-person during the early voting period.[131] Additionally, of the over 202,000 voters who voted by absentee ballot or in-person during the early voting period, 37.3% were Black.[132]

80.    In the past two presidential election years (the 2012 Presidential Primary and General Election and the 2016 Presidential Primary and General Election) only 2% to 3.3% of voters voted by absentee mail-in ballot, and between 8.9% and 23% of voters chose to vote during the early voting period, compared to the level of absentee and early voting participation during the July 11, 2020 Presidential Preference Primary.[133]   These data signal that during the November general election, a significant number of voters will continue to vote during the early voting period, and further, that the number of voters who vote by absentee mail-in ballot will increase dramatically.

---

[131] Statewide Early Voting Statistical Report, La. Sec. of State, 7/11/2020,

https://electionstatistics.sos.la.gov/Data/Early_Voting_Statistics/Statewide/2020_0711_StatewideStats.pdf

[132] *Id*.

[133] These numbers are calculated based on data available on the La. Sec. of State website.  Statewide Post Election Statistical Report, La. Sec. of State, 3/24/2012, https://electionstatistics.sos.la.gov/Data/Post_Election_Statistics/Statewide/2012_0324_sta.pdf; Statewide Early Voting Statistical Report, La. Sec. of State, 3/24/2012, https://electionstatistics.sos.la.gov/Data/Early_Voting_Statistics/Statewide/2012_0324_StatewideStats.pdf; Statewide Post Election Statistical Report,, La. Sec. of State, 11/6/2012, https://electionstatistics.sos.la.gov/Data/Post_Election_Statistics/Statewide/2012_1106_sta.pdf; Statewide Early Voting Statistical Report, La. Sec. of State, 11/6/2012, https://electionstatistics.sos.la.gov/Data/Early_Voting_Statistics/Statewide/2012_1106_StatewideStats.pdf; Statewide Post Election Statistical Report, La. Sec. of State, 3/5/2016, https://electionstatistics.sos.la.gov/Data/Post_Election_Statistics/Statewide/2016_0305_sta.pdf;  Statewide Early Voting Statistical Report, La. Sec. of State, 3/5/2016, https://electionstatistics.sos.la.gov/Data/Early_Voting_Statistics/Statewide/2016_0305_StatewideStats.pdf; Statewide Post Election Statistical Report, La. Sec. of State, 11/8/2016, https://electionstatistics.sos.la.gov/Data/Post_Election_Statistics/Statewide/2016_1108_sta.pdf;Statewide Early Voting Statistical Report, La. Sec. of State, 11/8/2016, https://electionstatistics.sos.la.gov/Data/Early_Voting_Statistics/Statewide/2016_1108_StatewideStats.pdf.

A.    **Louisiana's Absentee and Early Voting Processes**

81.     Louisiana's state election code enumerates specific categories of eligible voters who may request and vote by mail-in ballot, a process described in Louisiana's election code as "absentee voting by mail." La. R.S. 18:1308. The categories include voters who expect to be out of the parish in which they would be qualified to vote in person on Election Day, such as service members, students, clergy members, and overseas citizens. La. R.S. 18:1303(B). Voters who are not necessarily absent from the parish but will remain incarcerated pre-trial or sequestered as a jury member during the election may also request and vote by absentee ballot. La. R.S. 18:1303(C)-(G). Eligible voters who submit certain identification or documentation of a qualifying disability may vote absentee. La. R.S. 18:1303(I). Voters who are 65 years of age and older also qualify for this accommodation. La. R.S. 18:1303(J). Finally, qualified voters who were unable to participate in early voting and will be unable to vote on Election Day due to hospitalization may vote by absentee ballot. La. R.S. 18:1303(D).

82.     All requests to vote absentee by mail must specify the reason for the request. La. R.S. 18:1307. Applications can be sent to the registrar of voters by mail, fax, hand delivery, or electronically through the Secretary of State's website at GeauxVote.com. La. R.S. 18:1307. Absentee by mail applications must be received by the parish registrar of voters not later than 4:30 pm on the fourth day prior to the election for which it is requested. La. R.S. 18:1307(A)(d)(2).

