# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

JENNIFER HARDING; JASMINE POGUE; OMEGA
TAYLOR; LOUISIANA STATE CONFERENCE OF
THE NAACP; and POWER COALITION FOR
EQUITY AND JUSTICE

*Plaintiffs*,

v.

JOHN BEL EDWARDS, in his official capacity as
Governor of Louisiana; KYLE ARDOIN, in his official
capacity as Secretary of State of Louisiana,

*Defendants*,

and

THE STATE of LOUISIANA

*Defendant-Intervenor*.

Case. No. 3:20-cv-00495-SDD-RLB

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ......................................................................................... iii

I.      INTRODUCTION ............................................................................................... 1

II.     FACTUAL BACKGROUND ............................................................................. 3

       A.     The Impact of the COVID-19 Pandemic: Scope and Transmission ...................... 3

       B.     The COVID-19 Pandemic in Louisiana ............................................................ 6

       C.     COVID-19's Disproportionate Impact on Black People in Louisiana ................. 8

       D.     The COVID-19 Pandemic and Voting .............................................................. 10

       E.     Louisiana's Absentee by Mail Voting Excuse Requirement and Early
             Voting Period ................................................................................................. 10

       F.     Louisiana Elections During the COVID-19 Pandemic ....................................... 12

            1.     The Emergency Plan Applied to the July and August Elections .............. 12

            2.     The Emergency Plan Proposed for the November and December
                 Elections ..................................................................................... 13

III.    ARGUMENT .................................................................................................... 14

       A.     Plaintiffs Are Likely to Succeed on the Merits of Their Constitutional
             Claims Against the Challenged Provisions ......................................................... 15

            1.     The Excuse Requirement Imposes an Undue Burden on the
                 Fundamental Right to Vote .......................................................... 17

            2.     The Reduction of the Early Voting Period for the November and
                 December 2020 Elections Imposes an Undue Burden on the
                 Fundamental Right to Vote .......................................................... 20

       B.     Plaintiffs Are Likely to Succeed on the Merits of Their ADA Claims
             Against the Challenged Provisions .................................................................... 21

       C.     Plaintiffs Will Suffer Irreparable Harm if the Challenged Provisions Are
             Not Enjoined ................................................................................................. 23

       D.     The Balance of Hardships and the Public Interest Favor a Preliminary
             Injunction. ..................................................................................................... 25

IV.    CONCLUSION ................................................................................................ 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983) ..................................................................................................15

*Bennett-Nelson v. Louisiana Bd. of Regents*,
    431 F.3d 448 (5th Cir. 2005) ...................................................................................22

*Brock Servs., LLC v. Rogillio*,
    936 F.3d 290 (5th Cir. 2019) ...................................................................................14

*Burdick v. Takushi*,
    504 U.S. 428 (1992) ..................................................................................................15

*Common Cause Georgia v. Kemp*,
    347 F. Supp. 3d 1270 (N.D. Ga. 2018) ...................................................................23

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC*,
    710 F.3d 579 (5th Cir. 2013) ...................................................................................15

*Disabled in Action v. Bd. Of Elec. in City of N.Y.*,
    752 F.3d 189 (2d. Cir. 2014) ...................................................................................22

*Dudum v. Arntz*,
    640 F.3d 1098 (9th Cir. 2011) .................................................................................16

*Elrod v. Burns*,
    427 U.S. 347 (1976) ..................................................................................................23

*Esshaki v. Whitmer*,
    No. 20-cv-10831, 2020 U.S. Dist. LEXIS 68254 (E.D. Mich. Apr. 20, 2020) .......17

*Garbett v. Herbert*,
    No. 2:20-cv-245-RJS, 2020 U.S. Dist. LEXIS 75853 (D. Utah Apr. 29, 2020) ......16

*Jackson Women's Health Organization v. Currier*,
    760 F. 3d 448 (5th Cir. 2014) .................................................................................14

*League of Women Voters of Va. v. Va. State Bd. Of Elec.*,
    No. 6:20-cv-0024, _F. Supp. 3d _, 2020 WL 2158249 (W.D. Va. May 5,
    2020) ..........................................................................................................................16

*League of Women Voters of Va. v. Va. State Bd. Of Elec.*,
    No. 6:20-cv-0024, (W.D. Va. Aug. 21, 2020) .........................................................16

*Libertarian Party of Ill. v. Pritzker*,
  No. 20-cv-2112, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020)................................16

*McDonald v. Bd. of Elect. Comm'rs of Chicago*,
  394 U.S.803 (1969) ........................................................................................15

*Melton v. Dallas Area Rapid Transit*,
  391 F.3d 669 (5th Cir. 2004) ..........................................................................21

*N.C. State Conf. of NAACP v. Cooper*,
  No. 18-cv-1034, 2019 WL 7372980 (M.D.N.C. Dec. 31, 2019)........................23

*Nat'l Fed'n of the Blind v. Lamone*,
  813 F.3d 494 (4th Cir. 2016) ..........................................................................22

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) .....................................................................23, 25

*Silver v. City of Alexandria*,
  No. 1:20-CV-00698, 2020 WL 3639696 (W.D. La. July 6, 2020).........................22

*Taylor v. Louisiana.*,
  419 U.S. 522 (1975)........................................................................................25

*Texas Dem. Party v. Abbott*,
  961 F.3d 389 (5th Cir. 2020) ......................................................................15, 18

*Texas Indep. Party v. Kirk*,
  84 F.3d 178 (5th Cir. 1996) ............................................................................15

*Thakker v. Doll*,
  No. 1:20-cv-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020)...........................23

*Thomas v. Andino*,
  No. 3:20-CV-01552-JMC, 2020 WL 2617329 (D.S.C. May 25, 2020) .................16

*U.S. Airways, Inc. v. Barnett*,
  535 U.S. 391 (2002)........................................................................................22

**Statutes and Rules**

28 C.F.R. § 35.130 ..............................................................................................22

42 U.S.C. § 12131 ...............................................................................................22

42 U.S.C. § 12132 ..........................................................................................21, 22

La. R.S. 18:106.1 ................................................................................................11

La. R.S. 18:401.3 ................................................................................................12

La. R.S. 18:1303 ............................................................................................................2, 11

La. R.S. 18:1304 ...............................................................................................................11

La. R.S. 18:1307 ..........................................................................................................11, 12

La. R.S. 18:1308 ...............................................................................................................11

La. R.S. 18:1309 ............................................................................................................2, 12

Plaintiffs Jennifer Harding, Jasmine Pogue, Omega Taylor, Louisiana State Conference of the NAACP ("Louisiana NAACP"), and Power Coalition for Equity and Justice ("PCEJ") (collectively "Plaintiffs") respectfully submit this memorandum of law in support of their motion, pursuant to Federal Rule of Civil Procedure 65, for a preliminary injunction directing Defendants John Bel Edwards, in his official capacity as Governor of Louisiana, Kyle Ardoin, in his official capacity as Secretary of State of Louisiana, and Defendant-Intervenor, the State of Louisiana (collectively "Defendants") to take immediate action to remove the barriers that place undue burdens on Louisiana voters' fundamental right to cast a ballot during the November and December 2020 elections.

Accordingly, Plaintiffs respectfully ask the court to enjoin the maintenance of statutory limitations on who can vote absentee by mail and the reduction of the early voting period for the November and December 2020 elections.  Plaintiffs seek to extend the ability to vote by mail to voters with underlying conditions that make them acutely vulnerable to serious illness or death as a result of COVID 19.  And at the very least, Plaintiffs request that Defendants extend to the upcoming elections the limited protections provided in the emergency plan that governed the July and August 2020 elections (July/August Emergency Plan).

