# **EXHIBIT 8**

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JENNIFER HARDING, JASMINE POGUE, OMEGA TAYLOR, LOUISIANA STATE CONFERENCE OF THE NAACP, and POWER COALITION FOR EQUITY AND JUSTICE,<br><br>    *Plaintiffs*,<br><br> v.<br><br>JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana, and KYLE ARDOIN, in his official capacity as Secretary of State of Louisiana.<br><br>    *Defendants*. | Case. No. 3:20-cv-00495-SDD-RLB |

## DECLARATION OF ASHLEY SHELTON

ASHLEY SHELTON declares, pursuant to 28 U.S.C. § 1746, as follows:

1. I am 44 years old and competent to make this declaration.

2. I am a U.S. citizen and a lawfully registered voter. I have voted in Louisiana since I turned 18 years old and have never lost my right to vote by reason of a felony conviction or court order.

3. I am a resident of Baton Rouge, Louisiana, where I have lived my whole life. I serve as the Executive Director of the Power Coalition for Equity and Justice ("PCEJ"). I am also a member of several boards including Center for Planning Excellence, Southern Mutual Help Association, and Voice of the Experienced.

4. PCEJ is a nonpartisan, nonprofit statewide civic engagement table in Louisiana that works to build grassroots power, advocate for community-centered policies, and increase voter participation.

5. PCEJ's mission is to support community-driven activism and grassroots leadership development to empower citizens to address classism, racism, and other marginalization in their own lives and communities. PCEJ advances its mission with the support of full- and part-time staff, community volunteers, and a team of nonprofit and advocacy organizations united around an integrated civic engagement strategy to educate and empower voters across Louisiana.

6. In 2019, PCEJ engaged with 465,406 infrequent and semi-frequent voters of color through hundreds of thousands of doors knocked, phone calls, and text messages, totaling over 1.2 million contact attempts in an effort to support civic participation. As in other years, in 2019, PCEJ also provided rides to the polls and rapid response voter support during early voting and election days.

7. Since the COVID-19 pandemic began, PCEJ has been forced to shift to virtual engagement models, including tele-town halls, video meetings, and multilayer press strategies to communicate information to its membership and target constituencies. PCEJ has also been required to dedicate staff time and resources to monitor and respond to the State's insufficient attempts to address election access during the pandemic.

8. On March 10, 2020, PCEJ introduced a package of five election integrity bills to increase confidence in the State's election system. The package included legislation addressing redistricting and voter roll maintenance, as well as H.B. 419, which would have provided for no-excuse voting by mail. The bill would have expanded vote by mail eligibility to every Louisiana voter and required the State to provide pre-paid postage on absentee ballots.

9. On April 14, 2020, PCEJ released a comprehensive list of policy demands to advance an equitable COVID-19 response and recovery. This roadmap included a section titled "Protect Democracy," which listed the expansion of early voting and vote by mail opportunities

first among a long list of policy priorities.

10. On April 15, 2020, in my capacity as Executive Director of PCEJ, I attended the Senate and House committee meetings regarding the Secretary of State's initial emergency election plan ("First Emergency Plan") for the July and August elections. The meetings had been announced just days before (at 5:00 PM on Good Friday, April 10, 2020), at which point the plan had not been made public. At risk to my personal health, I attended the hearings in person in order to offer public testimony regarding the urgent need to expand voting opportunities for the hundreds of thousands of voters of color that PCEJ serves across our state—many of whom live at the highest risk of COVID-19.

11. While it was the position of PCEJ that the First Emergency Plan could have done more to protect voters, many of the plan's provisions mirrored our policy priorities, including the expansion of absentee voting opportunities. Among a broad range of accepted excuses, the plan allowed voters "[u]nable to appear in public due to concern of exposure to or transmission of COVID-19," to request an absentee ballot. To our disappointment, the Senate Committee, unlike their counterparts on the House & Governmental Affairs Committee, would not even vote to certify that Louisiana was in a state of emergency, effectively halting the First Emergency Plan.

