**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

JENNIFER HARDING, *et al.*

                                                        CIVIL ACTION

VERSUS                                          20-495-SDD-RLB

JOHN BEL EDWARDS, *et al.*

**RULING**

Before the Court is the *Joint Motion to Dismiss Plaintiffs' Complaint*[1] filed by

Defendant Louisiana Secretary of State Kyle Ardoin ("Secretary Ardoin") and Intervenor-

Defendant Louisiana Attorney General Jeff Landry ("the Attorney General") (collectively,

"Defendants"). Due to the time-sensitive nature of these proceedings, the Court did not

permit the parties to file *Oppositions* or *Replies*.[2] For the reasons that follow, the Court

finds that the *Motion* shall be GRANTED in part and DENIED in part.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

In a pair of consolidated cases filed in May[3] (the "prior case"), this Court considered

a challenge to the State's  Emergency Election Plan[4], which temporarily expanded early

voting and absentee-by-mail voting for the July 2020 and August 2020 elections in

response to the public health emergency caused by the COVID-19 pandemic (hereinafter,

"the  Pandemic"). The plaintiffs[5] in the prior case asserted that the Emergency Election

---

[1] Rec. Doc. No. 56.
[2] Rec. Doc. No. 39 (Minute Entry from Telephone Status Conference held August 26, 2020).
[3] *Clark, et al v. Edwards*, *et al*, 20-CV-308-SDD-RLB (M.D. La.) and *Power Coalition, et al v. Edwards*, *et al,* 20-CV-283-SDD-RLB (M.D. La).
[4] Enacted pursuant to La. R.S. 18:403.1, et. seq.
[5] Jennifer Harding and Jasmine Pogue, Plaintiffs in the instant case, were also individual plaintiffs in the May cases. Likewise, the Louisiana NAACP and Power Coalition for Equity and Justice, Plaintiffs herein, participated as organizational plaintiffs in the May cases. Plaintiff Omega Taylor did not participate in the May cases.

61868

Plan failed to adequately accommodate Pandemic-related concerns, thus creating an "extremely severe" burden on the plaintiffs' right to vote. The plaintiffs argued that, notwithstanding the Emergency Election Plan, they could not "safely vote in person," and were "effectively disenfranchised."[6] Ultimately, this Court dismissed the plaintiffs' claims without prejudice, finding that they "failed to adequately allege an injury-in-fact sufficient to give rise to standing under Article III" and that their alleged injury was "not traceable to state action."[7] Plaintiffs again challenge the constitutional adequacy of Louisiana's election law scheme in light of the ongoing risk to public health presented by the Pandemic.

In one respect, the underlying facts have not changed since this Court's *Ruling* in *the prior case.* The Pandemic still looms large and Louisiana remains in Phase 2 of the re-opening plan set forth by Governor John Bel Edwards ("Governor Edwards") in coordination with the White House Coronavirus Task Force.[8] Now, the state is preparing for a series of elections, one of which Secretary Ardoin anticipates will feature voter turnout between four and ten times that of the July and August elections.[9] Pursuant to the Governor's declaration that a state of emergency prevails with respect to the upcoming November and December elections,[10] Secretary Ardoin developed a different Emergency Election Plan ("the Proposed Plan").[11]

---

[6] *Clark, et al v. Edwards, et al*, Rec. Doc. No. 22-1, p. 17.
[7] *Id.* at Rec. Doc. No. 69, p. 35.
[8] https://gov.louisiana.gov/assets/Proclamations/2020/74-JBE-2020-State-of-Emergency-COVID-19-Resilient-Louisiana-Phase-2.pdf.
[9] *See* page 14, *infra.*
[10] https://gov.louisiana.gov/assets/Proclamations/2020/104-JBE-2020.pdf.
[11] https://www.sos.la.gov/OurOffice/PublishedDocuments/SOSProposedEmergencyElectionPlan.pdf.
61868

The contents of the Proposed Plan – which was approved by the relevant House and Senate committees and is now under consideration by the legislature as a whole – are of no moment for purposes of this *Ruling*, as the Plan will not be the law of the land for the upcoming elections. Governor Edwards did not approve the Plan[12] because, in his words, "it does not follow guidance from public health officials and does not provide for absentee mail-in voting options for people who are at high risk for suffering serious issues relating to COVID-19, those who have been exposed and are in quarantine and those who are caregivers for immunocompromised individuals."[13] Louisiana Revised Statute §18:401.3 requires gubernatorial approval to implement an Emergency Election Plan; so, without Governor Edwards' support, the Proposed Plan will not govern the November and December elections.   In the absence of an Emergency Election Plan, the existing statutory election scheme dictates the following procedures for the November 3, 2020 Presidential General and Open Congressional Primary Election:

- A period of early voting between October 20 and 27 (excluding Sunday, October 25) from 8:30 a.m. to 6:00 p.m.;

- An October 30 deadline to request an absentee by mail ballot;

- No Pandemic-specific excuses for requesting an absentee by mail ballot; voting by mail is limited to those specifically authorized to vote by mail by Louisiana Revised Statute §18:1303 (voters over age sixty-five, military and overseas voters, voters with disabilities, hospitalized voters and voters residing in a nursing home, voters working offshore on election day, voters

---

[12] See Rec. Doc. No. 49-5, August 20, 20202 Letter from Governor Edwards to Secretary Ardoin.
[13] https://gov.louisiana.gov/index.cfm/newsroom/detail/2644.

61868

who expect to be absent from the parish where they vote on election day, and several other categories).[14]

Plaintiffs' *Motion for Preliminary Injunction*,[15] which is set for hearing before this Court on September 8 and 9, contends that the failure to implement Pandemic-sensitive voting procedures to augment the State's statutory election scheme amounts to a "concrete violation of Plaintiffs' constitutional rights."[16]

Defendants Landry and Ardoin jointly move to dismiss the Plaintiffs' *Complaint*[17] for the following five reasons: "(1) The Court lacks subject matter jurisdiction because Plaintiffs' claims present non-justiciable political questions and Plaintiffs lack Article III standing; (2) Plaintiffs fail to state claims upon which relief can be granted because a communicable disease is not state action and is not protected by the Voting Rights Act; (3) Plaintiffs fail to state a claim upon which relief can be granted because they have not sufficiently plead their new claims regarding the Americans with Disabilities Act ("ADA"); (4) any Court order will result in electoral chaos in violation of the *Purcell* doctrine; and (5) Plaintiffs have failed to join the proper parties."[18] Because time is of the essence as the November election quickly approaches, the Court did not permit the Plaintiffs to file an *Opposition* to the *Motion to Dismiss.* The sufficiency of Plaintiffs' allegations as pleaded in the *First Amended Complaint*[19] is considered below.