83.     When applying for an absentee ballot, the applicant must provide the reason for their request to vote absentee by mail and attach any documents in support thereof. La. R.S. 18:1307(A)(2). If the registrar of voters has reason to believe that the eligibility of a voter to vote absentee by mail pursuant to La. R.S. 18:1303 is based upon false or fraudulent information, they "shall immediately notify the parish board of election supervisors." La. R.S. 18:1307(I). And, if

"after appropriate hearing and opportunity for the voter to be heard, the parish board of election supervisors finds that the voter's eligibility to vote absentee by mail was based upon false or fraudulent information, the board shall inform the appropriate district attorney and the registrar of voters who shall not allow the voter to vote absentee by mail." *Id*.

84.     The Secretary of State is responsible for preparing absentee ballots.  La. R.S. 18:1306(A).  Every ballot is mailed in an envelope with the following on its face in red bold face type: "VIOLATION OF ABSENTEE BY MAIL OR EARLY VOTING LAWS VOIDS BALLOT AND MAY RESULT IN CRIMINAL PENALTIES" and "VOTING AT POLLS AFTER VOTING ABSENTEE BY MAIL OR DURING EARLY VOTING IS PROHIBITED AND MAY RESULT IN CRIMINAL PENALTIES."  La. R.S. 18:1306(D).  The envelope also includes a "Certificate" to be signed by the voter, certifying that they "applied for the ballot, marked the enclosed ballot(s) himself or that they were marked for him according to his instructions and in his presence;" that the voter is entitled to vote at the precinct they name; and that the parish board of election supervisors is authorized to open the envelope and count their ballot.  La. R.S. 18:1306(E).

85.     The "Certificate," which is on the envelope, includes "an affidavit followed by a line for the handwritten signature or mark of the voter, certifying that the statements made . . . are true and correct and that the voter is aware of the penalties for knowingly making a false statement therein, which penalties shall be stated on the certificate."  La. R.S. 18:1306(E)(1)(f).

86.     Finally, the voter must sign the certificate in the presence of one witness, who must also sign the envelope.  The voter's certificate "shall be made under penalty of perjury for providing false or fraudulent information."  La. R.S. 18:1306(E)(2)(a).

87.     Once completed, the ballot must be returned to the registrar by the U.S. Postal Service, a commercial courier, or by hand delivery.  La. R.S. 18:1308(B).  If delivered by someone

other than the voter, a commercial courier, or the U.S. Postal Service, the registrar must require that the person making such delivery sign a statement, prepared by the Secretary of State, certifying that they have the authorization and consent of the voter to hand deliver the marked ballot. *Id.* No person except the immediate family of the voter may hand deliver more than one marked ballot to the registrar. *Id.* Under most circumstances, ballots must be received by 4:30 p.m. on the day before Election Day in order to be counted. La. R.S. 18:1308(C).

88.     The parish board of election supervisors conducts the counting and tabulation of all absentee by mail and early voting ballots in the parish. La. R.S. 18:1313(A). Absentee by mail and early voting ballots are counted at a public facility within the parish no later than 8:00 p.m. on Election Day. La. R.S. 18:1313(B). Several steps must be taken to validate each ballot before it may be counted: (1) a member of the board must compare the name on the certificate or on the flap of the envelope containing the absentee by mail ballot with the names on the absentee by mail voter report; (2) the board will consider any properly filed challenges to the ballot, following procedures delineated elsewhere in the statutes; (3) if a majority of the members of the board determine that an absentee by mail ballot is invalid, the members must leave the flap on the envelope containing the absentee by mail ballot, leave the envelope sealed, and a board member must write the word "rejected," together with the reasons for rejecting the ballot, and their initials. La. R.S. 18:1313(F). The rejected absentee by mail ballots and certificates must be replaced in the special absentee by mail and early voting ballot envelope or container. *Id.*

89.     No rejected absentee by mail ballot is counted. La. R.S. 18:1313(F)(5).

90.     If the board determines that an absentee by mail ballot is valid, the ballot certificate must be signed by two board members. La. R.S. 18:1313(F)(6).