## I.     INTRODUCTION

The persistence of COVID-19 throughout the summer has left no doubt that the pandemic will remain a serious risk for Louisiana voters at the time of the November and December 2020 elections. But in the midst of the ongoing pandemic, the State has declined to protect voters who are subject to an unacceptable risk of contracting COVID-19 by placing limitations on absentee mail in voting and reducing the early voting period.

As of this writing, Louisiana restricts absentee mail in voting by requiring that voters identify one of a limited number of narrow excuses (almost all of which apply to voters who will

be outside the state or outside their parish of residence) to be eligible to cast a ballot safely from home.  La. R.S. 18:1303; (the "Excuse Requirement").  Further, the election code provides for seven days of early voting. La. R.S. 18:1309.

On August 17, Defendant Secretary of State Ardoin released a proposed emergency election plan (the "Proposed Emergency Plan") for the November and December 2020 elections. The Proposed Emergency Plan eliminates the additional COVID-19-related excuses included in the emergency plan that was in place for the July and August elections and extends eligibility for absentee voting only to the narrow set of voters who test positive for COVID-19 during and after the early voting period but before election day.[1]  Additionally, the Proposed Emergency Plan reduces the early voting period from the 13 days offered for the July and August elections to 10 days. As of August 20, the House Committee on House and Governmental Affairs and the Senate Committee on Senate and Governmental Affairs have approved the plan.  Defendant Governor Jon Bel Edwards has publicly stated that the Proposed Emergency Plan is "woefully inadequate" and in correspondence to Secretary Ardoin confirmed that he will not approve the plan.[2]

This voting regime is far less protective of the health of Plaintiffs and all of the state's voters than were the baseline rules that applied to the July and August 2020 elections, removing protections for vulnerable voters including those with underlying medical conditions exposing them to higher risk of severe illness from COVID-19, voters advised to self-quarantine as a result of COVID-19, and voters experiencing symptoms of COVID-19 who are in the process of seeking

---

[1] Secretary of State Proposed Emergency Election Plan for the November 3, 2020 and December 5, 2020 Elections in the State of Louisiana (Aug. 17, 2020),
https://www.sos.la.gov/OurOffice/PublishedDocuments/SOSProposedEmergencyElectionPlan.pdf.
[2] Sam Karlin and Mark Ballard, *John Bel Edwards calls election plan 'woefully inadequate,' says we won't sign it*, THE ADVOCATE (Aug. 18 2020)
https://www.theadvocate.com/baton_rouge/news/politics/legislature/article_6067902e-e197-11ea-8d64-27d09a688c5f.html; Letter from John Bel Edwards, Gov. of La., to R. Kyle Ardoin, La. Sec. of State (Aug. 20, 2020), attached as Ex. 9.

medical diagnoses.[3]  This voting regime is also far less protective of voters' health than Louisiana's official policies regarding safety during the pandemic.  The state is currently in "Phase Two" of re-opening, during which it has instructed that "[a]ll individuals who are at higher risk of severe illness from COVID-19 should stay at home, unless traveling outside the home for an essential activity."[4]

There should be no doubt: this burden on voting rights is the direct result of governmental action. Making it more onerous for voters most vulnerable to illness and death from COVID-19 to vote is governmental action.  Refusing to, at minimum, extend the limited baseline protections that applied to the primary and municipal elections to the General Election is governmental action. This is a concrete violation of Plaintiffs' constitutional rights that this Court is fully empowered to correct.

## II.    FACTUAL BACKGROUND

### A.    The Impact of the COVID-19 Pandemic: Scope and Transmission

The COVID-19 pandemic is not ending in the near future.  Decl. of Dr. Arthur L. Reingold ¶¶ 20–24 (hereinafter "Reingold Decl." attached as Ex. 1).  As of August 20, 2020, the Centers for Disease Control and Prevention (the "CDC") estimate that there have been 5,506,929 cases of COVID-19 in the United States, resulting in more than 172,000 confirmed deaths.[5]  There is no vaccine, and it is highly unlikely one will be widely available to the public until sometime in 2021 at the earliest.  Reingold Decl. ¶ 22.

---

[3] Secretary of State Emergency Election Plan for the July 11, 2020 Presidential Preference Primary and August 15, 2020 Municipal General Elections in the State of Louisiana (Apr. 20, 2020), 7-9, https://house.louisiana.gov/Agendas_2020/Apr_2020/Emergency%20Election%20Plan%20for%20PPP%20and%20Mun%20General%20Rev.%204-20.pdf.
[4] La. Exec. Dep't Proclamation No. 101 JBE 2020 (Aug. 6, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/101-JBE-2020-covid-19-Public-Health-Emergency-Renewal-of-Phase-2.pdf
[5] *See* Ctrs. for Disease Control & Prevention (hereinafter "CDC"), Coronavirus Disease 2019 (COVID-19): *Cases in the U.S.*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html, (last visited Aug. 20, 2020).

COVID-19 is extremely contagious and spreads in a variety of ways.  First, it spreads from person to person, primarily through respiratory droplets via coughing, sneezing, talking, and close personal contact. [6]  *Id*. ¶ 16.  Second, there is evidence that the virus can be aerosolized, such that microscopic droplets containing the virus and capable of causing infection remain in the air and can be subsequently inhaled by others.  *Id*. ¶ 17.  This could mean, for example, that if someone with COVID-19 releases droplets that are aerosolized, a person behind them in a line may be exposed to the aerosolized particles by entering the same air space as she moves forward in the line, even if she remains six or more feet away from the infected person.  *Id*.

While the risks of severe or deadly symptoms from COVID-19 increase with age, these risks still escalate at ages far younger than 65—the age at which a voter in Louisiana is entitled to vote by mail.  The death rate for individuals aged 30-39 is twice as high as for those aged 18-29.[7]  The rate is three times higher for those who are 40-49 and four times higher for people 50-64.[8]  Still, people of all ages are at risk of developing severe and life-threatening complications.  *Id*. ¶ 11.  Data from the CDC shows that as of March, half of the people in the United States who were in intensive care because of the coronavirus were under the age of 65.[9]  *Id*.

---

[6] *See* CDC, Coronavirus Disease 2019 (COVID-19): *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html, (last updated June 16, 2020); The World Health Organization (WHO) suggests the COVID-19 virus can survive "for up to 72 hours on plastic and stainless steel," up to "4 hours on copper," and up to 24 hours on cardboard."  World Health Org. (WHO), *Q&A On Coronaviruses (COVID-19)* (Apr. 17, 2020), https://www.who.int/news-room/q-a-detail/q-a-coronaviruses.

[7] *See* CDC, Coronavirus Disease 2019 (COVID-19): *COVID-19 Hospitalization and Death By Age*, https://www.cdc.gov/coronavirus/2019-ncov/downloads/covid-data/hospitalization-death-by-age.pdf (last updated Aug. 10, 2020).

[8] *Id*.

[9] *See* Lisa Lockerd Maragakis, M.D., M.P.H., *Coronavirus and COVID-19: Younger Adults Are at Risk, Too*, JOHNS HOPKINS MED., https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-and-covid-19-younger-adults-are-at-risk-too, (last updated Apr. 9, 2020).