12. On April 22, 2020, I returned to the State Capitol Building after Defendant Ardoin announced the release of a new plan (the "Revised Emergency Plan" or "July/August Emergency Plan"), which drastically reduced the protections for voters provided under the First Emergency Plan. PCEJ was particularly concerned that the Revised Emergency Plan did not address the health and safety concerns of frontline workers, including healthcare, public transportation, sanitation, and food-service professionals. Many of these workers, who are disproportionately Black and Brown folks, no longer qualified to vote by absentee ballot because of the reduction in accepted

excuses to vote by mail under the Revised Emergency Plan compared to the First Emergency Plan.

13. Before the committees voted, PCEJ issued a press release to express concern that the Revised Emergency Plan would result in widespread disenfranchisement due to the history of racial voter suppression and inequality in Louisiana. By April, it was well-documented that communities of color in Louisiana were suffering greater rates of infection and death from COVID-19 than their white counterparts. PCEJ's press release highlighted that this disparity could reasonably lead to greater fear in communities of color about showing up to polling locations to cast their ballots.

14. When the Revised Emergency Plan was approved, PCEJ had to refocus its efforts to address the plan's gaps and ambiguities. The exclusionary and vague terms of the COVID-19-related absentee-by-mail excuses included in the plan were confusing. Time allocated to answering questions regarding eligibility to vote by mail went from a small portion of PCEJ's voter education work to a constant and complicated effort. These questions represented almost half of all inquiries PCEJ fielded in the months leading up to the July/August elections and distracted from other efforts to register voters, drive Census participation, and train and recruit volunteers.

15. For example, many of PCEJ's constituents are essential workers in the medical field who are not eligible to vote by absentee ballot under any general excuses defined in the Louisiana Election Code. The limited additional COVID-19-related excuses presented in the Revised Emergency Plan also did not afford many essential workers a mechanism to vote by mail. PCEJ had to field numerous inquiries from essential medical workers who were concerned about entering voting precincts after a shift at the hospital and potentially spreading the virus. We heard similar concerns from essential workers in many other non-medical fields.

16. The fact that the Revised Emergency Plan only applied to the July and August elections created further challenges for our workflow. After PCEJ dedicated time and resources to helping voters learn and interpret five pandemic-specific excuses for mail balloting in July and August, we now need to re-educate voters that these excuses will not be available for the fall and winter elections; and further that the early voting period will be reduced. Educating voters as to all these changing rules, dates, and deadlines has and will continue to require PCEJ to divert resources from its registration and re-enfranchisement activities.

17. When the Secretary of State failed to extend the terms of the Revised Emergency Plan to November and December, and stalled on releasing a new plan, PCEJ had to delay many of our seasonal voter outreach efforts. It has not been possible for PCEJ to provide simple or decisive responses to voters' questions regarding their eligibility to vote by mail or produce materials with critical voter information like early voting dates for the remaining elections. We had to postpone mass design and printing projects, like door-hangers, with early voting schedules and absentee ballot request deadlines. But for the State's inaction, these materials would have been printed by the thousands in July and ready to distribute shortly after the conclusion of August elections.

18. PCEJ routinely hires around 100 part-time workers to serve as phone bankers and canvassers leading up to major elections. While these workers are typically hired and trained in the mid-summer months, we had to postpone our onboarding and training because of the lingering ambiguity about voters' rights and health protections for the November and December elections. We employ many of these workers on a yearly basis, and our full-time staff has had to dedicate extra time to answering their questions and maintaining these relationships as start dates have been delayed. Because onboarding will now be closer to the peak of our voter outreach efforts, we anticipate it will require our primary staff to work overtime to train and bring on this team while

balancing our other election programming.