---

[14] https://www.sos.la.gov/ElectionsAndVoting/GetElectionInformation/Pages/default.aspx.
[15] Rec. Doc. No. 31.
[16] Rec. Doc. No. 31-1, p. 8.
[17] Rec. Doc. No. 22 (*First Amended Complaint*).
[18] Rec. Doc. No. 56, p. 1.
[19] Rec. Doc. No. 22.

61868

4

II.    **LAW AND ANALYSIS**

   **A. Justiciability and Standing**

      1)  <u>Justiciability</u>

Defendants first contend that this suit should be dismissed because it presents a political question and "there are no judicially manageable standards to determine what measures must be taken to regulate elections in light of the Virus."[20] In their view, the questions presented by this suit are "political – not judicial – questions that are not addressable by the federal courts."[21] Yet, Secretary Ardoin has repeatedly declared that an Emergency Election Plan "will [have to] be decided in court" and beseeches the Court to include in its "the critical mechanisms my office needs to administer the election in the extraordinary circumstances of a pandemic."[22] On September 3, Secretary Ardoin told Baton Rouge-based television station WAFB that the matter is now before the Court and that he "would think the Court's going to have to order some sort of process."[23] The Secretary's public comments are not binding legal analysis, but the  political question argument  rings hollow  in light of  Defendant Ardoin's public embrace of this Court's intervention.

   Matters "entrusted to one of the political branches or involve[] no judicially enforceable rights"[24] Are considered non-justiciable political questions. While so-called political questions may be "outside the courts' competence and therefore beyond the

---

[20] Rec. Doc. No. 56, p. 19.
[21] Rec. Doc. No. 56, p. 20.
[22]  https://www.theadvocate.com/baton_rouge/news/politics/legislature/article_37557c18-eafd-11ea-955d-4bf29cdb7e3e.html
[23]  https://www.wafb.com/2020/09/03/sec-state-discusses-nov-election-plan-la-recovers-hurricane-laura-continues-fight-covid-/; 1:35 mark *et seq.*
[24] *Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019).

61868

courts' jurisdiction,"[25] movants do not claim, because they cannot so claim, that the right to vote is not a judicially enforceable right. It is axiomatic that the right to vote is the bedrock of our constitutional democracy, and Court-issued voting rights rulings are legion. Where there is a "lack of judicially discoverable and manageable standards for resolving" an issue, the political question doctrine "protects the separation of powers and prevents federal courts from overstepping their constitutionally defined role."[26] Defendants' argument that this issue presents a political question is limited to their conclusory assertion that "there are no judicially manageable standards"[27] to be applied in this case. A mere recitation of the boilerplate law on political question doctrine does not suffice to demonstrate that this Court lacks jurisdiction.

Defendants also offer a quote from a recent case from the District Court for the Northern District of Georgia, where the court stated that granting the plaintiffs' requested Pandemic-related voting measures would "require the Court to micromanage the State's election process."[28] The Northern District of Georgia is not binding authority upon this Court. Moreover, the relief sought by the plaintiffs in the Georgia case was significantly more expansive than what Plaintiffs herein seek. Specifically, the Georgia plaintiffs urged the court to postpone the election, force polling places to use paper ballots instead of electronic voting machines, extend the deadlines for receipt of mail-in ballots, adjust the number of voting stations, expanding early voting, implement curbside voting and

---

[25] *Id.*
[26] *Baker v. Carr*, 369 U.S. 186, 210 (1962).
[27] Rec. Doc. No. 56, p. 19. To the contrary, in a case mightily relied upon by the Movants, the Fifth Circuit has plainly recognized that "The standards for resolving such claims are familiar and manageable, and federal courts routinely entertain suits to vindicate voting rights." *Texas Democratic Party v. Abbott*, 961 F.3d 389, 398 (5th Cir. 2020).
[28] *Coalition for Good Governance, et al v. Raffensperger, et al,* No. 1:20-CV-1677-TCB, 2020 WL 2509092, at *1 (N.D. Ga. May 14, 2020).

61868

temporary mobile voting centers, streamline voter check-in, and offer state-provided personal protective equipment ("PPE"). . .[29] The scope of the relief sought by Plaintiffs herein is hardly so broad.

Louisiana law commends the process for creating an Emergency Election Plan to the legislature, the Secretary of State, and the Governor.[30] But the Court hardly lacks jurisdiction to assess the constitutionality of the state's voting scheme simply because the scheme arises out of the political process. Indeed, the Fifth Circuit held as much in the recent case *Texas Democratic Party v. Abbott*, which Defendants themselves describe as "extremely persuasive [and] even controlling."[31] In *Abbott*, the Fifth Circuit clearly rejected the notion that cases like the instant one present nonjusticiable political questions, explaining:

> [W]e need not – and will not – consider the prudence of Texas's plans for combating the Virus when holding elections. Instead, *we must decide* only whether the challenged provisions of the Texas Election Code run afoul of the Constitution, not whether they offend the policy preferences of a federal district judge. The standards for resolving such claims are familiar and manageable, and federal courts routinely entertain suits to vindicate voting rights.[32]

The same can be said here. Thus, the Attorney General and Secretary Ardoin's *Motion to Dismiss* challenging justiciability shall be DENIED.

2) Article III Standing

"Article III standing is a jurisdictional prerequisite."[33]  If a plaintiff lacks standing to bring a claim, the Court lacks subject matter jurisdiction over the claim, and dismissal

---

[29] *Id.* at *1.
[30] *See* La. R.S. § 18:403.1.
[31] Rec. Doc. No. 56, p. 2.
[32] *Texas Democratic Party v. Abbott*, 961 F.3d 389, 398 (5th Cir. 2020).(emphasis added).
[33] *Crenshaw-Loga*l, 436 Fed.Appx. at 308 (citing *Steel Co.*, 523 U.S. at 101, 118 S.Ct. 1003, and *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 350 (5th Cir. 1989)).