91.    Any person who knowingly, willfully, or intentionally votes or attempts to vote more than once in an election, or otherwise votes in a false, fictitious, or fraudulent way shall be fined up to $2,000 dollars, be imprisoned for up to two years, or both, for the first offense.  La. R.S. 18:1461.2(B).  These penalties are listed boldly on all absentee ballot applications.[134]

92.    La. R.S. 18:1309 allows for seven days of early voting beginning fourteen days before a scheduled election and ending seven days before that election.

93.    All registered voters may vote early.[135]

**B.    The Emergency Election Plan**

94.    Louisiana election procedures are governed by the Louisiana Election Code. Pursuant to La. R.S. 18:401.3, if the Governor declares a statewide emergency, the Secretary of State may certify that the emergency will impair an upcoming election.  The Secretary of State sends the certification with the underlying facts and reasons detailing the election impairment to the Governor, the Senate Committee on Senate and Governmental Affairs, and the House Committee on House and Governmental Affairs.

95.    If the Governor and the majority of each of the two committees agree that an emergency election plan is necessary, the Secretary of State shall develop a plan to address any impairments the emergency presents to the holding of the election.  The Secretary of State may, if deemed necessary, include in the emergency plan a proposal to conduct early voting in certain

---

[134]*See* General Application for Absentee By Mail Ballot, La. Sec. State, https://www.sos.la.gov/ElectionsAndVoting/PublishedDocuments/GeneralApplicationForAbsenteeByMailBallot.pdf; Disabled Application for Absentee By Mail Ballot, La. Sec. State, https://www.sos.la.gov/ElectionsAndVoting/PublishedDocuments/DisabledApplicationForAbsenteeByMailBallot.pdf; Military Overseas Application for Absentee By Mail Ballot, La. Sec. State, https://www.sos.la.gov/ElectionsAndVoting/PublishedDocuments/MilitaryOverseasApplicationForAbsenteeByMailBallot.pdf.

[135]*See*, Elections and Voting, La. Sec. State, https://www.sos.la.gov/ElectionsAndVoting/Vote/VoteEarly/Pages/default.aspx.

parishes to enable displaced voters to vote.  The written emergency plan must then be submitted by the Secretary of State to the two aforementioned committees and the Governor.

96.     The majority of the two committees must approve of the plan, after which it will be submitted to the members of each house of the legislature for approval by the majority of each house.  Upon approval by a majority of the members of the House and the Senate and by the Governor, the Secretary of State must then take steps necessary to implement the plan.

97.     On March 13, 2020, Secretary of State Ardoin certified to the Governor that a state of emergency exists that would affect the electoral process, and certified the same one month later on April 13, 2020.[136]  On April 14, 2020, Secretary Ardoin presented his first emergency plan to the Governor, the Senate Committee on Senate and Governmental Affairs, and the House Committee on House and Governmental Affairs ("the First Emergency Plan").  Among the relevant provisions of this plan were the expansion of early voting from seven to thirteen days; the addition of an expansive list of COVID-19 related excuses, including expanding eligibility to voters who were at high risk of severe illness from COVID-19 due to underlying medical conditions, voters subject to a stay-at-home-quarantine, or isolation order or caring for such an individual, and most notably, to voters who were "unable to appear in public due to concern of exposure to or transmission of COVID-19;" and the elimination of the requirement that returned absentee ballots could be rejected for lack of witness signature.[137]

98.     On April 15, 2020, the Senate and Governmental Affairs Committee blocked the First Emergency Plan in committee on a party-line vote, citing concerns that making absentee

---

[136] *See* La. Exec. Dep't: Proclamation No. 46 JBE 2020 (Apr. 14, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/modified/46-JBE-2020-Elections.pdf.

[137] *See* Secretary of State Emergency Election Plan for the July 11, 2020 Presidential Preference Primary and August 15, 2020 Municipal General Elections in the State of Louisiana, at 2 (Apr. 14, 2020), *supra* note 21.

voting available to anyone concerned about exposure to COVID-19 would enable voter fraud, despite statistics and evidence to the contrary,[138] and despite Secretary Ardoin's assurances that the same safeguards that are in place to prevent fraud during other elections and that the Secretary and his office had confidence in would remain in place.[139]  Blocking the First Emergency Plan in committee ensured that the full Louisiana legislature would not be able to approve of the plan.[140]