People with certain medical conditions, or "comorbidities," are also at higher risk of serious complications from COVID-19.[10] *Id.*  According to a July 2020 CDC report (reviewing data through April 24, 2020), 83% of individuals under 65 who died from COVID-19 had an underlying medical condition; among them, at least 60.9% had cardiovascular disease and at least 39.5% had diabetes mellitus.[11] *Id.* ¶ 12.

Among Louisiana adults, 36.8% have been diagnosed as obese, and 39.0% have hypertension or high blood pressure.[12]  Other illnesses are also common: over 14% of Louisiana adults have diabetes, 9.9% have chronic obstructive pulmonary disorder (COPD), and over six percent have coronary heart disease.[13]  Each of these conditions may place an individual at higher risk of serious illness or death from COVID-19.

To protect themselves, large numbers of Americans report that they are taking steps to avoid contact with people outside their household.[14]  In late July, a Gallup poll found that that roughly six in ten Americans "are avoiding going to public places" such as stores or restaurants and on any given day.[15]  Forty-four percent of Americans reported that they are "completely" (10%) or "mostly" (34%)" isolating themselves from people outside their household.[16]  As of early

---

[10] CDC, Ctrs. for Disease Control & Prevention (hereinafter "CDC"), Coronavirus Disease 2019 (COVID-19):*People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last updated Aug. 14, 2020).

[11] Jonathan M. Worthan et. al, *Characteristics of Persons Who Died with COVID-19 - United States, February 12 - May 18, 2020*, MORBIDITY AND MORTALITY WEEKLY REPORT (MMWR) (July 10, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6928e1.htm.

[12] CDC, Behavioral Risk Factor Surveillance System (BRFSS): *Prevalence & Trends Data* (2018), https://www.cdc.gov/brfss/brfssprevalence/index.html.

[13] *Id.*

[14] Lydia Saad, *Americans' Social Distancing Steady a Pandemic Worsens*, GALLUP (July 20, 2020) https://news.gallup.com/poll/315872/americans-social-distancing-steady-pandemic-worsens.aspx.

[15] *Id.*

[16] *Id.*

June, more than half of Americans still report that they are skipping medical and dental care because of the coronavirus.[17]

"Stay-at-Home Orders," or orders closing businesses and encouraging people to stay in their homes except for essential activities, have helped slow the spread of the virus for entire communities throughout the United States and around the world.[18]  *Id*. ¶ 29.  In recent weeks, multiple states have experimented with re-opening certain businesses and allowing specified activities.  In most, this has resulted in a spike in COVID-19 cases.[19]  *Id*. ¶ 30.  In response to these re-opening-related case increases, governments (including at least 13 states) have re-instituted restrictions in order to decrease the spread of the virus.[20]  Many other states have paused re-opening plans where the rate of COVID-19 has not adequately decreased.[21]

## B.    The COVID-19 Pandemic in Louisiana

As of August 22, 2020, Louisiana had the highest per capita COVID-19 case rate of the fifty states and U.S. territories.[22]  At that time, over 141,000 cases were reported in Louisiana and over 4,500 Louisianans had died from COVID-19.[23]

In light of these facts, it is not surprising that 56.5%of Louisiana respondents to the *50 State COVID-19 Survey* reported that they had followed guidance to avoid contact with other

---

[17] KAISER FAMILY FOUNDATION (KFF), POLL: AMERICANS ARE LEAVING HOME MORE OFTEN NOW THAN IN APRIL AS STATES EASE SOCIAL DISTANCING RESTRICTIONS, THOUGH CORONAVIRUS FEARS REMAIN (June 26, 2020), https://www.kff.org/disparities-policy/press-release/poll-americans-are-leaving-home-more-often-now-than-in-april-as-states-ease-social-distancing-restrictions-though-coronavirus-fears-remain/.

[18] *See e.g.* Janet Weiner, *Wuhan Lockdown Halted Spread of Coronavirus Across China*, HEALTH POLICY$ENSE (March 22, 2020), https://ldi.upenn.edu/healthpolicysense/wuhan-lockdown-halted-spread-coronavirus-across-china; Mark N. Lurie, et al., *COVID-19 epidemic doubling time in the United States before and during stay-at-home restrictions*, JRNL. OF INFECTIOUS DISEASES (Aug. 1, 2020), https://academic.oup.com/jid/advance-article/doi/10.1093/infdis/jiaa491/5879762.

[19] Jasmine C. Lee, et al., *See How All 50 States Are Reopening (and Closing Again)*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html (updated Aug. 21, 2020).

[20] *Id*.

[21] *Id*.

[22] CDC, COVID Data Tracker, *United States COVID-19 Cases and Deaths by State*, https://www.cdc.gov/covid-data-tracker/#cases (last updated Aug. 22, 2020).

[23] La. Dep't of Health, *Coronavirus (COVID-19)*, http://ldh.la.gov/Coronavirus/ (last visited Aug. 22, 2020).

people "very closely" in the past week, while 68.9% said followed guidance to avoid public or crowded places "very closely."[24]  Similarly, the *Manship School Survey of Public Reactions of Coronavirus in Louisiana* published in early June found that 45% of respondents did not leave home in the two weeks prior to the survey to go to work, church, or for any other reason.[25]

On March 11, 2020, Governor Edwards declared a State of Emergency.[26] On March 22, he issued a statewide Stay-at-Home Order banning public gatherings of more than 10 individuals, directing all Louisianans to remain at home unless engaging in an "essential activity," and closing most businesses.[27]  On April 30, the Governor extended the Stay-at-Home Order until May 15 in order to continue to slow the spread of the disease.[28]

On May 15, the Governor issued an order stating that the State would remain in a state of emergency and a statewide public health emergency but would be entering "Phase One" of lifting the Stay-at-Home Order.[29]  On June 4, 2020, he issued an order moving Louisiana into Phase Two of its reopening plan.[30]  Under Phase Two, churches, places of worship, and many business were allowed to operate at 50% capacity with social distancing, masks for employees, and increases

---

[24] David Lazer, et al., The State of the Nation: A 50-State COVID-19 Survey Report #4 (June 2020), https://www.kateto.net/covid19/COVID19%20CONSORTIUM%20REPORT%20JUNE%202020.pdf.

[25] LSU Manship School of Mass Communication, Manship School Survey of Public Reactions of Coronavirus in Louisiana 2, 35 (June 8, 2020) https://www.lsu.edu/manship/files/msmc-covid-19-louisiana-survey-wave-two-report.pdf.

[26] La. Exec. Dep't Proclamation No. 25 JBE 2020 (Mar. 11, 2020), https://gov.louisiana.gov/assets/ExecutiveOrders/25-JBE-2020-COVID-19.pdf.

[27] La. Exec. Dep't Proclamation No. 33 JBE 2020 (Mar. 22, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/JBE-33-2020.pdf; Press Release Office of the Governor, *Gov. Edwards Issues Statewide Stay at Home Order to Further Fight the Spread of COVID-19 in Louisiana* (Mar. 22, 2020), https://gov.louisiana.gov/order/.

[28] La. Exec. Dep't Proclamation No. 52 JBE 2020 (Apr. 30, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/modified/52-JBE-2020-State-of-Emergency-COVID-19-Extension-to-May-15.pdf; *see also* Press Release, Office of the Gov., *Gov. Edwards Will Extend Stay at Home Order Until May 15 to Continue Flattening the Curve and Slowing the Spread of COVID-19* (Apr. 27, 2020), https://gov.louisiana.gov/home-order-extended-may15/.