19. PCEJ also relies heavily on volunteers for our voter advocacy and Election Day efforts. We have recently been forced to divert volunteer recruitment from our own "Get Out the Vote" ("GOTV"), rides to the polls, and election monitoring efforts to instead steer potential volunteers to work as government-paid poll workers. PCEJ has identified poll worker shortages as a risk factor for polling site closures, long lines, and congestion during the early voting period and Election Day voting hours. Based on public health guidance, we believe these issues will exacerbate COVID-19 transmission. If the limits on voting by mail and early voting were not in effect for the November and December elections, the threat of long lines and congestion at polling sites would be mitigated and PCEJ would not need to steer its own volunteers to instead work as poll workers or spend numerous hours developing outreach materials to promote this new call-to-action.

20. With support from members of PCEJ's remaining volunteer base, our team was able to closely monitor the July and August elections. From the calls that PCEJ staff received, the reports observed through traditional and social media sources, and the observations of our field volunteers, we were convinced that polling sites were not consistently nor reliably safe under the conditions of the pandemic. For example, we monitored reports that voters witnessed poll workers and other voters who were not wearing masks, were forced to touch communal surfaces that were not sanitized, and were not consistently provided protective finger coverings to avoid contaminated surfaces.

21. PCEJ fielded an unprecedented number of reports of issues at polling places in July and August—even after we observed the significant rise in ballots cast by mail and during the early voting period. In a predictably higher turnout election like November, PCEJ anticipates these

issues will increase and will only be exacerbated by the limitations on alternative voting days and methods.

22. On July 28, 2020, PCEJ sent a letter to Defendant Ardoin, co-signed by roughly two dozen organizations, calling for the implementation of a new emergency plan to provide safe voting opportunities during the November and December elections. The letter stated that the July/August Emergency Plan represented only a baseline for accommodations that should—at minimum—be extended to November and December. The letter also called for the expansion of mail-in voting to all voters, public guidance on absentee voting qualifications, the extension of deadlines to request and return absentee ballots, and the removal of the witness requirement. Defendant Ardoin never replied. On August 17, 2020, he released a proposal for a new plan that included none of the provisions PCEJ and our cosignatories advised.

23. On August 19, 2020, I returned to the State Capitol Building to speak on behalf of PCEJ in opposition to Defendant Ardoin's proposed emergency plan for the November and December elections. The plan failed to maintain the minimal vote-by-mail and early voting expansions included in the July/August Emergency Plan. In my testimony, I emphasized how Louisiana, and our Black community in particular, has been ravaged by the COVID-19 pandemic. In these times especially, I argued, the plan failed to provide Louisiana voters the pathways they need to exercise their right to vote—a mission that should not be politicized.

24. From listening to the testimony of Secretary of State Ardoin, legislators, and health experts during the House and Governmental Affairs Committee hearing, I learned that the proposed November/December Emergency Plan was not informed by the advice of health officials or written to meet the best interests of voters.

25. During the meeting, Secretary Ardoin cited his experience as a lobbyist and said

that he developed a plan that he was confident would pass the legislature because he knew "how to count votes." He answered "no" when asked if he consulted Department of Health staff or public health experts in drafting the plan. When asked directly, he refused to assert that the plan was the best plan for voters.

26. PCEJ's target constituencies are the communities hardest hit by the pandemic in Louisiana. They are people of color, low-income families, and essential frontline workers. These communities have faced the highest losses and steepest challenges during the pandemic. In the absence of state guidance or leadership, PCEJ has had to dedicate time and resources to addressing the unique challenges that these communities face in accessing their right to vote.

27. Any votes lost during the pandemic due to limits on early voting or the restrictions on voting by mail will disrupt PCEJ's objective to ensure all eligible voters are included in our political process—especially members of the historically underrepresented communities we serve. Because of the confusion caused by the State's inadequate pandemic election planning, PCEJ will be continually forced to shift its focus and resources from registration, re-enfranchisement, and Census outreach, to educating voters on the State's changing, onerous, and unsafe voting requirements. Our organization and our constituencies will be consistently and disproportionately burdened by the State's failure to protect voters if action is not taken to provide safe voting opportunities during the ongoing health crisis and upcoming November and December elections. I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 24, 2020

*Ashley K. Shelton*
Ashley Shelton