61868

under Rule 12(b)(1) is appropriate.[34] The party seeking to invoke federal jurisdiction bears the burden of showing that standing existed at the time the lawsuit was filed.[35] Article III of the Constitution limits federal courts' jurisdiction to certain "cases" and "controversies." "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."[36]   "One element of the case-or-controversy requirement" is that plaintiffs "must establish that they have standing to sue."[37] The United States Supreme Court has held that "the irreducible constitutional minimum of standing contains three elements"[38]:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[39]

To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent."[40] A particularized injury is one which "affect[s] the plaintiff in a

---

[34] *Whitmore v. Arkansas*, 495 U.S. 149, 154-55, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990); *Chair King, Inc. v. Houston Cellular Corp.*, 131 F.3d 507, 509 (5th Cir. 1997).

[35] *M.D. Anderson Cancer Ctr. v. Novak*, 52 S.W.3d 704, 708 (Tex. 2001); *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001); *Ramming*, 281 F.3d at 161.

[36] *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (internal quotation marks omitted); *Raines v. Byrd*, 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (internal quotation marks omitted); *see, e.g., Summers v. Earth Island Institute*, 555 U.S. 488, 492-493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009).

[37] *Raines,* 521 U.S. at 818, 117 S.Ct. 2312; *see also Summers,* 555 U.S. at 492-493, 129 S.Ct. 1142; *DaimlerChrysler Corp.,* 521 U.S. at 342, 126 S.Ct. 1854; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

[38] *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–61 (1992).

[39] *Id.* (internal citations and quotations omitted).

[40] *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139 (2010).

61868

personal and individual way."[41] "Although 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending."[42] "Allegations of *possible* future injury"[43] do not suffice.

a)  *Standing: Individual Plaintiffs*

Relying on their success on the standing question in the prior case, movants argue the same result is compelled now, because "[n]othing indicates that Plaintiffs are in substantially different positions than they were only weeks ago for standing purposes."[44] The Court disagrees. The Pandemic-related state of emergency remains the same, but all the other operative facts surrounding Plaintiffs' claims have changed.

Jennifer Harding and Jasmine Pogue, who were also plaintiffs in the prior case, allege the same personal, medical, and social circumstances to support their claim. This Court's conclusion in the prior case, that the plaintiffs failed to articulate sufficient injury-in-fact, turned on its finding that the Emergency Election Plan then in place *did*, in fact, permit Harding and Pogue to request an absentee by mail ballot. Specifically, Harding asserted that she wanted to vote by mail in the July and August elections because of her caretaker role for her high-risk, elderly parents and grandmother, but she hesitated to request a ballot on that basis because she was not a *full-time* caretaker. This Court wrote:

> The "COVID-19 Emergency Application" prepared by the Secretary of State allows an applicant to attest that she is unable to vote in person because she is "Caring for an individual . . . who is subject to a medically necessary quarantine or isolation order as a result of COVID-19 or who has been advised by a health care provider to self-quarantine due to COVID-19

---

[41] *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, and n. 1 (1992).

[42] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992).

[43] *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

[44] Rec. Doc. No. 56, p. 2.

61868

concerns."[45] The excuse as written is not conditioned upon having only live-in or full-time care responsibilities. It is true, as the application states, that providing a false statement on the ballot application is a felony offense, but the Court fails to see why Harding would be subject to a penalty for making a false statement when she clearly alleges that she has significant elder care responsibilities, and the Secretary of State's form does not inquire as to the "live-in" or "full-time" nature of those responsibilities. The ballot application states that a penalty attaches to "knowingly making false statements;" as Harding avers that she does not know whether she meets the criteria, her attestation that she needs to vote absentee because she is "caring for an individual. . ." would not be knowingly false.[46]

The *First Amended Complaint* in the current action alleges that Harding's voting rights would be best protected by a Plan that allowed her to vote by mail in order to protect her elderly parents and grandmother.[47] Harding's circumstances may be the same, but the legal landscape for the upcoming elections is vastly different and distinguishable. Now, there is no Emergency Election Plan, and no Pandemic-related mail-in voting provision available to Harding or other similarly situated voters with Pandemic-related concerns. Previously, this Court held that "Harding's own belief that she would not qualify based on the Secretary of State's criteria is apparently entirely speculative and not sufficiently concrete to give rise to an injury-in-fact."[48] Now, Harding's inability to qualify for an absentee by mail ballot is an objective fact, not speculation. In this Court's view, the state's failure to provide any accommodation for Pandemic-affected voters is state action which operates to create an injury-in-fact that conveys upon Harding Article III standing.

Likewise, Plaintiff Jasmine Pogue's allegations in the *First Amended Complaint* echo her allegations in the prior case but are more compelling in the absence of an

---

[45] https://www.sos.la.gov/OurOffice/PublishedDocuments/COVID-19%20VR2%20Absentee%20by%20Mail%20Application%20(Rev.%204-20)%20Ver.%201.pdf
[46] *Clark v. Edwards*, No. CV 20-283-SDD-RLB, 2020 WL 3415376, at *8 (M.D. La. June 22, 2020).
[47] Rec. Doc. No. 22, p. 9-10.
[48] *Clark v. Edwards*, No. CV 20-283-SDD-RLB, 2020 WL 3415376, at *8 (M.D. La. June 22, 2020).

61868

Emergency Election Plan. Regarding Pogue, this Court wrote in its previous *Ruling*:

> Pogue alleges that she suffers from asthma and has a history of upper respiratory infections, including one in mid-March of this year. Her asthma attacks leave her with "severe difficulty breathing." Despite this, she "does not believe that her asthma qualifies as 'moderate or severe'": the COVID-19 Emergency Application lists "moderate to severe asthma" as an example of the conditions that place an individual at higher risk due to the Virus and, therefore, qualify him or her for an absentee ballot. Pogue, based on her own belief that her asthma is not moderate to severe, "does not believe that she qualifies to apply for an absentee ballot." The Court admires Pogue's desire to be cautious when filling out the ballot application. But her alleged injury – being forced to vote in person because she does not fulfill any of the excuses provided – is speculative. She did not apply; her application was not rejected. Additionally, it seems to the Court that, based on her asthma and history of respiratory infections, Pogue qualifies for an absentee ballot on the basis of "chronic lung disease," which is one of the explicitly enumerated qualifying conditions [under the Emergency Election Plan].As it stands, Pogue's alleged injury is hypothetical. It assumes that she does not meet any of the [newly] provided excuse criteria and that, if she applied, her application would be rejected.[49]

Under the former Emergency Election Plan, Pogue could have qualified to vote by mail pursuant to one of the Virus-specific excuses provided for the July and August elections. Now, in the absence of a Plan, Pogue's only option to mail vote is to pursue the statutory disability excuse [50] based on her asthma.