99.    On April 20, 2020, less than a week after the First Emergency Plan was blocked, Secretary Ardoin presented a revised emergency plan (the "Emergency Plan").[141]  Unlike the First Emergency Plan, the new Emergency Plan did not allow voters with a "concern of exposure" to COVID-19 to request an absentee-by-mail ballot, or extend access to absentee ballots to voters over the age of 60 or those caring for a child or grandchild whose school or daycare is closed and/or where alternative childcare was not available due to COVID-19 concerns.[142]  Furthermore, the Emergency Plan covered only the July and August elections—it did not expressly provide for expanded access to absentee ballots for either the November or December.[143]

100.    Two days later, on April 22, 2020, both the Senate and Governmental Affairs Committee and House Committee on House and Governmental Affairs approved the revised

---

[138] *See* Sam Karlin, *Louisiana Republicans Block Emergency Coronavirus Election Plan; Future of Election Unclear*, THE ADVOCATE (Apr. 15, 2020), https://www.theadvocate.com/baton_rouge/news/coronavirus/article_4dfccfd6-7f44-11ea-b67e-73d2172ba20b.html; *see also* Melinda Deslatte, *Louisiana Lawmakers Approve Emergency Summer Elections Plan*, U.S. NEWS (Apr. 28, 2020), https://www.usnews.com/news/best-states/louisiana/articles/2020-04-28/louisiana-lawmakers-approve-emergency-summer-elections-plan.

[139] Video, Louisiana Senate Committee on Governmental Affairs, Hearing to Consider the Emergency Election Plan, Apr. 15, 2020; 8:54-9:12, http://senate.la.gov/video/videoarchive.asp?v=senate/2020/04/041520S~G_0

[140] *See id.*

[141] *See* Secretary of State Emergency Election Plan for the July 11, 2020 Presidential Preference Primary and August 15, 2020 Municipal General Elections in the State of Louisiana (Apr. 20, 2020), *supra* note 20.

[142] *Id.*

[143] *Id.*

Emergency Plan.  On April 27, 2020, the Emergency Plan was approved by the full Louisiana State House (passing 62–39) and State Senate (passing 31–8).

101.    For the July and August 2020 elections only, the Emergency Plan allowed for voters to seek absentee ballots if they attest on an application that they (i) are "[a]t a higher risk of severe illness from COVID-19 due to serious underlying medical conditions as identified by the Centers for Disease Control and Prevention (including chronic lung disease, moderate to severe asthma, hypertension and other serious heart conditions, diabetes, undergoing chemotherapy, severe obesity (BMI of 40 or higher), chronic kidney disease and undergoing dialysis, liver disease, pregnancy, or immunocompromised due to cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications)[144]; (ii) are "[s]ubject to a medically necessary quarantine or isolation order as a result of COVID-19"; (iii) are "[a]dvised by a health provider to self-quarantine due to COVID-19 concerns"; (iv) are "[e]xperiencing symptoms of COVID-19 and seeking medical diagnosis"; or (v) are "[c]aring for an identified individual who is subject to medically necessary quarantine or isolation order as a result of COVID-19 or who has been advised by a health care provider to self-quarantine due to COVID-19 concerns."[145]

102.    The Emergency Plan did not define or explain qualifying terms included in the list of COVID-19 specific excuses, including the terms "medically necessary," and "moderate or

---

[144] A current list of serious underlying conditions can be found on the CDC's website. CDC, Coronavirus Disease 2019 (COVID-19): *Evidence used to update the list of underlying medical conditions that increase a person's risk of severe illness from COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html (last visited on July 28, 2020).

[145] Secretary of State Emergency Election Plan for the July 11, 2020 Presidential Preference Primary and August 15, 2020 Municipal General Elections in the State of Louisiana (Apr. 20, 2020), *supra* note 20; State of Louisiana Official Absentee Ballot Application: COVID-19 Emergency Application (last updated April 2020), *supra* note 23.

severe," nor does the Emergency Plan provide guidance on what qualifies as being "advised by a health provider" or "seeking medical diagnosis."[146]

103.    The State's COVID-19 Emergency Absentee Ballot Application expressly stated and required a voter requesting an absentee mail in ballot based on one of the COVID-19-related excuses to acknowledge that "[p]roviding a false statement to an election official is a felony offense," and that doing do will subject the voter to a fine or imprisonment, with or without hard labor.[147]

### C.    Failure to Modify the Challenged Provisions Will Unduly Burden the Right to Vote in Light of the COVID-19 Pandemic

104.    The ongoing COVID-19 pandemic has reached a second peak of new cases as the "first wave" of the coronavirus continues with the number of new infections per day becoming higher than at any time before.   In light of this evidence, along with public health officials' assurances that the United States will likely get worse, Defendants' failure to modify the Challenged Provisions will unduly burden the right to vote.