[29] La. Exec. Dep't Proclamation No. 58 JBE 2020 (May, 15, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/58-JBE-2020.pdf

[30] La. Exec. Dep't Proclamation No. 74 JBE 2020 (June 4, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/74-JBE-2020-State-of-Emergency-COVID-19-Resilient-Louisiana-Phase-2.pdf.

sanitation measures.[31]  But even under Phase Two, individuals at higher risk of severe illness from COVID-19 are directed to stay at home, leaving only for essential activities, such as obtaining food or medicine.[32]

The original plan was for Phase Two to last for 21 days, at which point the state would move to Phase Three.[33]  However, the case rate rose throughout the initial Phase Two period.[34] Accordingly, Phase Two has since been repeatedly extended.[35]  On July 13, 2020, the Governor added more protections to Phase Two by implementing a face mask order, closing bars for on-premises consumption, and restricting gatherings to 50 people or less.[36]  On August 6, 2020, the Governor signed a proclamation extending Phase Two, as modified on July 13, through August 28, 2020.[37]

### C.    COVID-19's Disproportionate Impact on Black People in Louisiana

The COVID-19 pandemic has had a devastating and disproportionate impact on Black people nationwide, and quite significantly in Louisiana.  Decl. of Dr. Camara P. Jones ¶¶ 24-32 (hereinafter Jones Decl. attached as Ex. 2).  Nationally, as of August 3, 2020, Black people represented 22.4% of COVID-19-related deaths in the U.S., while only 12-13% of the total U.S. population is Black.[38]  Reingold Decl. ¶ 13.  The death rate for Black people aged 45-54 is at least

---

[31] *Id.*
[32] *Id.*
[33] Office of the Gov., *Gov. Edwards Signs Order Moving Louisiana to Phase Two of Reopening on Friday* (June 4, 2020), https://gov.louisiana.gov/index.cfm/newsroom/detail/2532.
[34] *Louisiana Coronavirus Map and Case Count*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/louisiana-coronavirus-cases.html (last updated Aug. 22, 2020).
[35] La. Exec. Dep't Proclamation No. 101 JBE 2020 (Aug. 6, 2020). https://gov.louisiana.gov/assets/Proclamations/2020/101-JBE-2020-covid-19-Public-Health-Emergency-Renewal-of-Phase-2.pdf.
[36] *Id.*
[37] *Id*.
[38] CDC, COVID Data Tracker, *Demographic Trends of COVID-19 cases and deaths in the US reported to CDC,*, https://www.cdc.gov/covid-data-tracker/index.html#demographics (last updated Aug. 22, 2020).

six times higher than for white people in the same age group.[39]  *Id.*.  In Louisiana, Black residents make up 32% of the state's population, yet, since the pandemic hit, the COVID-19 death rate among Black residents has been consistently at 50% and has reached as high as 70%.[40]  According to the CDC, the COVID-19 hospitalization rate for Black people is approximately five times that of non-Hispanic white persons.[41]

Persistent and systemic racial inequities in health access and outcomes and socio-economic factors, Decl. of William S. Cooper ¶¶ 10-11 (hereinafter Cooper Decl. attached as Ex. 3), have put Black Louisianans at increased risk of illness and death due to COVID-19.  Jones Decl. ¶¶ 7-16, 24-32.  The CDC has recognized this increased risk among racial and ethnic minorities and, correspondingly, has recognized that they are among the groups of people that need to take extra precautions.[42]

Moreover, higher rates of chronic conditions—recognized as comorbidities for COVID-19—among racial and ethnic minority groups have been identified as a factor that influences the disproportionate impact of COVID-19 on the Black population.[43] Nationwide, Black people have higher rates of high blood pressure, heart disease, obesity, kidney disease, diabetes, and asthma. Jones Decl. ¶ 8; Reingold Decl. ¶ 14.  This pattern is mirrored among Black residents of Louisiana, who have higher rates of comorbidities than White residents of the state. Reingold Decl. ¶ 15.

---

[39] Tiffany Ford, et al., *Race gaps in COVID-19 deaths are even bigger than they appear*, BROOKINGS INSTITUTE (June 16, 2020): https://www.brookings.edu/blog/up-front/2020/06/16/race-gaps-in-covid-19-deaths-are-even-bigger-than-they-appear/.

[40] *See* La. Dep't of Pub. Health, *Coronavirus (COVID-19)*, *supra* note 23.

[41] *See* CDC, Coronavirus Disease 2019 (COVID-19): *COVID-19 Hospitalization and Death by Race/Ethnicity*, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html (last updated Aug. 18, 2020).

[42] CDC, Coronavirus Disease 2019 (COVID-19): *Health Equity Considerations and Racial and Ethnic Minority Groups*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html (last updated July 24, 2020).

[43] *Id*.

**D.    The COVID-19 Pandemic and Voting**

The pandemic has disrupted elections nationwide. Many states already have in place processes or have modified existing election process, including the expansion of absentee voting, to ensure voters can cast their ballots safely amid the COVID-19 pandemic.  Thirty-four states and the District of Columbia already offer all voters a vote by mail option, and of the states without no-excuse absentee voting all but 6—including Louisiana—have expanded the scope of access to absentee ballots due to the significant risks to voters presented by COVID-19.[44]

Analysis of elections in jurisdictions that held primaries during the spring of 2020 provides evidence of the health risks related to in-person voting.  Reingold Decl. ¶ 34. These outcomes are consistent with what we know about the virus and about in-person voting behavior.  Due to the close proximity of large numbers of individuals—voters, observers, poll workers—in a limited indoor space, polling locations are a prime area of concern with regard to increased transmission of COVID-19.  *Id*. ¶ 32.  While it may be possible to mitigate that risk through the wearing of masks and social distancing (six feet of separation) to a degree, it is not clear that such measures will be completely effective, given the difficulty of enforcing these measures.  *Id*.  Indeed, under the Proposed Emergency Plan, mask wearing will be encouraged, but not required, for voters at polling places during the November and December elections.[45]

**E.    Louisiana's Absentee by Mail Voting Excuse Requirement and Early Voting Period**

As of now, the November 3, 2020 election and December 5, 2020 election will take place

---

[44] Kate Rabinowitz and Brittany Renee Mayes, *At least 83% of American voters can cast ballots by mail in the fall*, WASHINGTON POST (Aug. 20, 2020), https://www.washingtonpost.com/graphics/2020/politics/vote-by-mail-states/; there is active litigation in the six states that have not expanded absentee voting options for the November general election.

[45] *See* Secretary of State Proposed Emergency Election Plan for the November 3, 2020 and December 5, 2020 Elections in the State of Louisiana (Apr. 17, 2020), *supra* note 1, at 6.

in accordance with state election laws unmodified by an emergency plan.[46]  The statutory scheme

can be succinctly stated.

Only voters who meet one of the following specific excuses enumerated in Louisiana's

state election code, La. R.S. 18:1308, are eligible to apply for and vote by absentee-by-mail ballot

(the "Excuse Requirement"):

1. Voters who expect to be out of the parish in which they would be qualified to vote in person on Election Day, such as service members, students, clergy members, and overseas citizens.  La. R.S. 18:1303(B).
2. Voters who remain incarcerated pre-trial or sequestered as a jury member during the election.  La. R.S. 18:1303(C)–(G).
3. Eligible disabled voters who submit certain identification or documentation of a qualifying disability.  La. R.S. 18:1303(I).[47]
4. Voters who are 65 years of age and older.  La. R.S. 18:1303(J).
5. Voters who were unable to participate in early voting and will be unable to vote on Election Day due to hospitalization.  La. R.S. 18:1303(D).