The Court finds that Pogue successfully alleges injury because the statutory disability excuse imposes a burden – in terms of time, effort, and potential additional risk of exposure – that she did not face for the July and August elections which made specific

---

[49] Rec. Doc. No. 69, 20-308, p. 18-19.
[50] Louisiana Revised Statute § 18:1303 provides that a qualified voter may obtain an absentee by mail ballot upon providing one of the following types of "proof" of disability:

> (a)  A copy of a current mobility impairment identification card bearing a photograph of the voter and the international symbol of accessibility issued by the secretary of the Department of Public Safety and Corrections as authorized by the provisions of R.S. 47:463.4; (b) A copy of current documentation showing eligibility for social security disability benefits, veteran's disability benefits, paratransit services, benefits from the office for citizens with developmental disabilities, or benefits from Louisiana Rehabilitation Services. (c) Current proof of disability from a physician.

See further discussion of the disability excuse, *infra*.

61868

provisions for the known risk of in-person voting for voters with chronic lung conditions. The emergency conditions remain unchanged, Pogue's increased risk of contracting Coronavirus remains unchanged, but her opportunity to vote at lower risk has been curtailed, which the Court finds is injury-in-fact.

It is true that the Fifth Circuit in *Texas Democratic Party v. Abbott* stated that "[t]he Constitution is not offended simply because some groups find voting more convenient than do the plaintiffs. . ."[52] Although the burden placed upon Pogue to obtain and submit proof of disability could be characterized as merely "inconvenient," the fact that state officials previously accommodated individuals in her situation by temporarily expanding mail-in voting excuses demonstrates to this Court that the burden of complying with the disability excuse was viewed as onerous enough that relief was required. Additionally, although Pogue does not explicitly allege such, the Court notes that injury also arises from the confusion caused by attempting to understand and comply with the ever-shifting landscape of Pandemic-era voting procedures.

Pogue's attestation that that voting in person is "her only option to participate in the November and December elections"[53] is perplexing in light of  that she "ha[s] disabilities within the scope defined by the ADA."[54] Nevertheless, the Court finds that Pogue has clearly articulated injury to support Article III standing.

Plaintiff Omega Taylor is 56 years old and has diabetes, high blood pressure, and "other medical conditions that put her at high risk of severe complications from COVID-

---

[52] *Texas Democratic Party v. Abbott*, No. 20-50407, 2020 WL 2982937, at *11 (5th Cir. June 4, 2020) (internal citations and quotations omitted).
[53] Rec. Doc. No. 22, p. 11.
[54] Rec. Doc. No. 22, p. 53.

61868

19."[56] Although she has been "very cautious in avoiding contact with others and has engaged in social distancing"[57] to reduce her risk of contracting the Virus, voting in person at her regular polling place concerns her because it is a "small fire station" with "limited interior space."[58] Based on her actual experience voting at her precinct in July and August,[59] Taylor believes that "it will be impossible . . . to practice social distancing and vote safely there."[60]

Defendants point out that Taylor's allegations are belied to some extent by the fact that she worked at a polling place as Commissioner in Charge for both the July and August elections, spending two full election days engaged in at least some level of contact with the public. Defendants argue that Taylor's service as Commissioner in Charge "substantially eviscerates any standing she might have had to be a proper Plaintiff in this case."[61] While this circumstance undermines the credibility of Taylor's claims regarding fear of exposure to the virus, on a *Motion to Dismiss* the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"[62]  Taylor's presence at the polling place as a Commissioner does not negate her attestation that "the interior space [of her polling place] is too small to allow for social distancing."[63] While Taylor may lack credibility regarding her fear of Virus risks, her alleged injury is not fear, it is the risk of exposure to the Virus. Taylor alleges that, due to the actions of Defendants, she will be

---

[56] Rec. Doc. No. 22, p. 11.

[57] *Id.* at p. 12.

[58] *Id.*

[59] Rec. Doc 31-8, Exhibit 6, ¶ 16.

[60] Rec. Doc. No. 22, p. 12. The Court notes that under the Emergency Election Plan in place for the July and August Elections, Taylor would have qualified to request an absentee by mail ballot because of her underlying health conditions.

[61] Rec. Doc. No. 56, p. 12.

[62] *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007)(quoting *Martin v. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d 464, 467 (5th Cir. 2004)).

[63] Rec. Doc. 31-8, ¶ 16.

61868

presented with precinct conditions that fail to ameliorate or protect from real Pandemic-related health risks. In that case, her alleged injury may be not only the risk she faces in voting, but the fact that she cannot serve as Commissioner at a polling place – as she has done since November 2015[64] -- without being exposed to large Presidential turnout crowds, crowds unmitigated by the lack of expanded mail-in and early voting.

Defendants argue that, even if the statutory scheme "forces" Plaintiffs to vote in person, the risk presented by the Pandemic is too remote and speculative to give rise to a "certainly impending" injury as required by the doctrine. Defendants' woeful attempt to support this contention by reference to two studies of the April 2020 Wisconsin election falls flat.[65] The question before the Court is whether, based on the allegations in the *First Amended Complaint*, Plaintiffs have sufficiently articulated an injury-in-fact. The purported findings of two studies (technically, one study and one "pre-print") regarding the epidemiological effect upon the population of a different state, based on voting in a different election five months ago, is hardly dispositive of this issue.

Defendants note that in its earlier *Ruling*  the Court held that the "chain of possibilities" that would result in an individual becoming infected with Coronavirus due to voting in person was too remote to support Article III standing. That reasoning was based on an entirely different set of facts. First, this Court's conclusion that Harding and Pogue's injuries were too speculative began with the fact that, in this Court's view, they *did* qualify to vote by mail under the Emergency Election Plan then in place. No such provision is available to them now. Next, this Court's assessment of the risk that Plaintiffs would face

---

[64] Rec. Doc. No. 52-4, p. 3.
[65] See Rec. Doc. No. 56, p. 7-8.

61868

from voting in person was based on a set of procedures no longer in place. Furthermore, the record now contains facts that support the conclusion that some polling places could not physically accommodate social distancing in July and August,[66] a circumstance that will only be exacerbated by the significantly higher voter turnout anticipated in November. Early voting in July and August was offered for 13 days; for the upcoming elections, the law provides for 7 days. This will only have the effect of increasing the number of people in a polling place at any given time. That is especially true for the November election. In Secretary Ardoin's proposed Emergency Election Plan for November and December, he states "it is expected that 2.1 million ballots will be cast."[67] By contrast, around 523,000 voters participated statewide in the July 2020 election,[68] and only 213,000 in the August 2020 election.[69] Though the turnout will inevitably vary across parishes and polling places, Secretary Ardoin's own data suggests that the November turnout will be roughly four to ten times higher than it was for the July and August elections, for which the Emergency Election Plan allowing expanded mail-in voting was in place.