105.    The ongoing health risks posed by COVID-19 in Louisiana necessitate that Defendants modify the Excuse Requirement and provide all eligible voters the opportunity to cast an absentee by mail ballot without any excuse so that they can avoid the significant danger posed by voting in person.   Moreover, all voters who are forced by Defendants to take on the risks of in-person voting during the pandemic will necessarily bring those risks home with them, potentially spreading COVID-19 to their families and community members, vulnerable and healthy alike.

---

[146] *See* State of Louisiana Official Absentee Ballot Application: COVID-19 Emergency Application (last updated April 2020), *supra* note 23.

[147] *See id.*

106.    Defendant's maintenance of the Excuse Requirements during COVID-19 requires voters to leave the safety of their homes; to commute to and from the polls, potentially via public transportation; to line up at polling places (potentially for hours); and to congregate with unknown individuals, including other voters, poll workers, and poll monitors, for extended periods of time. Making one's way to cast a vote in person will also require voters to touch shared surfaces, which may include voting machines, shared writing instruments, doorknobs, elevator buttons, and parking meters.  Public health officials have unequivocally warned of the danger of engaging in these activities in public during the COVID-19 pandemic.

107.    Defendants' choice not to modify the excuses regime during the November and December elections—as the COVID-19 pandemic continues and accelerates—will impose undue burdens on the right to vote, particularly for certain categories of vulnerable individuals, including voters with underlying medical conditions and disabilities, as well as Black voters.

108.    The CDC has warned that "[p]eople of any age with certain underlying medical conditions are at increased risk for severe illness from COVID-19."[148]  As noted previously, among those conditions are, cancer, chronic kidney disease, chronic obstructive pulmonary disease, obesity, serious heart conditions, sickle cell disease, and type 2 diabetes.[149]  Louisiana is among the five states with the highest incidence of adult obesity[150], diabetes,[151] and cardiovascular

---

[148] CDC, Coronavirus Disease 2019 (COVID-19): *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last updated July 17, 2020).

[149] *Id*.

[150] America Health Rankings, Annual Report 2019, Obesity, https://www.americashealthrankings.org/explore/annual/measure/Obesity/state/LA (last visited July 31, 2020).

[151] America Health Rankings, Annual 2019, Diabetes, https://www.americashealthrankings.org/explore/annual/measure/Diabetes/state/LA (last visited July 31, 2020).

deaths,[152] three indicators of chronic health conditions.  If enforced during the November and December elections, the Excuse Requirement will disproportionately burden voters with pre-existing health conditions and compromised immunity, who face heightened risk of infection and death from COVID-19.

109.    Louisiana's Excuse Requirement will also disproportionately burden Black voters, who face heightened risks from contracting COVID-19 because of social and economic disparities, as well as disparities in health and healthcare that raise the stakes for them at every step of the process.

110.    If Black voters contract the virus while voting in person, they are more likely to suffer serious and even deadly consequences, because they disproportionately suffer from the underlying medical conditions that exacerbate the virus and because they are also more likely to be subject to inequalities in the health care system.

111.    These heightened risks, both individually and collectively, demonstrate that the Excuse Requirement imposes an especially severe burden on Black voters.  Racial disparities in serious illness and death due to COVID-19 are inextricably linked to a long history and ongoing patterns of racial discrimination against Black people in voting and ongoing and current racial disparities in education, employment, and health.

112.    Defendants' failure to allow all eligible voters to vote absentee by mail in the upcoming elections will also impose a heightened risk of contracting COVID-19 on voters who live with, care for, or work with individuals who have a heightened risk of contracting COVID-19; and all poll workers.