Absentee ballot applications may be returned by mail, fax, or hand delivery, or through the

state's online voter portal, and must include the reason for the request and any necessary supporting

documentation.  La. R.S. 18:1307A(2)–(B).  No person, except the immediate family of any voter,

as defined in this code, shall hand deliver more than one voter's application to vote by mail to the

registrar of voters. La. R.S. 18:1307(B)(1)(a).  Subject to certain exceptions, an application to

request an absentee ballot must be received by the registrar by 4:30 p.m. four days prior to the

election for which the ballot is requested.  La. R.S. 18:1307.  Except for military, overseas, and

---

[46] *See* 2020 Elections Calendar, La. Sec. State, https://www.sos.la.gov/ElectionsAndVoting/PublishedDocuments/ElectionsCalendar2020.pdf (last visited Aug. 24, 2020).

[47] Voters claiming disability as an excuse for an absentee ballot must submit a unique "Disabled Application Form," plus a copy of a mobility impaired identification card issued by the Office of Motor Vehicles; a copy of social security disability benefits, veteran's disability benefits, paratransit services, benefits from the Office for Citizens with Developmental Disabilities or benefits from Louisiana Rehabilitation Services; or a physician's letter certifying their disability.  La. R.S. 18:1304(I)(1).  Voters must also enclose a copy of a photo ID (Louisiana driver's license, Louisiana special ID card, or other photo ID with name and signature) or a letter of oath listing the names and addresses of two persons residing in their precinct who could make oath, if required, to the fact that the voter is physically disabled.  La. R.S. 18:1304(I)(2).  Voters who are disabled and homebound and are voting for the first time, must provide a physician's letter as their proof of disability, certifying that they are homebound to exempt them from law that requires that they either register or vote for the first time in person. La. R.S. 18:106.1(A)(2).

hospitalized voters, who may return a voted absentee ballot to the registrar by 8:00 p.m. on election day, all other voters using an absentee ballot must return their ballot by 4:30 p.m. the day before election day for it to be counted. *Id*.

With respect to early voting, La. R.S. 18:1309 allows for seven days of early voting beginning 14 days before a scheduled election and ending seven days before that election.

### F.    Louisiana Elections During the COVID-19 Pandemic

#### 1.    The Emergency Plan Applied to the July and August Elections

Pursuant to La. R.S. 18:401.3, on March 13, 2020, Secretary Ardoin certified that the statewide COVID-19 emergency would impair the upcoming elections.[48]  The Governor then issued an executive order postponing the April 4, 2020 Presidential Preference Primary Election and the May 9, 2020 Municipal General Election to July 11, 2020 ("the July election") and August 15, 2020 ("the August election"), respectively.[49]

After the Senate and Governmental Affairs Committee blocked the Secretary of State's initial proposed emergency plan for the July and August elections, on April 20, 2020 the Secretary submitted a (revised) emergency plan to the Legislature.[50]  Following hearings on April 22, both the Senate Committee and the House Committee approved the plan.[51]  On April 27, it was approved by the full legislature and the Governor.  For the July and August 2020 elections only, the emergency plan allowed for voters to seek absentee ballots if they attest on an application that they (i) are "[a]t a higher risk of severe illness from COVID-19 due to serious underlying medical

---

[48] *See* La. Exec. Dep't Proclamation No. 46 JBE 2020 (Apr. 14, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/modified/46-JBE-2020-Elections.pdf.
[49] La. Exec. Dep't Proclamation No. 28 JBE 2020 (March 13, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/modified/28-JBE-2020-Special-Elections-COVID19-Postponement.pdf.
[50] Secretary of State Emergency Election Plan for the July 11, 2020 Presidential Preference Primary and August 15, 2020 Municipal General Elections in the State of Louisiana (Apr. 20, 2020), *supra* note 3.
[51] Fritz Esker, *La. Legislature Approves Emergency Election Plan*, THE LOUISIANA WEEKLY (May 4, 2020), http://www.louisianaweekly.com/la-legislature-approves-emergency-election-plan/.

conditions as identified by the CDC (including chronic lung disease, moderate to severe asthma, hypertension and other serious heart conditions, diabetes, undergoing chemotherapy, severe obesity (BMI of 40 or higher), chronic kidney disease and undergoing dialysis, liver disease, pregnancy, or immunocompromised due to cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications); (ii) are "[s]ubject to a medically necessary quarantine or isolation order as a result of COVID-19"; (iii) are "[a]dvised by a health provider to self-quarantine due to COVID-19 concerns"; (iv) are "[e]xperiencing symptoms of COVID-19 and seeking medical diagnosis"; or (v) are "[c]aring for an identified individual who is subject to medically necessary quarantine or of COVID-19 or who has been advised by a health care provider to self-quarantine due to COVID-19 concerns."[52]

### 2. The Emergency Plan Proposed for the November and December Elections

On August 17, 2020 the Secretary of State proposed an emergency plan for the November 3 and December 5, 2020 elections.[53]  In contrast to the July/August Emergency Plan, the Proposed Emergency Plan only extends eligibility for absentee voting only to voters who test positive for COVID-19 during and after the early voting period but before Election Day.[54]  The Proposed Emergency Plan provides no other absentee voting eligibility to any other category of voter, regardless of the potential vulnerability of themselves of their family members, and regardless of their potential increased likelihood of inadvertently spreading the virus.  So no one is confused,

---

[52] Secretary of State Emergency Election Plan for the July 11, 2020 Presidential Preference Primary and August 15, 2020 Municipal General Elections in the State of Louisiana (Apr. 20, 2020), *supra* note 3; State of Louisiana Official Absentee Ballot Application: COVID-19 Emergency Application, https://house.louisiana.gov/Agendas_2020/Apr_2020/COVID-19%20Absentee%20by%20Mail%20Application%20(Rev.%204-20)%20Ver.%209.pdf
[53] Secretary of State Proposed Emergency Election Plan for the November 3, 2020 and December 5, 2020 Elections in the State of Louisiana (Aug. 17, 2020), *supra* note 1.
[54] *Id*. at 12.

the proposed plan plainly states: **"This proposed plan is NOT an expansion of mail-in or absentee voting."** (all caps in the original).[55]

Notably, citing correspondence received by Secretary Ardoin from the U.S. Postal Service general counsel regarding the time frame for absentee ballots requests, transmission, and return, the Proposed Emergency Plan modifies the deadline to submit an absentee ballot request from 4 days before election day to 10 days prior to election day.[56] Yet, the deadline by which a voted absentee ballot must be returned to the registrar in order to be counted remains unchanged—the ballot must be *received* by the registrar no later than 4:30 pm the day before election day.[57]

In addition, the Proposed Emergency Plan would increase the early voting period from seven to 10 days, reducing the 13-day early voting period offered under the July/August Emergency Plan.[58]

On August 20 and 21, 2020, the Proposed Emergency Plan was passed by the pertinent legislative committees. If the Proposed Emergency Plan is not then approved by both the full legislature and the Governor, then the statutory scheme, described above, sets the procedures for voting.

## III. ARGUMENT

A preliminary injunction is warranted if Plaintiffs show (1) a substantial likelihood of success on the merits; (2) irreparable injury if the injunction is not granted; (3) that the injury outweighs any harm that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *See Brock Servs., LLC v. Rogillio*, 936 F.3d 290, 296 (5th Cir. 2019); *see also Jackson Women's Health Organization v. Currier*, 760 F. 3d 448, 452 (5th Cir.