I In *Texas Democratic Party v. Abbott* the Fifth Circuit instructs that

The Constitution is not offended simply because some groups find voting more convenient than do the plaintiffs because of a state's mail-in ballot rules. That is true even where voting in person may be extremely difficult, if not practically impossible, because of circumstances beyond the state's control, such as the presence of the Virus.[70]

While the Pandemic is a "circumstance beyond the state's control," the procedures for

---

[66] Rec. Docs. 31-6, 31-7, 31-8.
[67] https://www.sos.la.gov/OurOffice/PublishedDocuments/SOSProposedEmergencyElectionPlan.pdf, p. 10.
[68] https://electionstatistics.sos.la.gov/Data/Post_Election_Statistics/Statewide/2020_0711_sta.pdf
[69] https://electionstatistics.sos.la.gov/Data/Post_Election_Statistics/Statewide/2020_0815_sta.pdf
[70] *Texas Democratic Party v. Abbott*, No. 20-50407, 2020 WL 2982937, at *11 (5th Cir. June 4, 2020) (internal citations and quotations omitted).
61868

voting during Pandemic circumstances are *not* beyond the state's control. To the contrary, the state has a duty to enable its citizenry to vote. The Court's previous *Ruling* was premised on the fact that state officials had responded to the Pandemic by creating and implementing an Emergency Election Plan that significantly *expanded* mail-in voting and early voting. Against the backdrop of an *expansion* of voting access, this Court relied on *Abbott* for the proposition that an election scheme is not rendered unconstitutional simply because some groups would prefer different rules. Now, in light of the state's failure to enact any sort of Pandemic-related election measures for the November and December election, the Plaintiffs' claims cannot be characterized as mere complaints that voting is not "convenient." Their concerns are more serious than that. And, although the Pandemic may be beyond the state's control, state officials have already demonstrated that they are capable of enacting rules in response to the Pandemic that protect Louisiana residents' right to vote, a right that is "of the most fundamental significance under our constitutional structure."[72]

Defendants consulted public records to determine that all three individual Plaintiffs in this action voted in person for the July and August 2020 elections (the Plaintiffs also attest as much in the *Declarations* attached to the *Motion for Preliminary Injunction*).[73] In the eyes of Defendants, the fact that Plaintiffs voted in person is fatal to their Article III standing. Rather callously, movants argue that voting in person is not as dangerous as they claim, stating, "Plaintiffs apparently have not contracted the Virus or died as a result."[74] The suggestion that Plaintiffs must actually become sick or die before they have

---

[72] *Burdick*, 504 U.S. at 433 (1992)(quoting *Illinois Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184 (1979)).
[73] Rec. Doc. No. 56, p. 11 (citing Rec. Doc. Nos. 31-6, 31-7, 31-8).
[74] *Id.*

61868

standing to sue is ridiculous and without legal support. In this Court's view, state officials' failure to implement an Emergency Election Plan, combined with the likelihood of significantly increased turnout and the physical limitations of polling places, bestows upon Plaintiffs standing to mount a constitutional challenge to the state's election scheme under pandemic circumstances. Accordingly, Defendants' *Motion to Dismiss* shall be DENIED with respect to its argument that Plaintiffs' claims should be dismissed for lack of Article III standing.

b) *Organizational Plaintiffs*

The two organizational Plaintiffs in this suit, Power Coalition for Equity and Justice ("Power Coalition") and the Louisiana State Conference of the NAACP ("Louisiana NAACP"), were also plaintiffs in the prior case . This Court previously dismissed their claims finding that neither organization had adequately established its standing under Article III. The rationale behind that conclusion relied on the fact that the Emergency Election Plan for the July and August elections affected an *expansion* of voting opportunities and could thus hardly be said to frustrate the missions of the organizations, both of which had preexisting voter outreach and education components. Here, as in the prior cases, Power Coalition and the Louisiana NAACP allege that they have diverted their limited resources to respond to the need for voter education and organization efforts in advance of the fall elections. The Louisiana NAACP advances the additional argument that "a substantial number of [its thousands of members] have medical conditions, like asthma, hypertension, and diabetes that put them at higher risk of infection or death from COVID-19."[75]

---

[75] Rec. Doc. No. 22, p. 12.

61868

An organization "can establish standing in its own name if it meets the same standing test that applies to individuals."[76] The organizational Plaintiffs must demonstrate the same "injury-in-fact," traceability and redressability required of individual plaintiffs. The Fifth Circuit has held that "[n]onprofit organizations can suffer an Article III injury when a defendant's actions frustrate their missions and force them to "divert significant resources to counteract the defendant's conduct."[77] Organizational standing based on resource diversion arises when "the defendant's conduct significantly and 'perceptibly impair[s]' the organization's ability to [conduct] its "'activities—with the consequent drain on the organization's resources...' Such injury must be "concrete and demonstrable."[78] "Not every diversion of resources to counteract the defendant's conduct, however, establishes an injury in fact."[79]

Power Coalition describes itself as a "nonpartisan, nonprofit statewide civic engagement table in Louisiana that works to build grassroots power, advocate for community-centered policies, and increase voter participation."[80] In 2019, Power Coalition's voting-related efforts included over 1.2 million "contact attempts" in the form of door knocks, phone calls, and text messages to "infrequent and semi-frequent voters of color."[81] Power Coalition also "routinely provides rides to the polls and rapid response voter support on Election Days."[82]

---

[76] *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017).
[77] *N.A.A.C.P. v. City of Kyle, Texas*, 626 F.3d 233, 238 (5th Cir. 2010).
[78] *N.A.A.C.P.,* 626 F.3d at 238 (5th Cir. 2010).
[79] *Id.*
[80] Rec. Doc. No. 22, p. 13.
[81] *Id.*
[82] *Id.* at p. 14.