---

[152] America Health Rankings, Annual Report 2019, Cardiovascular Deaths, https://www.americashealthrankings.org/explore/annual/measure/CVDDeaths/state/LA (last visited July 30, 2020).

113.    Louisiana's current excuse-required regime is unduly burdensome because the refusal to allow all eligible voters to vote absentee by mail in response to the pandemic cannot be justified by any legitimate state interest.  Louisiana has a number of procedures and processes in place that ensure the integrity of the absentee by mail voting process that are separate and apart from the Excuse Requirement. *See supra* ¶¶ 84-85, 88, and 91.

114.    In the same way, Defendants' failure to expand the early voting period for the November and December elections will increase the risks of COVID-19 infection and unduly burden the fundamental right of all eligible voters.

115.    For in-person voters, early voting can help make social distancing effective and reduce the risk of crowds gathering at polling places.  The need to reduce the gathering of large groups of people is only increasing, as more and more evidence suggests that the virus may be transmitted as an aerosol and linger in the air for long periods of time.

116.    Defendants' choice not to extend early voting from seven to 13 days for the November and December elections to provide sufficient opportunities for safe in-person voting without large gatherings and with the necessary social distancing is an undue burden on Louisiana voters.

117.    The existence and implementation of the Emergency Plan for the July and August elections reflects Defendants' recognition that the COVID-19 pandemic requires modifications of the State's election processes, including the Challenged Provisions.  The Emergency Election Plan that was in place for the July and August elections included additional COVID-19-related excuses that expanded eligibility to vote by absentee ballot and extended the early voting access from seven to thirteen days.  Despite this recognition, as well as the fact that the pandemic's spread is worse than it was prior to the implementation of the Emergency Plan, Defendants have failed to make

necessary modifications to Louisiana's unduly burdensome absentee and early voting processes, which, at a minimum, should include extending the basic protections of the Emergency Plan to the fall elections.

## COUNT I

### Violations of the Fundamental Right to Vote under the First and Fourteenth Amendments to the U.S. Constitution (42 U.S.C. § 1983)
(Excuse Requirement)

118. Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the Counts below as though fully set forth herein.

119. The First and Fourteenth Amendments of the U.S. Constitution protect the fundamental right to vote. Under the *Anderson-Burdick* doctrine, a court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the precise interests put forward by the State as justification for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights. *See Burdick v. Takushi,* 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

120. Under the circumstances brought about by COVID-19, Defendants' enforcement of the Excuse Requirement will impose an undue burden on the fundamental right to vote of Louisiana voters. This requirement limits eligibility for absentee voting to a narrow category of voters and will likely prevent many thousands of otherwise eligible voters from casting effective ballots, placing a disproportionate burden on voters with underlying medical conditions, disabilities, and Black voters, like Plaintiffs.

121.    Defendants' refusal to eliminate the Excuse Requirement as regards the November and December 2020 elections is a governmental action that substantially burdens the rights of the voters of Louisiana during the COVID-19 pandemic.  Defendants' refusal to extend the Emergency Plan to the November and December elections constitutes further state action that imposes severe and undue burdens on the right to vote.

122.    Defendants cannot provide a reasonable justification for their refusal to make changes to Louisiana's voting processes that accommodate the significant challenges voters will face in the November and December elections as a result of the pandemic.  Defendants' maintenance of the Excuse Requirement is not supported by any state interest that is sufficient to justify the resulting burdens on the right to vote.  This fact is underscored by Defendants' adoption of the Emergency Plan for the July and August elections.  The decision to relax the Excuse Requirement for these elections is an admission that COVID-19 has shifted the impact that the Excuse Requirement imposes on voting rights and seriously undermines any justification for refusing to do the same for the November and December elections.

## COUNT II

**Violations of the Fundamental Right to Vote under the First and Fourteenth Amendments to the U.S. Constitution (42 U.S.C. § 1983)**
(Early Voting)

123.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the Count below as though fully set forth herein.

124.    Under the circumstances brought about by COVID-19, Defendants' failure to extend early voting for the November and December elections will impose an undue burden on the fundamental right to vote of Louisiana voters.  The lack of additional days of early voting forces voters to subject themselves to significant health risks and will likely prevent many thousands of eligible voters from casting effective ballots, placing disproportionate burdens on

voters with underlying medical conditions and disabilities, older voters, and Black voters, like Plaintiffs.