---

[55] *Id*. at 3.
[56] *Id*. at 13.
[57] *Id*. at 15.
[58] *Id*. at 7.

2014).  Plaintiffs here satisfy each of these requirements with respect to the Excuse Requirement and the reduction of the early voting period for the November and December 2020 elections (together, the "Challenged Provisions")

### A.    Plaintiffs Are Likely to Succeed on the Merits of Their Constitutional Claims Against the Challenged Provisions

To demonstrate a likelihood of success on the merits, Plaintiffs "must present a prima facie case" that they are likely to succeed, "but need not prove that [they are] entitled to summary judgment."  *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 582 (5th Cir. 2013)*.  Plaintiffs are likely to prevail on the merits of their claims that, in the context the ongoing COVID-19 pandemic, the Challenged Provisions unduly burden the fundamental right to vote in violation of the First and Fourteenth Amendments.

Under the test set forth by the Supreme Court in *Anderson v. Celebrezze* and *Burdick v. Takushi*, a court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justification for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.  *Burdick v. Takushi,* 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *see also Texas Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996) (citations omitted).[59]

Where the burden is viewed as severe, a heightened scrutiny standard is applied.  *Burdick*, 504 U.S. at 434.  Under this approach the challenged restraint must be  a  "[n]arrowly tailored"

---

[59] *But cf*., *Texas Dem. Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020). In *Texas Dem Party*, the Fifth Circuit considered a motion to stay an injunction of Texas's 65 years and older absentee voting classification as a violation of the 26th Amendment. Relying on *McDonald v. Bd. of Elect. Comm'rs of Chicago*, 394 U.S.803 (1969), the court applied rational basis review and stayed (pending the outcome of an appeal) the district court's order granting an injunction.  Plaintiffs disagree with the *Texas Dem. Party* court's analysis under *McDonald* and preserve the issue for further review.

restriction that constitutes the means  that is "the one best tailored to achieve [the state's] purposes," *Dudum v. Arntz*, 640 F.3d 1098, 1114 (9th Cir. 2011), or the "least restrictive means,"

During the course of the COVID-19 pandemic, courts have engaged in the *Anderson-Burdick* analysis and held that voting requirements that may have previously been permissible, constituted undue burdens on the right to vote in light of the COVID-19.  *See, e.g.*, Memorandum Opinion, *League of Women Voters of Va. v. Va. State Bd. Of Elec*., No. 6:20-cv-0024, ECF 109 at 15 (W.D. Va. Aug. 21, 2020) (finding an absentee ballot witness signature requirement "creates a burden on a substantial and discrete class of Virginia's electorate while the pandemic rages on, and this burden is not justified by the value of that requirement as an anti-fraud measure in face of the risk posed by COVID-19."); *Thomas v. Andino*, No. 3:20-CV-01552-JMC, 2020 WL 2617329, at *24 (D.S.C. May 25, 2020) (concluding that "adherence to [an absentee ballot] Witness Requirement in June would only increase the risk for contracting COVID-19 for members of the public with underlying medical conditions, the disabled, and racial and ethnic minorities); *League of Women Voters of Va. v. Va. State Bd. Of Elec*., No. 6:20-cv-0024, _F. Supp. 3d _, 2020 WL 2158249, at *7-8 (W.D. Va. May 5, 2020) (acknowledging that "[i]n ordinary times, [the absentee ballot] witness signature requirement may not be a significant burden on the right to vote [, b]ut these are not ordinary times," and finding that in the context of the COVID-19 pandemic, an absentee ballot witness signature requirement's "substantial" burdens outweighed any countervailing state interests and approving a consent decree enjoining it); *Garbett v. Herbert*, No. 2:20-cv-245-RJS, 2020 U.S. Dist. LEXIS 75853, at *43 (D. Utah Apr. 29, 2020) (finding that, as applied in the "unforeseen, extraordinary circumstances" of COVID-19, a state ballot access framework imposed a severe burden on the right to vote and was not narrowly tailored to serve a compelling government interest); *Libertarian Party of Ill. v. Pritzker*, No. 20-cv-2112, 2020 WL 1951687, at *3  (N.D. Ill. Apr. 23, 2020) (finding that, when assessing state-imposed burden within

the context of "the extraordinary circumstances arising from COVID-19," "the combined effect of . . . Illinois' stay-at-home order and the usual in-person signature requirements [created] a nearly insurmountable hurdle"); *Esshaki v. Whitmer*, No. 20-cv-10831, 2020 U.S. Dist. LEXIS 68254, at *20 (E.D. Mich. Apr. 20, 2020) (finding heightened scrutiny analysis appropriate where "unprecedented . . . restrictions imposed on daily life by the Stay-at-Home Order, when combined with the ballot access requirements . . . created a severe burden").

In the context of the ongoing and significant health risks posed by COVID-19, the Challenged Provisions impose an undue burden on the fundamental right to vote that Defendants cannot justify by any state interest.

### 1.    The Excuse Requirement Imposes an Undue Burden on the Fundamental Right to Vote

Defendants' failure to modify the Excuse Requirement for the November and December elections will impose undue burdens on the right to vote, particularly for certain categories of vulnerable voters, including those with underlying medical conditions and disabilities and their caretakers.

*Plaintiff Jennifer Harding*, 42, is a caretaker for both her adolescent son and elderly, immunocompromised parents and grandmother.  Under the Excuse Requirement, Ms. Harding will have to break her diligent social distancing practices in order to vote.  Decl. of Jennifer Harding ¶¶ 4, 20 (hereinafter "Harding Decl." attached as Ex.4).  She will have to vote in person at her polling place, alongside others who may not be socially distancing, and who are not required to wear masks.  *Id*. ¶¶ 16-19.  This was Ms. Harding's exact experience when voting in person in July and August 2020, after she was unable to receive assurances from the Secretary of State and her parish registrar that she could qualify to vote by absentee ballot under the July/August Emergency Plan.  *Id*. ¶¶ 11-15.

*Plaintiff Jasmine Pogue* is a 33-year-old Black woman who was recently diagnosed with asthma. Decl. of Jasmine Pogue ¶ 5 (hereinafter Pogue Decl. attached at Ex. 5).  If the Excuse Requirement remains in effect, Ms. Pogue will have to vote in person in an enclosed space where she will be unable to effectively maintain social distancing or trust that others will abide by safety measures, like wearing a mask.  *Id*. ¶¶ 12-16.  Indeed, just to enter her polling site, Ms. Pogue will be required to walk through and stand in a long narrow hallway that does not allow individuals walking in opposite directions to remain six feet apart.  *Id*. ¶ 13.

*Plaintiff Omega Taylor* is a 56-year old Black woman who resides in Hammond, Louisiana, with her husband. Decl. of Omega Taylor ¶¶ 1, 3 (hereinafter Taylor Decl. attached as Ex. 6).  Ms. Taylor has diabetes, high blood pressure, and a thyroid disorder, which put her at higher risk of complications and death if she contracts COVID-19.  *Id*. ¶ 4.  Her husband, who is 67 years old has severe health complications that put him of high risk of suffering severe health complications from COVID-19.  *Id*. ¶ 8. Under the Excuse Requirement, Ms. Taylor would have to abandon her strict social distancing practices in order to vote.  Ms. Taylor's regular polling place is a small fire station with limited interior space in which she is unlikely to be able to maintain safe distance from other voters and poll workers.  *Id*. ¶ 16.