61868

Power Coalition alleges that the moving target of voting options have caused it "to shift its focus, and its resources, from registration, re-enfranchisement, and Census outreach, to focus on educating voters of the state's new and changing vote by mail requirements."[83] Overall, Power Coalition asserts, "[e]ducating voters as to all of these changing rules, dates, and deadlines will require [it] to divert resources from its registration and re-enfranchisement activities."[84]

*In NAACP v. City of Kyle, Tex.,* the Fifth Circuit found that the Home Builders Association of Greater Austin ("HVA") did not have organizational standing in a Fair Housing Act case where it alleged injury based on a new city housing ordinance because the HBA failed to allege how the activities it undertook in response to the challenged ordinance "differ[ed] from the HBA's routine lobbying activities."[85] The allegations here assert a significant redirection of the organizations routine and customary operational efforts. Power Coalition clearly alleges that it has been pulled away from its routine activities and has instead been engaged in "developing and correcting multiple versions of documents describing how absentee voting qualifications have evolved" and has "launched new efforts to encourage its members and constituents to sign up to serve as poll workers."[86] The Court is persuaded that, if not for the Defendants' actions, "the threat of long lines and congestion at polling sites would be mitigated and [Power Coalition] would not be forced to steer its own volunteers to instead work as poll workers or spend numerous hours developing outreach materials."[87]

---

[83] *Id.*
[84] *Id.*
[85] *N.A.A.C.P.,* 626 F.3d at 238 (5th Cir. 2010).
[86] Rec. Doc. No. 22, p. 15.
[87] *Id.*

61868

In *OCA-Greater Houston v. Texas*, the Fifth Circuit explained that an organization that "went out of its way to counteract the effect of Texas's allegedly unlawful voter-interpreter restriction"[88] had organizational standing. In the prior case the Court failed to discern injury to Power Coalition's mission to "increase voter participation"[89] where state officials had adjusted the normal electoral scheme in a way that was harmonious with its mission, even if it did not go as far as Power Coalition would have preferred. Power Coalition contends that the state's *rollback* of Pandemic-related voting opportunities has caused it to change its mission-centric operational activities entirely. The Court finds that Power Coalition adequately pleads that its mission has been rendered more onerous and its operations have been diverted by the state's failure to provide Pandemic-sensitive voting methods.

The Louisiana NAACP likewise alleges that, as an organization dedicated to "ensuring the protection of voting rights" that undertakes "efforts to register, educate, and advocate on behalf of Black voters throughout Louisiana," it has been required to "[divert] its limited resources"[90] in response to the actions of Defendants. It has "spent money and resources on obtaining masks and sanitization products" for its members to vote safely in person "if required to do so."[91] In addition, it has invested in "advertising and virtual canvassing and public education for community members in response to widespread concerns among its members about the health risks of congregating at polling places."[92]

---

[88] *OCA-Greater Houston*, 867 F.3d at 612 (5th Cir. 2017).
[89] Rec. Doc. No. 22, p. 13.
[90] Rec. Doc. No. 22, p. 13.
[91] *Id.*
[92] *Id.*

61868

The Court finds that these allegations – of concrete spending changes and new initiatives in response to Defendants' actions – state a claim of sufficient diversion of resources and frustration of mission which conveys Article III standing on the part of the Louisiana NAACP. In the prior case, the Court was skeptical of these plaintiffs' organizational standing because (1) their missions were not frustrated by an expansion of voting rights and (2) any resource diversion was more likely attributable to the Virus, not the actions of Defendants. The circumstances now presented are markedly different. Now, the organizations are faced with a more restrictive voting regime and their need to divert of funds and change their operations is largely attributable to Defendants' failure to implement an Emergency Election Plan for the fall elections, and the attendant voter confusion caused thereby. Accordingly, Defendants' *Motion to Dismiss* the organizational plaintiffs for want of standing shall be DENIED.

## B. State Action

Defendants next contend that Plaintiffs' claims should be dismissed because their alleged injuries are not fairly traceable to any state action. Instead, they argue, the novel Coronavirus – or, as they sarcastically call it, "the invisible menace"[93] – is the culprit, and, as this Court is powerless to control the Pandemic, any order from this Court could not redress Plaintiffs' alleged injuries. In this Court's view, pointing the finger entirely at the Pandemic is disingenuous. Clearly, it is the *combination* of state action (or inaction) and the existence of the Pandemic that gives rise to Plaintiffs' claims. While the Pandemic may be the *sine qua non*, it poses a real risk which can be ameliorated by reasonable,

---

[93] Rec. Doc. No. 56, p. 20.

61868

well-intended measures as was done in July and August. Judicial intervention can redress concrete risks.[95]

Defendants' state action argument was on stronger footing in the prior case, when, as discussed *ad nauseam* throughout this *Ruling*, Defendants promulgated an Emergency Election Plan for the July and August elections that responded to the Pandemic by enacting a meaningful expansion of early voting and mail-in voting. Given the landscape of expanded mail voting, the risk of Coronavirus exposure was more traceable to the Pandemic, not the actions or inactions of state officials. Previously, the state recognized and abided by its obligation to protect and enfranchise its citizens' vote. But now Louisiana voters are left high and dry without a Plan. Secretary Ardoin has said that he expects that the Court will "have to order some sort of process"[96]; it appears that even he views the Court as being in a position to redress Plaintiffs' alleged injuries. Accordingly, Defendants' *Motion to Dismiss* shall be DENIED with respect to their state action argument.

### C.  Americans with Disabilities Act (ADA)

Count IV in Plaintiffs' *Complaint* is a claim pursuant to the Americans with Disabilities Act (42 U.S.C. §§ 12131, *et seq*). Plaintiffs allege that Plaintiffs Pogue, Taylor, and certain members of the Louisiana NAACP "have disabilities within the scope defined by the ADA" and that Defendants are in violation of the ADA due to their "failure and refusal to provide reasonable accommodations . . . for those voters . . . whose health conditions significantly limit their ability to safely leave home or have close contact with

---

[95] *See*, e.g., *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966).
[96]    https://www.wafb.com/2020/09/03/sec-state-discusses-nov-election-plan-la-recovers-hurricane-laura-continues-fight-covid-/

61868

other people during the COVID-19 pandemic . . ."[97] Among other arguments, Defendants contend that Plaintiffs' ADA claims should be dismissed because they are not yet ripe in light of the fact that Plaintiffs "may be eligible under Louisiana law to vote by absentee ballot, and yet they have not attempted [to] comply with the applicable statutory requirements to do so."[98] The Court agrees.