125.    Under their own Emergency Election Plan, passed in the early days of the pandemic, Defendants emphasized the need for expanded early voting for the July and August elections.  Their recognition of the need for expanded early voting during the pandemic serves as the baseline of necessary action.  Failure to implement this minimal action for the November and December elections constitutes a state action that will impose an undue burden on the fundamental right to vote.

126.    Defendants' stated interest in protecting the integrity of elections is a valid governmental interest, but it is not advanced by the failure to expand early voting, nor does the interest outweigh or justify the undue burden imposed on the fundamental right to vote, especially in the context of the global COVID-19 pandemic.

## COUNT III

### Violations of Section 2 of the Voting Rights Act (52 U.S.C. § 10301)

127.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the Count below as though fully set forth herein.

128.    Section 2 of the Voting Rights Act prohibits Defendants from imposing, applying, or maintaining any "qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

129.    "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed

by black and [nonblack] voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

130.    Section 2 vote-denial claims have two elements.  First, "[t]he challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Second, "[t]hat burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class."  *Veasey v Abbott*, 830 F.3d 216, 244 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 612 (2017).

131.    The Excuse Requirement and the failure to expand the early voting period for the November and December elections (collectively "the Challenged Provisions"), will result in the denial or abridgment of the right to vote for Black voters in Louisiana.

132.    The Challenged Provisions, if not enjoined, will independently and collectively, impose a discriminatory burden on Black voters in Louisiana.

133.    Because Black people in Louisiana continue to bear the effects of discrimination in areas such as education, employment, and health status, they are particularly at risk of infection from COVID-19 if forced to vote in person, and thus, disproportionately burdened by the Challenged Provisions.

134.    The discriminatory burdens imposed by the Challenged Provisions affect Black voters disparately because they interact with social and historical conditions that have produced or currently produce discrimination against Black people in Louisiana causing an inequality in the opportunities to elect their preferred representatives.

135. Under the totality of the circumstances, the Challenged Provisions deny or abridge the rights of Black voters in Louisiana because the State has an established and judicially recognized history of official voting-related discrimination; Louisiana also has an extensive and judicially recognized history of racially polarized voting; and Black people in Louisiana continue to bear the effects of discrimination in areas such as education, employment, and health status, which hinder their ability to participate effectively in the political process.

## COUNT IV

**Failure to Provide Reasonable Accommodations in Violation of Title II of the Americans with Disabilities Act (42 U.S.C. §§ 12131, *et seq.*)**

136. Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the Count below as though fully set forth herein.

137. Under Title II of the Americans with Disabilities Act ("ADA"), public entities, including state and local governments, are prohibited from imposing requirements on participation in public services, programs, or activities—including voting—that screen out qualified individuals with disabilities from full participation in those services, programs, or activities.  42 U.S.C. § 12132.

138. Specifically, public entities must not "impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally" participating in any service, program, or activity unless such criteria are essential for the provision of the service, program, or activity. 28 C.F.R. § 35.130(b)(8). Accordingly, public entities are required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).

Beyond its prohibition of disability-based discrimination, the ADA imposes upon public entities an affirmative obligation to make such reasonable accommodations for disabled individuals, including reasonable modifications to rules or policies. *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454-55 (5th Cir. 2005).

139.    Plaintiffs Pogue, Taylor, and members of the Louisiana NAACP have disabilities within the scope defined by the ADA, 42 U.S.C. § 12102, including significant medical vulnerabilities that put them at risk of severe complications from COVID-19. They are "qualified" for the programs, services, and activities being challenged herein in that they meet all essential eligibility requirements to vote in Louisiana. 42 U.S.C. § 12131(2).

140.    Defendants' failure and refusal to provide reasonable accommodations with respect to the Challenged Provisions for those voters, such as Plaintiffs Pogue, Taylor, and members of Plaintiff the Louisiana NAACP, whose health conditions significantly limit their ability to safely leave home or have close contact with other people during the COVID-19 pandemic, violates the ADA.