Protecting the rights of such acutely vulnerable voters is wholly consistent with Fifth Circuit's recent decision in *Texas Democratic Party et al. v. Abbott et al.*, 961 F.3d 389 (5th Cir. 2020).  There the court considered whether a statute limiting vote by mail to those over 65 discriminated against young voters and applied rational basis review because plaintiffs were not "absolutely prohibited" from voting if they were obliged to vote in person.  *Id*. at 404, 406.  Not so for those with comorbidities.  In their circumstances the requirement to show up at the polls carries a heightened risk of serious illness or death.  There can be no more forceful prohibition on the right to vote.

Recognizing the increased burden posed by certain of the State's election laws and requirements, the Defendants implemented modifications to mitigate the elevated burden through the July/August Election Plan. The State cannot now re-impose undue burdens on voters most susceptible to infection and severe illness from COVID-19 and voters following state and public health social distancing and isolation guidelines, including Plaintiffs.

Defendants' primary purported interest in restraining opportunities to vote by absentee ballot is their stated concern in deterring voter fraud.[60] This interest fails to support maintaining the Excuse Requirement during the November and December elections for several reasons.

First, Defendant Secretary Ardoin has repeatedly stated that voter fraud in the State's elections is not a significant concern.[61] His statements regarding the lack of instances of voter fraud are well grounded in the historical record.[62] Instances of election fraud via absentee voting are extremely rare in the United States, and are minimal to nonexistent in Louisiana.[63]

Second, recent experience from the July election reinforces that point, further undercutting any contention that voter fraud is of concern. There have been no reported instances of voter fraud

---

[60] Voter fraud was the justification proffered by members of the Senate & Governmental Affairs Committee who blocked the first and most expansive emergency plan proposed by the Secretary of State on April 15, 2020. No member presented evidence that fraud had occurred or was likely to occur. *See* Sam Karlin, Louisiana Republicans Block Emergency Coronavirus Election Plan; Future of Election Unclear, The Advocate (Apr. 15, 2020), https://www.theadvocate.com/baton_rouge/news/coronavirus/article_4dfccfd6-7f44-11ea-b67e-73d2172ba20b.html.

[61] Video, Louisiana House Committee on Governmental Affairs, Hearing to Consider the Emergency Election Plan, April 15, 2020; 18:25-21:00, https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2020/apr/0415_20_HG;

[62] *See, e.g.,* Dede Willis, *Elections Chief says no evidence of voter fraud in Louisiana*, KNOE News (Jan. 26, 2017) http://www.knoe.com/content/news/Elections-chief-says-no-evidence-of-voter-fraud-in-Louisiana-411805135.html; Amber Phillips, *Trump's Voting Commission was doomed from the start*, WASHINGTON POST (Jan. 4, 2018) (Secretary of State Schedler denying that significant voter fraud exists in Louisiana) https://www.washingtonpost.com/news/the-fix/wp/2018/01/04/trumps-voter-fraud-commission-was-doomed-fromthe-start/?noredirect=on&utm_term=.b9bacaefe02d.

[63] Even the Heritage Foundation, an organization dedicated to "[p]reventing, deterring, and prosecuting election fraud," has not identified cases of absentee voting fraud in Louisiana. *See* The Heritage Foundation, Election Fraud Cases, https://www.heritage.org/voterfraud/search?combine=&state=LA&year=&case_type=All&fraud_type=24489 (last visited Aug. 24, 2020).

in the any election where the July/August Emergency Plan expanded the statutory limitations on who can cast an absentee ballot.

Third, Louisiana has robust mechanisms in place to ensure that absentee mail in voting fraud does not occur, including: review of absentee voting eligibility by the registrar of voters, strict requirements for voter attestation and verification under penalty of perjury, specific criminal penalties for violation of absentee voting laws with notice of such penalties highlighted on every absentee ballot, and ballot-by-ballot review of each absentee ballot by parish boards of election supervisors to identify ballots that must be rejected and not counted.  Additionally, before submitting his or her ballot, under penalty of perjury, an absentee voter must execute a certification attesting to the voter's awareness of criminal penalties associated with voting at the polls after voting absentee by mail or during early voting, which is printed in all caps, boldface, red type on the envelope of the ballot delivered to the voter.

> **2.    The Reduction of the Early Voting Period for the November and December 2020 Elections Imposes an Undue Burden on the Fundamental Right to Vote**

The State's reduction of the early voting period from 13 days under the July/August Emergency Plan to seven under the existing code will impose an undue burden on Plaintiffs' right to vote during the November and December elections.

For in-person voters, additional days of early voting will allow for effective social distancing and reduce the risk of crowds gathering in lines to enter a polling place and inside the polling place. Defendants recognized the seriousness of this risk in April and expanded early voting from seven days to 13 days for the July and August elections.

Voter participation is expected to be substantially higher in November than in the July and August elections.[64] By Defendant Ardoin's own estimation, the expected voter turnout will be 2.1 million.[65] The reduction of the early voting period to 7 days significantly increases the likelihood that voters will have to break from months of diligent social distancing to enter potentially crowded lines and polling places. The State has no valid justification for its failure to implement the 13-day early voting period during the November and December elections.

### B. Plaintiffs Are Likely to Succeed on the Merits of Their ADA Claims Against the Challenged Provisions

Plaintiffs are likely to prevail on the merits of their claims that, in the context the ongoing COVID-19 pandemic, the Challenged Provisions unduly exclude people with comorbidities from equal participation in the upcoming elections in violation of Title II of the Americans with Disabilities Act ("ADA").

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services." 42 U.S.C. § 12132. To make out a *prima facie* case under Title II, a plaintiff must show "(1) that [they are] a qualified individual within the meaning of the ADA; (2) that [they are] being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004). "Plaintiffs need not, however, prove that they have been disenfranchised or otherwise 'completely prevented from enjoying a service,

---

[64] Drew Desilver, *Voter turnout always drops off for midterm elections, but why?*, Pew Research Center (July 24, 2014), https://www.pewresearch.org/fact-tank/2014/07/24/voter-turnout-always-drops-off-for-midterm-elections-but-why/ (explaining that turnout is higher during presidential elections).
[65] Secretary of State Proposed Emergency Election Plan for the November 3, 2020 and December 5, 2020 Elections in the State of Louisiana (Aug. 17, 2020), *supra* note 1.

program, or activity' to establish discrimination" in violation of the voting rights protected by the ADA. *Disabled in Action v. Bd. Of Elec. in City of N.Y.*, 752 F.3d 189, 198 (2d. Cir. 2014) (citation omitted). Plaintiffs qualifying disabilities may be situationally defined by "certain environmental or health-related situations." *Silver v. City of Alexandria*, No. 1:20-CV-00698, 2020 WL 3639696, at *4 (W.D. La. July 6, 2020) (stating that consideration of a "serious underlying medical situation, in light of the pandemic's existence, is the proper way to make the disability determination."). COVID-19, for example, imbues disability status on individuals with comorbidities who would not otherwise require accommodations in the absence of the pandemic.

Once Plaintiffs prove that a challenged provision denies them equal access to the ballot, the State must offer "reasonable modifications to rules, policies, or practices." 42 U.S.C. § 12131(2); *see also* 28 C.F.R. § 35.130(b)(7). Where the State has an affirmative obligation to make reasonable accommodations for disabled individuals but fails to do so, "the cause of that failure is irrelevant." *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 455 (5th Cir. 2005) (citation omitted). The determining inquiry is whether the requested accommodation was reasonable or would cause "undue financial or administrative burden" or require "fundamental alteration" to the process of election administration. *Id.* A modification to a rule is reasonable if it will not cause "undue hardship." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401-03 (2002). The burden of showing that a modification is reasonable is "not a heavy one" and it "is enough for the plaintiff to suggest the existence of a plausible accommodation." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 508 (4th Cir. 2016). The determination of reasonableness is "fact-specific." *Id.* at 508.