The United States Supreme Court has instructed that "[a] claim is not ripe for adjudication if it rests upon "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"[99] The ripeness doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required."[100] Assuming *arguendo* that Plaintiffs Taylor and Pogue are disabled, as they claim, the law already provides a means for them to vote by mail, pursuant to Louisiana Revised Statute § 18:1303(I). § 18:1303(I) provides that "[a]ny qualified voter . . . may vote absentee by mail upon meeting the requirements of this Chapter." With proof of a disability and the completion of the applicable form, Taylor and Pogue could vote by mail, as is their stated preference. Neither Plaintiff alleges that she has applied under the statute and been rejected. Nor does either Plaintiff allege that the proof requirements are unduly burdensome so as to prevent them from making an application. Undoubtedly, the process of "proving" a disability requires more time and effort than would be required of Plaintiffs

---

[97] Rec. Doc. No. 22, p. 53.
[98] Rec. Doc. No. 56, p. 18.
[99] *Texas v. United States*, 523 U.S. 296, 300, 118 S. Ct. 1257, 1259, 140 L. Ed. 2d 406 (1998).
[100] *Choice Inc. of Texas v. Greenstein,* 691 F.3d 710, 714–15 (5th Cir. 2012) (internal citations and quotations omitted).

61868

if their underlying medical conditions (asthma, diabetes, hypertension, and others) were listed as acceptable excuses for absentee by mail voting, as they were in the Emergency Election Plan that applied to the July and August elections. But until Taylor and Pogue have been refused the accommodation provided for under the law, their failure to accommodate claim is not ripe. Plaintiffs correctly state that "the ADA imposes upon public entities an affirmative obligation to make such reasonable accommodations for disabled individuals."[101] In the context of disability and voting by mail, it appears that the state has already made those accommodations. In short, because Louisiana's electoral scheme already provides a means for absentee by mail voting by disabled voters, Plaintiffs' ADA claim fails because further factual development is required and adjudication by this Court would be premature. Accordingly, Defendants' Motion to Dismiss shall be GRANTED as to Plaintiffs' Americans with Disabilities Act claim.

### D. Purcell

Defendants seek dismissal of this case based on *Purcell v. Gonzalez*, where the Supreme Court held that courts in cases like this are bound to "weigh . . . considerations specific to election cases."[102] Those considerations include the possibility that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls."[103] The *Purcell* doctrine does not command judicial abstention in late-breaking election cases. But *Purcell* clearly instructs that a court considering significant judicial intervention "on the eve of an election"[104] is to proceed with caution, recognizing that, in the words of the Supreme

---

[101] Rec. Doc. No. 22, p. 53.
[102] *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).
[103] *Id.* at 4-5.
[104] *Republican Nat'l Comm.,* 140 S. Ct. 1205, 1207 (2020).

61868

Court, "[n]o bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms."[105]

Defendants declare that "Louisiana is on the eve of the November election"[106] and that "election administrators are currently making preparations to print and distribute vote by mail applications and ballots."[107] According to Defendants, "[c]hanging the method of absentee balloting at this stage will invite chaos into the system and harm more people though voter confusion than any court-ordered remedy would help."[108] The Court finds this statement to be imprecise and unpersuasive. As an initial matter, the Court questions whether we truly find ourselves "on the eve of an election." This Court's *Ruling* in *Power Coalition* and *Clark* relied to some extent on *Purcell* because it was not issued until early voting was already underway for the July election. By contrast, as Defendants state, early voting for the November election begins on October 20, six weeks away. And the statutory deadline to request an absentee by mail ballot is October 30.

As to the suggestion that chaos and voter confusion will be invited into the system by judicial involvement, voter confusion or perceived chaos have already resulted from the state's rollback of the protections offered by the previous Emergency Election Plan. And, as discussed above, Secretary Ardoin himself has repeatedly stated that the Court will have to step in to *resolve* the issue.  It is possible that the Defendants may be presented with logistical challenges depending on the outcome of the hearing on the *Motion for Preliminary Injunction*. To be sure, the Pandemic has upended normal operating procedures and presented novel challenges across our society. For example,

---

[105] *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 359 (1997).
[106] Rec. Doc. No. 56, p. 31.
[107] *Id.*
[108] Rec. Doc. No. 56, p. 31.

61868

the Court and all parties will conduct the upcoming hearing on the pending *Motion* for injunctive relief by remote video conference, a process heretofore uncontemplated. The ability to be nimble and adjust to the conditions on the ground is the new normal. The unelaborated statement that officials are already "making preparations"[109] for the fall elections is not persuasive. In short, *Purcell*, and Defendants' cursory argument for its application, simply does not compel the dismissal of Plaintiffs' claims.

### E. Failure to Join Proper Parties

Defendants offer a very brief final argument: that this action should be dismissed because Plaintiffs have failed to include any of the parish election boards as Defendants, Because Defendants believe that this Court could not accord complete relief in the absence of the boards, Defendants contend that they are required by Federal Rule of Civil Procedure 19 to be joined. This argument fails.

Federal Rule of Civil Procedure 19 "seeks to ensure that lawsuits are disposed of fairly and completely."[110] To that end, Rule 19(a)(1) requires the joinder of a person subject to process who would not deprive the court of subject matter jurisdiction if, among other reasons, the court cannot accord complete relief among existing parties in that person's absence. The Court fails to see how complete relief is unavailable via the current parties, given that Secretary Ardoin – "the chief election officer of the state"[111] under Louisiana law – is made Defendant herein.

It is a matter of clear Fifth Circuit precedent that the "buck stops" with the Secretary of State when it comes to traceability and redressability of voting-related injuries. The

---

[109] Rec. Doc. No. 56, p. 31.
[110] *Zenith Ins. Co. v. Texas Inst. for Surgery, LLP,* No. 3:18-CV-0182-D, 2018 WL 5297754, at *3–4 (N.D. Tex. Oct. 25, 2018) (citing *Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305, 1308 (5th Cir. 1986)).
[111] La. R. S. § 18:421.

**61868**

notion that Plaintiffs' injuries would be sufficiently redressed by the presence of the Secretary of State as a Defendant in this action finds support in a very recent decision by the United States Court of Appeals for the Fifth Circuit. In *Texas Democratic Party v. Abbott*, the Fifth Circuit considered an appeal out of the Western District of Texas, where the district judge had just issued a preliminary injunction "ordering that [a]ny eligible Texas voter who seeks to vote by mail in order to avoid transmission of [the Virus]. . .can apply for, receive, and cast an absentee ballot in upcoming elections during the pendency of pandemic circumstances."[112] Texas state officials contended that the *Abbott* plaintiffs lacked standing because the "[a]cceptance or rejection of an application to vote by mail falls to local, rather than state, officials."[113] The question presented – whether Plaintiffs could demonstrate standing when the *Complaint* named state-level officials, but no local ones – was the inverse of the one here, where state and local officials are named as Defendants. However, the Fifth Circuit's reasoning in *Abbott* is germane to the instant case.