141.    Defendants have no valid justification for their failure or refusal to offer the reasonable accommodation of modifying the Challenged Provisions for voters, such as Plaintiffs Pogue and Taylor, whose health statuses severely limit their ability to leave home and have close contact with other people amid the pandemic.

142.    The failure to reasonably accommodate these voters constitutes eligibility criteria that has the effect of screening out voters with disabilities from participating in the November 3 and December 5, 2020 elections, and such exclusion is in no way essential to the operation of these elections, but rather serves to hinder their implementation in an equitable, accessible manner as required.

143.    Unless the requested relief is granted, Plaintiffs and those similarly situated will suffer irreparable harm given that they will be discriminated against and denied equal access to absentee voting, or otherwise forced to risk their health, and potentially their lives, to vote in person at a polling place—*i.e.*, a program, service, or activity impacting their ability to participate in the voting process.

144.    The ADA authorizes injunctive relief as appropriate to remedy discriminatory acts against individuals with disabilities.  42 U.S.C. §§ 12188(a)(1)-(2).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.  Declare that Defendants' enforcement of the Excuse Requirement for all elections taking place for the duration of the COVID-19 pandemic in Louisiana violates the First and Fourteenth Amendments of the U.S. Constitution, Section 2 of the Voting Rights Act, and Title II of the ADA;

B.  Declare that Defendants' failure to extend the early voting period during all elections taking place in Louisiana for the duration of the COVID-19 pandemic violates the First and Fourteenth Amendments of the U.S. Constitution, Section 2 of the Voting Rights Act, and Title II of the ADA;

C.  Declare that Defendants' failure to extend the modifications set forth in the Emergency Plan for the July and August 2020 elections to the November and December 2020 elections violates the First and Fourteenth Amendments of the U.S. Constitution, Section 2 of the Voting Rights Act, and Title II of the ADA;

D.  Preliminarily and permanently enjoin Defendants from enforcing the Excuse Requirement for all eligible voters during all elections taking place in Louisiana in 2020, or, in the

alternative, order Defendants to extend the Emergency Plan to the November and December elections;

E.  Preliminarily and permanently order Defendants to extend the early voting period to a minimum of thirteen days during all elections taking place in Louisiana in November and December 2020;

F.  Preliminarily and permanently order Defendants to issue guidance instructing all local parish election officials, including registrars of voters, clerks of court, parish boards of election supervisors, and parish governing officials who perform election-related duties to issue absentee mail-in ballots to any eligible voter who requests one without requiring an excuse for all Louisiana elections in 2020;

G.  Award Plaintiffs their costs, expenses, and reasonable attorneys' fees; and

H.  Grant such other and further relief as this Court deems just and proper in the circumstances.

DATED this 24th day of August 2020.     Respectfully submitted,

Robert D. Fram*           /s/ Ronald L. Wilson
Morgan Lewis**          Ronald L. Wilson, (LSBN 13575)
Joshua González*         701 Poydras Street, Suite 4100
Covington & Burling LLP     New Orleans, LA 70139
One Front Street           Tel.: (504) 525-4361
San Francisco, CA 94111-5356   cabral2@aol.com
Tel: (415) 591-6000
rfram@cov.com            John Z. Morris*
MELewis@cov.com         Steven Lance*
jgonzalez@cov.com        Victoria Wenger**
                       NAACP Legal Defense &
John Fraser**            Educational Fund, Inc.
Covington & Burling LLP     40 Rector Street, 5th Floor
The New York Times Building   New York, NY 10006
620 Eighth Avenue         Tel.: (212) 965-2200
New York, NY 10018-1405     zmorris@naacpldf.org
Tel: (212) 841-1000       slance@naacpldf.org
JFraser@cov.com          vwenger@naacpldf.org

Frederic M. Levy**        Catherine Meza*
Covington & Burling LLP     NAACP Legal Defense &
One City Center           Educational Fund, Inc.
850 Tenth Street, NW      700 14th Street, NW, Suite 600
Washington, D.C. 20001     Washington, D.C. 20005
Tel: (202) 662-5154       Tel.: (202) 682-1300
flevy@cov.com           cmeza@naacpldf.org


*Pro Hac Vice
**Pro Hac Vice Motion pending

***Attorneys for Plaintiffs***