Due to their diagnosed comorbidities of COVID-19, Plaintiffs Pogue and Taylor have qualifying disabilities under the ADA. Plaintiffs are eligible to vote and would do so without risk to personal health if provided reasonable accommodations to vote by absentee ballot. Without a modification to the Challenged Provisions, Plaintiffs fundamental right to vote will be

unduly burdened by reason of their disability. Because Louisiana already has a limited absentee voting program, it is of no undue administrative burden to extend this option to voters who should properly qualify for such reasonable accommodation in the context of the pandemic.

### C. Plaintiffs Will Suffer Irreparable Harm if the Challenged Provisions Are Not Enjoined

Encroachment on the right to vote "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Therefore, invariably, a "restriction on the fundamental right to vote . . . constitutes irreparable injury." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (citing *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir.1986) (finding that the denial of the right to vote is "irreparable harm")).

Plaintiffs Harding, Pogue, and Taylor are among the many citizens of Louisiana who wish to exercise their right to vote, but who face extreme risks if they are forced to break from their current safety practices in order to vote in person. *See* Harding Decl. ¶ 4; Pogue Decl. ¶ 4; Taylor Decl. ¶¶ 8-9. There "can be no injury more irreparable" than "serious, lasting illness or death." *Thakker v. Doll*, No. 1:20-cv-480, 2020 WL 1671563, at *4 (M.D. Pa. Mar. 31, 2020). Courts have already established that "COVID-19 constitutes an irreparable harm" that supports the grant of preliminary relief. *Id.* at *7.

Organizational plaintiffs the Louisiana NAACP and Power Coalition for Equity and Justice ("PCEJ") also face irreparable harm. A voting rights organization is "irreparably harmed when the right to vote is wrongfully denied or abridged—whether belonging to its membership or the electorate at large." *N.C. State Conf. of NAACP v. Cooper*, No. 18-cv-1034, 2019 WL 7372980, at *24 (M.D.N.C. Dec. 31, 2019); *see also Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270, 1295 (N.D. Ga. 2018) (finding plaintiff organization's harm "to its organizational interests is coterminous with the harms suffered by its citizen members").

The Louisiana NAACP has thousands of members across the state.  Decl. of Michael W. McClanahan ¶ 7 (hereinafter McClanahan Decl. attached as Ex. 7).  Many are Black, and a substantial number of them have medical conditions, like asthma, hypertension, and diabetes, that put them at higher risk of infection or death from COVID-19.  *Id*. Under such circumstances, many of the Louisiana NAACP's members would, if eligible, seek to vote by absentee mail in ballot during the November and December elections.  *Id.* at ¶¶ 6-8.

Additionally, as a direct result of the maintenance of the Challenged Provisions for the upcoming elections, the Louisiana NAACP has diverted its limited resources to monitor and investigate the impact of the Challenged Provisions on its members given COVID-19's disproportionate impact on Black Louisianans, and has advocated for modifications of the Challenged Provisions.  *Id.* at ¶¶ 6, 9.  As part of its efforts, the organization estimates that it will require about 300 volunteers to spend approximately 480 hours at over 30 branches throughout the state to hand out 40,000 to 45,000 masks and hand sanitizers for voters who are required to vote in person amid the pandemic.  *Id.* at ¶ 9.  The Louisiana NAACP has also spent money and resources on advertising, virtual canvassing, and public education efforts for community members in response to widespread concerns among its members about the health risks of congregating at polling places when voting in person.  *Id*.

PCEJ is a nonpartisan, nonprofit that focuses on increasing voter registration and re-enfranchisement.  Decl. of Ashley Shelton ¶¶ 4, 14, 27 (hereinafter Shelton Decl. attached as Ex. 8).  In anticipation of the 2020 cycle, PCEJ also prioritized resources for efforts to increase Census participation.  *Id*. ¶ 14.  Since the COVID-19 pandemic began, PCEJ has had to shift its focus, and its resources, from registration, re-enfranchisement, and Census outreach, to focus on educating voters on Louisiana's new and changing COVID-19-related voting rules. *Id*. ¶ 14-16; 26-27. Questions regarding the implications of the state's changing absentee qualifications have

represented almost half of all inquiries PCEJ has fielded in recent months and have distracted from PCEJ's intended priority efforts.  *Id.* ¶ 14.

PCEJ After PCEJ dedicated time and resources to helping voters learn and interpret five pandemic-specific excuses for absentee voting in July and August, PCEJ must now re-educate voters that these excuses are no longer available and that the early voting period will also be reduced.  *Id.* ¶ 16.  PCEJ has also diverted volunteer recruitment for Election Day voter mobilization and election protection efforts.  *Id.* ¶ 19.

### D.    The Balance of Hardships and the Public Interest Favor a Preliminary Injunction.

An injunction would favor the public interest by "permitting as many qualified voters to vote as possible."  *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012).  Enjoining the Challenged Provisions would protect Plaintiffs' constitutional right to vote and the health of the public at large by enabling voting opportunities that do not require unnecessary and unsafe in-person interactions.

Defendants risk no irreparable harm nor substantial burden if the Excuse Requirement is enjoined and the early voting period expanded.  While Defendants and their agents will be tasked with facilitating expanded absentee and early voting opportunities and educating voters on their rights, these duties already fall within the purview of their offices and, more so, "administrative convenience" cannot justify limiting voters' access to their fundamental rights.  *Taylor v. Louisiana.*, 419 U.S. 522, 535 (1975).

### IV.    CONCLUSION

For the reasons stated, Plaintiffs respectfully request that this Court grant their Motion for Preliminary Injunction.

DATED this 25th day of August 2020.          Respectfully submitted,

Robert D. Fram*                              /s/ Ronald L. Wilson
Morgan E. Lewis*                             Ronald L. Wilson, (LSBN 13575)
Joshua González*                             701 Poydras Street, Suite 4100
Covington & Burling LLP                      New Orleans, LA 70139
One Front Street                             Tel.: (504) 525-4361
San Francisco, CA 94111-5356                 cabral2@aol.com
Tel: (415) 591-6000
rfram@cov.com                                John Z. Morris*
MELewis@cov.com                              Steven Lance*
jgonzalez@cov.com                            Victoria Wenger*
                                             NAACP Legal Defense &
John Fraser**                                   Educational Fund, Inc.
Covington & Burling LLP                      40 Rector Street, 5th Floor
The New York Times Building                  New York, NY 10006
620 Eighth Avenue                            Tel.: (212) 965-2200
New York, NY 10018-1405                      zmorris@naacpldf.org
Tel: (212) 841-1000                          slance@naacpldf.org
JFraser@cov.com                              vwenger@naacpldf.org

Frederic M. Levy*                            Catherine Meza*
Covington & Burling LLP                      NAACP Legal Defense &
One City Center                                 Educational Fund, Inc.
850 Tenth Street, NW                         700 14th Street, NW, Suite 600
Washington, D.C. 20001                       Washington, D.C. 20005
Tel: (202) 662-5154                          Tel.: (202) 682-1300
flevy@cov.com                                cmeza@naacpldf.org

                                             * *Pro Hac Vice*
                                             ** *Pro Hac Vice* Motion forthcoming

                                             **Attorneys for Plaintiffs**