The Fifth Circuit reasoned that, although Texas's vote-by-mail statutes are administered by *local* officials, it is the Texas Secretary of State who "has the duty to 'obtain and maintain uniformity in the application, operation, and interpretation of' Texas's election laws, including by 'prepar[ing] detailed and comprehensive written directives and instructions relating to' those vote-by-mail rules."[114] Based on that statutory scheme, the Fifth Circuit found, the state officials had not shown that plaintiffs lacked standing, because the voting-related injuries were fairly traceable to and redressable by the

---

[112] *Texas Democratic Party v. Abbott*, No. 20-50407, 2020 WL 2982937, at *2 (5th Cir. June 4, 2020) (internal quotations omitted).
[113] *Id.* at *5 (internal quotations omitted).
[114] *Id.* at *6 (5th Cir. June 4, 2020).

61868

Secretary of State. Although the *Abbott* court applied Texas law, Louisiana law appears materially consistent with Texas law as to the role of the Secretary of State in absentee by mail voting.[115]

In its *Abbott* opinion, the Fifth Circuit cited *OCA-Greater Houston v. Texas*,[116] a 2017 Fifth Circuit case where the plaintiff challenged a Texas law requiring an interpreter to "be a registered voter of the county in which the voter needing the interpreter resides."[117] Texas argued that the plaintiff lacked standing because it had named the state and the Secretary of State as defendants, when in fact, it argued, "the plaintiff's injury was caused by local election officials—who determined whether a voter could serve as an interpreter—not the state or its Secretary of State."[118] The Fifth Circuit disagreed, holding that the "invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the State itself and its Secretary of State, who serves as the 'chief election officer of the state.'"[119] Again, though the *OCA* court applied Texas law, the Article III standing analysis nevertheless applies; as discussed above, Louisiana law contains the same reference to the Secretary of State as the "chief election officer" and, specifically in the emergency context, tasks the Secretary of State with the responsibility for taking "all steps necessary"[120] to implement a voting plan.

Defendants cite to *Jacobson v. Florida Sec'y of State*,[121] a recent Eleventh Circuit case where the court held that the plaintiff's alleged voting-related injury was not traceable

---

[115] La. R. S. § 18:1306 provides: "The secretary of state shall prepare absentee by mail ballot envelopes, absentee by mail instructions, certificates, and other absentee by mail balloting paraphernalia consistent with the provisions of this Chapter. . .".

[116] 867 F.3d 604, 612–13 (5th Cir. 2017).

[117] Texas Election Code section 61.033.

[118] *Texas Democratic Party v. Abbott*, No. 20-50407, 2020 WL 2982937, at *6 (5th Cir. June 4, 2020).

[119] *OCA-Greater Houston v. Texas,* 867 F.3d 604, 613 (5th Cir. 2017).

[120] La. R. S. § 18:401.3.

[121] 957 F.3d 1193 (11th Cir. April 29, 2020).

61868

to or redressable by the Florida Secretary of State. As an initial matter, this Court is obviously not bound by Eleventh Circuit precedent, nor is Eleventh Circuit precedent particularly persuasive when the Fifth Circuit has so recently and clearly spoken on the issue. In any event, *Jacobson* is distinguishable.

The *Jacobson* plaintiff challenged "a law that governs the order in which candidates appear on the ballot in Florida's general elections."[122] The Eleventh Circuit explained that "Florida law tasks the Supervisors [of Elections], independently of the Secretary, with printing the names of candidates on ballots in the order prescribed by the ballot statute.[123] Because the Supervisors of Elections, not the Secretary, had legal authority over ballot ordering, the Eleventh Circuit held that "any injury from ballot order is not traceable to the Secretary" because "the Supervisors are independent officials under Florida law who are not subject to the Secretary's control."[124] The Florida election laws at issue in *Jacobson* stand in sharp contrast to Louisiana's statutory scheme, discussed above, which, particularly in the emergency election context, positions the Secretary of State as the ultimately accountable official, while requiring that "all officials of the state and of any political subdivision thereof shall cooperate with and provide assistance to the secretary as necessary to implement the plan."[125] Moreover, in contrast with Florida law, Louisiana law tasks the Secretary of State – not local officials – with the preparation of ballots, including "the size and weight of paper, size and type of print, and other matters pertaining to absentee by mail and early voting ballots."[126]

---

[122] *Id.* at 1197.
[123] *Id.* at 1207 (citing Fla. Stat. § 99.121)("The names of [candidates] shall be printed by the supervisor of elections upon the ballot in their proper place as provided by law").
[124] *Id.* at 1207.
[125] La. R. S. § 18:401.3.
[126] La. R. S. § 18:1306.

61868

More apposite is *Self Advocacy Sols. N.D. v. Jaeger*,[127] a recent decision out of the District of North Dakota. In *Self Advocacy*, the plaintiffs challenged "two North Dakota statutes that vest election officials with authority to reject mail-in ballots based on signature discrepancies, insofar as the statutes fail to provide affected voters with notice and an opportunity to verify their ballots before rejection."[128] North Dakota officials argued that the plaintiffs lacked standing because "local election boards and county canvassing boards [are] the entities that make the ultimate determinations on whether a ballot is rejected for a signature discrepancy."[129] The district court found this argument "unavailing."[130] Because it found that the local election officials were, as a matter of law, "subordinate to the Secretary in election matters"[131] and "expressly 'responsible to' the Secretary when carrying out election-related duties,"[132] the court held that the plaintiff had satisfied the necessary standing elements. The same can be said here. Because the Defendants have failed to show that complete relief cannot be afforded to Plaintiffs without joining the Parish Boards as parties, their *Motion to Dismiss* is DENIED with respect to their Rule 19 compulsory joinder argument.

---

[127] No. 3:20-CV-00071, 2020 WL 2951012, at *1 (D.N.D. June 3, 2020).
[128] *Id.* at *1.
[129] *Id.* at * 5.
[130] *Id.*
[131] *Id.* at *7.
[132] *Id.*

61868

## III.    CONCLUSION

For the reasons stated above, Defendants' *Motion to Dismiss*[133] is hereby GRANTED in part and DENIED in part. Plaintiffs' claims under the ADA are dismissed without prejudice. In every other respect, the *Motion to Dismiss* is DENIED.

**IT IS SO ORDERED**.

Signed in Baton Rouge, Louisiana the 7th day of September, 2020.


_____

**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[133] Rec. Doc. No. 56.

**61868**