## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

JENNIFER HARDING, *et al.*

CIVIL ACTION

VERSUS

20-495-SDD-RLB

JOHN BEL EDWARDS, *et al.*

### <u>RULING</u>

Before the Court is the *Motion for Preliminary Injunction*[1] filed by Plaintiffs Jennifer Harding ("Harding"), Jasmine Pogue ("Pogue"), the Louisiana State Conference of the NAACP (the "Louisiana NAACP"), and Power Coalition for Equity and Justice ("Power Coalition") (collectively, "Plaintiffs").[2] Defendant Louisiana Secretary of State Kyle Ardoin ("Secretary Ardoin") and Intervenor-Defendant Louisiana Attorney General Jeff Landry ("the Attorney General") (collectively, "Defendants") filed a *Joint Response in Opposition* to the *Motion*,[3] and Governor John Bel Edwards ("Governor Edwards") filed a *Response* to Plaintiffs' *Motion for Preliminary Injunction*.[4] This matter came before the Court for hearing on September 8 and September 9, 2020.[5] For the reasons that follow, the Court finds that the *Motion* shall be GRANTED in part and DENIED in part.

---

[1] Rec. Doc. No. 31.
[2] The Court previously dismissed Plaintiff Omega Taylor from this action upon Plaintiffs' *Motion to Withdraw Plaintiff* (Rec. Doc. No. 71).
[3] Rec. Doc. No. 52.
[4] Rec. Doc. No. 49.
[5] *See* Rec. Doc. Nos. 74 and 83 (*Minute Entries*).

62304

## I.    FACTUAL AND PROCEDURAL BACKGROUND

During the COVID-19 pandemic, "[t]here are quite reasonable concerns about voting in person."[6] Those concerns are the province of the state legislatures, to whom the Constitution commends decisions involving the "Times, Places and Manner of holding Elections."[7] Though the states retain considerable power to regulate elections, their power has limits: in the course of their regulation, they may not unduly burden the citizens' right to vote – the "'fundamental political right, because preservative of all rights.'"[8] Indeed, "voting is of the most fundamental significance under our constitutional structure."[9]

This year, with the global pandemic caused by the novel coronavirus known as COVID-19 (or "the Virus") sweeping across the United States, Louisiana state officials have struggled to adopt voting rules that ameliorate the risk presented by in-person voting. Across the country, courts – including this one – have likewise struggled with issues related to the risk of voting in person during the pandemic. The United States Supreme Court has been presented with more than a handful of cases on the subject of elections during the pandemic, but has provided virtually no guidance.[10] In *Republican National Committee v. Democratic National Committee*, for example, the Court stayed a lower court's injunction requiring Wisconsin to count absentee ballots that were

---

[6] *Texas Democratic Party v. Abbott*, No. 20-50407, 2020 WL 5422917 at *17 (5th Cir. Sept. 10, 2020).

[7] U.S. Const. art. I, § 4, cl. 1.

[8] *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 667 (1966)(quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370).

[9] *Illinois Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184 (1979); *Burdick v. Takushi,* 504 U.S. 428 (1992).

[10] *Little v. Reclaim Idaho*, No. 20A18, 2020 WL 4360897 (U.S. July 30, 2020); *Merrill v. People First of Alabama*, No. 19A1063, 2020 WL 3604049 (U.S. July 2, 2020); *Republican Nat. Comm. v. Common Cause RI*, No. 20A28, 2020 WL 4680151 (U.S. Aug. 13, 2020); *Republican Nat'l Comm. v. Democratic Nat'l Comm.,* 140 S. Ct. 1205, 1208 (2020); *Texas Democratic Party v. Abbott*, 140 S. Ct. 2015 (2020); *Clarno v. People Not Politicians,* No. 20A21, 2020 WL 4589742 (U.S. Aug. 11, 2020); *Thompson v. DeWine*, No. 19A1054, 2020 WL 3456705, at *1 (U.S. June 25, 2020).

62304

2

postmarked after Election Day, but was quick to circumscribe its holding, noting that it "should not be viewed as expressing an opinion on the broader question of whether to hold the election, or whether other reforms or modifications in election procedures in light of COVID–19 are appropriate. That point cannot be stressed enough."[11]

In August, Louisiana Governor John Bel Edwards and Secretary of State Kyle Ardoin declared that an emergency exists with respect to the upcoming November presidential election. Secretary Ardoin drafted a proposed Emergency Election Plan that would have expanded early voting to ten days (from the seven-day period provided by statute) and offered the opportunity to vote absentee by mail to "any registered voter testing positive for COVID-19 during and after early voting but before election day."[12] Although the proposed Plan eventually passed the Louisiana legislature, it was never implemented because Governor Edwards – whose approval is required by Louisiana law – rejected it. Per Edwards, the proposed Plan was "woefully inadequate"[13] because it was "contrary to guidance from the Centers for Disease Control (CDC) and the Louisiana Department of Health (LDH)"[14] and failed to "protect[] the right to vote while protecting the health of the public."[15] Thus, with Louisianans headed to the polls in roughly seven weeks, the state has enacted no measures whatsoever to make voting safer during the pandemic.

---

[11] *Republican Nat'l Comm. v. Democratic Nat'l Comm.,* 140 S. Ct. 1205, 1208 (2020).

[12] Defendant's Exhibit 4, p. 13.

[13] "John Bel Edwards calls election plan 'woefully inadequate,' says he won't sign it" <u>The Advocate</u>, August 18, 2020 https://www.theadvocate.com/baton_rouge/news/politics/legislature/article_6067902e-e197-11ea-8d64-27d09a688c5f.html

[14] Defendant's Exhibit 5, p. 1.

[15] *Id.*

62304

It is against this backdrop that the Court turns to the *Motion for Preliminary Injunction* filed by Plaintiffs, two individuals and two groups who contend that the lack of an emergency election plan for the November and December elections has the effect of unduly burdening their right to vote. Plaintiffs seek an injunction lifting or expanding the "statutory limitations on who can vote absentee by mail" (known as the Excuse Requirement) in the November and December elections and enjoining "the reduction of the early voting period"[16] for the same. "At minimum," Plaintiffs ask the Court to order Defendants to "extend to the upcoming elections the baseline protections provided in the emergency plan that governed the July and August 2020 elections."[17] That Plan provided for a thirteen-day period of early voting and created a "COVID-19 Ballot Application" that offered Virus-specific reasons to request a mail ballot.[18]

Plaintiffs' request for expanded early and mail-in voting is joined by Governor Edwards, who contends that allowing the November and December elections to proceed without a plan to mitigate the effects of the pandemic imposes "severe undue burdens on the constitutional rights to vote for many voters in Louisiana."[19] Secretary Ardoin and Attorney General Landry oppose Plaintiffs' requested relief.

---

[16] Rec. Doc. No. 31-1, p. 6.

[17] Rec. Doc. No. 31, p. 2.

[18] Those expanded excuses applied to the following voters: those at higher risk because of serious medical conditions, those subject to a "medically necessary quarantine or isolation order," those advised by a health provider to self-quarantine, those experiencing symptoms of COVID-19 and seeking a medical diagnosis, and those caring for an individual who is subject to a quarantine order and has been advised to self-quarantine.

[19] Rec. Doc. No. 49, p. 4.

62304

## II.    LAW AND ANALYSIS

### A. Preliminary Injunction

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right."[20] The decision whether to grant or deny a request for a preliminary injunction is within the sound discretion of the court.[21] In order to prevail on a motion for a preliminary injunction, the movant must prove "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest."[22] A preliminary injunction is an extraordinary remedy requiring the applicant to unequivocally show the need for its issuance.[23] The movant must prove *all* four elements.[24]

### 1. *Likelihood of Success on the Merits*

Plaintiffs claim that the Excuse Requirement[25] and limited early voting period impose undue burdens on the right to vote in violation of the First and Fourteenth Amendments"[26] of the U.S. Constitution. It is unquestionable that "voting is of the most

---

[20] *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal citations and quotations omitted). *See* also *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989); *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) (preliminary injunctive relief "is an extraordinary remedy and should be granted only if the movant has clearly carried the burden of persuasion with respect to all four factors").

[21] *See Allied Mktg. Grp., Inc.*, 878 F.2d at 809.

[22] *Robinson v. Hunt Country, Texas*, 921 F.3d 440, 451 (5th Cir. 2019).

[23] *Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013), *cert. denied*, 572 U.S. 1053 (2014).

[24] *Illinois Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184 (1979); *Burdick v. Takushi,* 504 U.S. 428 (1992).

[25] The "Excuse Requirement" refers the reasons or "excuses" that a voter must offer as a matter of Louisiana law to be considered for an opportunity to vote by mail. Under Louisiana Revised Statute §18:1303, only voters certifying one of the "excuses" set forth therein are eligible to receive an absentee by mail ballot.

[26] Rec. Doc. No. 31, p. 2.

62304

5

fundamental significance under our constitutional structure."[27] Although the Constitution explicitly empowers state legislatures to regulate the "Times, Places and Manner of holding Elections,"[28] and "[e]lection laws will invariably impose some burden upon individual voters,"[29] state regulations may not *unduly* burden the right to vote. The Equal Protection Clause provides one restraint against any such undue burden.[30]

In *Burdick v. Takushi*, the United States Supreme Court instructs that

> [T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions.[31]

When cases fall somewhere between strict scrutiny and rational basis review, the *Anderson-Burdick*[32] framework provides that "a more flexible standard applies."[33] In these cases, featuring a moderate burden on the right to vote, the court must weigh that burden against "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'"[34] If the State's interests outweigh the burden on Plaintiffs' right to vote, the voting restrictions survive the Equal Protection challenge.

---

[27] *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979).

[28] U.S. Const. art. I, § 4, cl. 1.

[29] *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).

[30] *See McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969) ("[O]nce the States grant the franchise, they must not do so in a discriminatory manner").

[31] *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (internal citations omitted).

[32] *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

[33] *Burdick*, 504 U.S. 428 at 434. "The appropriate standard for evaluating a claim that a state law burdens the right to vote is set forth in *Anderson." Id.* at 438.

[34] *Id.* (quoting *Anderson*, 460 U.S. at 789).

62304

The Court turns now to the task of identifying the burden that the Excuse Requirement and a limited period of early voting place on Plaintiffs' right to vote.

      a. <u>Burden: The Excuse Requirement</u>

The first aspect of Louisiana election law that Plaintiffs seek to enjoin is the set of statutory limitations on who can vote absentee by mail, known as the "Excuse Requirement."[35] Louisiana Revised Statute § 18:1303 generally provides that registered voters over age 65, hospitalized voters, voters confined to nursing facilities, voters with disabilities, military and overseas voters, and voters who expect to be absent from their home parish on Election Day are permitted to vote "absentee" by mail. Plaintiffs contend that, under the circumstances of a global pandemic, the limited excuses available to cast a ballot by mail operate as an "undue burden[] on the fundamental right to vote that Defendants cannot justify by any state interest."[36] Plaintiffs ask this Court to enjoin the Excuse Requirement entirely, or, "at a minimum," to order that Defendants must implement the expanded set of Virus-related excuses that the legislature made available during the July and August 2020 elections via the Secretary of State's previous Emergency Election Plan.[37]

The Excuse Requirement imposes some burden on the right to vote. Plaintiff Jennifer Harding attests in her *Declaration* that she has assumed significant caretaking responsibilities for her 72-year-old father, who has Parkinson's Disease; her 71-year-old mother, who has post-polio syndrome and recently underwent surgery; and her 93-year-old grandmother, who has been diagnosed with dementia.[38] Harding  began frequently

---

[35] Rec. Doc. No. 31, p. 2.
[36] Rec. Doc. No. 31-1, p. 22.
[37] *Id.* at p. 2; See *supra*, n. 14.
[38] Rec. Doc. No. 31-6, p. 3, ¶ 6.

62304

assisting her parents and grandmother this year because they no longer employ an in-home caretaker "due to concerns about COVID-19 and the caretaker's exposure to other patients she assists throughout the week."[39] Because of the possibility that "if [she] contracted the virus, even unknowingly, [she] could put [her] parents and grandmother at acute risk,"[40] Harding "would vote by absentee mail-in ballot in order to eliminate the chance of exposure to COVID-19 at [her] polling location – both inside and while waiting in line to vote."[41] But La. R.S. § 18:1303 does not provide for caretakers of high-risk individuals to vote absentee by mail. Harding further attests that her experience voting in-person during the July 2020 election was "uncomfortable and unsafe"[42] because she was unable to abide by social distancing recommendations due to the physical configuration of her polling place. Based on her past experiences, Harding expects social distancing to be even more difficult for the November presidential election, when her polling place is typically "even more congested."[43]

Plaintiff Jasmine Pogue has asthma and a history of upper respiratory infections.[44] Contracting COVID-19 is of particular concern since her already-compromised lung capacity makes her more vulnerable to the virus.[45] Also, according to Pogue's doctor, the steroids she takes to fight her upper respiratory infections "put [her] at increased risk of COVID-19's effects."[46] Pogue attests that she is burdened by the Excuse Requirement because she does not qualify under any subpart of the statute, so "voting in person will

---

[39] *Id.* at p. ¶ 7.
[40] *Id.* at ¶ 8.
[41] *Id.* at p. 3-4, ¶ 10.
[42] *Id.* at p. 6, ¶ 16.
[43] Id. at ¶ 17
[44] Rec. Doc. No. 31-7, p. 3, ¶ 5-7.
[45] *Id.* at ¶ 8.
[46] Id. at ¶ 7-8.

62304

remain [her] only option to participate in any of this year's elections."[47] When she voted in person in July and August, the experience "was stressful and uncomfortable because of the inadequate enforcement of social distancing and sanitary precautions at [her] polling site."[48] Pogue's financial situation was made precarious by the pandemic because her commission-based income has declined.[49] As a result, contracting the Virus "would trigger medical expenses that would pose financial challenges to [her] family."[50]

The Court finds that Plaintiffs' testimony clearly establishes that the state's maintenance of limited absentee by mail voting imposes a burden on their right to vote. The burden on the right to vote is further supported by significant record evidence. As of August 24, 2020, the Louisiana Department of Health estimated that there were 19,862 known active cases of the Virus in Louisiana: twice as many active cases as there were when the state entered Phase 1 or Phase 2 of its reopening.[51] Additionally, the White House Coronavirus Task Force issued a report regarding Louisiana on August 16, 2020, where it explained that, although "Louisiana has seen a decrease in new cases and a decrease in test positivity," the process "is fragile" and "[a]ny loosening of mitigation efforts must be conservative, gradual, and associated with continued and expanded testing and contact tracing."[52] On August 23, the White House Coronavirus Task Force updated its remarks on Louisiana to reflect that "91% of all parishes in Louisiana have ongoing community transmission."[53] As of August 30, 80% of parishes still had ongoing

---

[47] *Id.* at ¶ 12.
[48] *Id.*
[49] *Id.* at ¶ 17.
[50] *Id.*
[51] Defendant's Exhibit 11, p. 37-38.
[52] *Id.* at p. 38.
[53] *Id.* at p. 39.

62304

9

community transmission, with 23% of parishes in the "red zone" for high levels of community transmission. Based on that data, the task force recommended that Louisiana "[c]ontinue the closure of establishments where social distancing and mask use cannot occur."[54]

The Centers for Disease Control and Prevention (CDC) has issued guidance for election officials, poll workers, and voters to prevent the spread of the Virus.[55] The CDC asserts that "the more an individual interacts with others, and the longer that interaction, the higher the risk of COVID-19 spread."[56] Lower-risk polling settings, the guidance explains, include those with "a wide variety of voting options"; "longer voting periods (more days and/or more hours); and "any other feasible options for reducing the number of voters who congregate indoors in polling locations at the same time."[57] Other recommendations identified by the CDC include "protect[ing] people at increased risk for severe illness" and "offer[ing] alternative voting options for voters with symptoms."[58] Clearly, based on the data and advice from state and federal authorities, the pandemic is ongoing in Louisiana and calls for the implementation of measures to mitigate the risks of appearing in person to vote.

The parties also presented expert opinion testimony on the burden presented by in-person voting during the pandemic. Plaintiffs' expert witness Dr. Arthur L. Reingold,[59]

---

[54] Defendant's Exhibit 12. This is a notable recommendation; as the Court discusses *infra*, one establishment where "social distancing and mask use cannot occur" may be the polling place, based on the testimony of Louisiana elections officials.

[55] Plaintiffs' Exhibit 76 ("Considerations for Election Polling Locations and Voters").

[56] *Id.* at p. 1.

[57] *Id.*

[58] *Id.* at p. 4.

[59] Dr. Reingold is the Division Head of Epidemiology and Biostatistics at the University of California at Berkeley School of Public Health. He spent eight years at the Centers for Disease Control and Prevention (CDC) and has substantial credentials in the field of epidemiology. (Rec. Doc. No. 60-1, p. 2 *et seq*). At the injunction hearing, Defendants stipulated to the tender of Dr. Reingold as an expert in Epidemiology. By

62304

who the Court finds credible, opined that "[p]olling locations are a prime area of concern with regard to increased transmission of [the Virus], due to the close proximity of large numbers of individuals – voters, observers, poll workers – in a limited indoor space."[60] Dr. Reingold points out that, in light of the particular concern associated with polling places, the Centers for Disease Control and Prevention recommends that election officials offer alternative voting methods to minimize direct contact and crowd size at polling places.[61] In Dr. Reingold's expert opinion, "voting by mail is a demonstrably safer option for voters in light of the [pandemic]."[62] Moreover, he attests, that opinion is not based merely on "people's generalized fear of infection."[63] Instead, it is based on "what we know about how this virus is transmitted" – specifically by "aerosols or droplets"[64] – which means that it "can spread rapidly in crowded conditions."[65] For that reason, he opines that "[a]llowing people to vote absentee ballot enables them to vote without placing themselves in the congregate setting of a polling location."[66]

In this Court's view, Dr. Reingold's opinions credibly support Plaintiffs' argument that in-person voting imposes a burden. Dr. Reingold's opinions were not effectively contradicted by the countervailing experts put forth by Defendants. Defendants submit

---

stipulation of the parties, Dr. Reingold's opinion was presented by way of his written *Report* (Rec. Doc. 60-1). Dr. Reingold was tendered for cross-examination by the Defendants and testified on cross regarding his opinions. See *Minute Entry,* Rec. Doc. No. 74. All of the expert witnesses submitted their testimony via written reports and were then subject to live cross-examination during the hearing.

[60] Rec. Doc. No. 60-1, p. 15.

[61] *Id.* at p. 16, citing CDC, *Considerations for Election Polling Locations and Voters: Interim Guidance to Prevent Spread of Coronavirus Disease* (Plaintiffs' Exhibit 76).

[62] *Id.* at p. 18.

[63] *Id.*

[64] *Id.* at p. 18.

[65] *Id.* at p. 8.

[66] *Id.* at p. 18.

62304

the expert testimony of Dr. Quentin Kidd,[67] who provides what he describes as "a *comparative analysis* of elections held in various states as they relate to the COVID-19 pandemic. . ."[68] Dr. Kidd specifically explained that his opinions were *not predictive*. Dr. Kidd posits that, based on his analysis, "for states that were not already in a situation where Coronavirus was surging, neither spikes or surges happened as a result of those elections."[69] Examining Dr. Kidd's data on a state-by-state basis, the Court observes that Dr. Kidd notably hedged his opinion by pointing out that "there have been no reports *that [he is] aware of* linking widespread COVID-19 cases or deaths to that [] election."[70]

The Court finds Dr. Kidd's opinion irrelevant, for several reasons. First of all, the Court is disinclined to find that the epidemiological situation on the ground in other states, during other elections dating back more than six months in some cases, is evidence of the likely burden on Louisiana voters in November and December. In Dr. Kidd's words it is not predictive. As Defendant's expert witness Dr. Phillip Barie stated at the hearing, no one has a crystal ball to know how the next few months will transpire with respect to the Virus. Moreover, if this Court's inquiry were to cast an eye toward other states, it would certainly bear mention that, as Plaintiffs point out, all but six of the fifty states "have

---

[67] Dr. Kidd is a professor of political science and Dean of the College of Social Sciences at Christopher Newport University in Newport News, Virginia, where he has been a faculty member for 23 years. Dr. Kidd presents himself as "an expert in American politics, specifically in the areas of political behavior, voting behavior, racial politics, Southern politics, and Virginia politics. . ." (Rec. Doc. No. 52-16, p. 2). At the injunction hearing, Plaintiffs stipulated to the tender of Dr. Kidd as an expert. See *Minute Entry*, Rec. Doc. No. 74.
[68] Rec. Doc. No. 56-16, p. 3 ) (emphasis added).
[69] *Id.* at p. 5.
[70] *See, e.g., Id.* at p. 13 (with respect to Virginia); p. 15 (for West Virginia and Georgia); p. 17 (for Kentucky); p. 19 (Alabama); p. 20 (Louisiana); p. 22 (Texas); p. 24 (South Carolina); p. 26 (Oklahoma); p. 29 (Florida) (emphasis added).

62304

expanded the scope of access to absentee ballots"[71] due to the risk presented by the Virus. Of the states that require an excuse to vote by mail, only six states – including Louisiana – have not deemed risk of exposure to the Virus a valid excuse.[72]

Second, Dr. Kidd's finding that no surge or spike occurred following past elections is not probative of the risk of encountering the Virus at polls in November and December elections.[73] The absence of a "widespread" outbreak does not negate the asserted burden on Plaintiffs' right to vote. The relevant burden is not the possibility that there will be a surge or spike at the population level; the burden on the right to vote asserted by Plaintiffs is the potential that they, as individuals, will contract the Virus as a result of having no choice but to vote in person. Dr. Kidd's analysis may show that, in the aggregate, in-person voting did not result in a large increase in Virus cases. But his testimony does not establish that individual voters are not burdened by virus exposure in public polling places. Additionally, as Plaintiffs' expert Dr. Reingold explains in his report, a study of the trend in cases after an in-person election is inherently flawed because it fails to account for "secondary transmission to family/household members, who would have become infected later, as well as missing others who either did not present for testing or who did not develop symptoms, but who might have gone on to subsequently infect others."[74] In other words, the data does not reflect the gravity of the risk and hence the nature and extent of the burden.

---

[71] Rec. Doc. No. 31-1, p. 15, citing Kate Rabinowitz and Brittany Renee Mayes, Washington Post, "At least 83% of American voters can cast ballots by mail in the fall," https://www.washingtonpost.com/graphics/2020/politics/vote-by-mail-states/ (August 20, 2020).
[72] *Id.*
[73] *Id.* at p. 29.
[74] Rec. Doc. No. 60-1, p. 16-17.

62304

Defendants' medical expert witness Dr. Philip Barie[75] is generally skeptical of the severity and the scope of the pandemic. But, when asked about his personal COVID-19 risk tolerance, he was far less cavalier. On cross-examination, Barie testified that if he had close contact with a person infected with COVID-19, he would quarantine and would *not* vote in person (this would be an option for Dr. Barie, since he lives in New York City, which has implemented universal vote by mail due to the Virus).[76] He also testified that he would be concerned for his own health and safety if he were standing in line at the polls behind a voter with tell-tale symptoms of the Virus.[77]

Dr. Barie attests that "the incidence and prevalence of COVID-19 may be gross overestimates" because PCR tests[78] can generate a positive result when they detect "amounts of protein that are inherently non-infectious, represent too small a viral load to be infectious, or when intact virus is not present at all."[79] Dr. Barie boldly asserts that "the false-positive rate. . .may be as high as 90%."[80] His opinion is rendered suspect and incredible by the following concessions that simply cannot be squared with his high false positive assertion.  Barie asserts that the COVID mortality rate "is 3.04% as of September 3, 2020 and is decreasing literally by the day."[81] As part of his source materials, he cites

---

[75] Dr. Barie is a Professor of Surgery and a Professor of Public Health in Medicine at the Joan and Sanford I. Weill Medical College of Cornell University in New York City, New York, (Rec. Doc. No. 61-3, p. 1), and has decades of experience as a publishing research scientist specializing in the epidemiology of critical surgical illness and other areas (*Id.* at p. 1-2). At the injunction hearing, Plaintiffs stipulated to the tender of Dr. Barie as an expert witness (See *Minute Entry*, Rec. Doc. No. 74).
[76] New York City Campaign Finance Board, "Voting and Coronavirus (COVID-19): Information for NYC Voters"; https://www.nyccfb.info/nyc-votes/coronavirus/ ("This fall, all New York voters can vote by mail due to the risk of contracting the coronavirus. You can select 'Temporary illness or disability' as the reason for your request.").
[77] Hearing testimony, *See also*, Rec. Doc. No. 85, p. 7.
[78] The polymerase chain reaction or "PCR" test, as distinct from the Antigen or "rapid test". Dr. Barie testified at the hearing that the Antigen test is associated with a higher false negative rate and the PCR test is associated with a higher false positive rate.
[79] Rec. Doc. No. 61-3, p. 8.
[80] *Id.*
[81] *Id.* at p. 13.

62304

to data collected by the Johns Hopkins University of Medicine Coronavirus Research Center.[82] As of the hearing date, Johns Hopkins had identified a total of 154,955 confirmed cases of the Virus in Louisiana.[83] If, as Barie claims, 90% of those cases were false positives,[84] the "true" number could be as low as 15,495 confirmed cases in the state. Yet, Louisiana has reported 5,140 deaths from the Virus.[85] That many deaths with only 15,495 cases would represent a mortality rate of 33.17% -- eleven times the rate cited by Dr. Barie. He does not account for this discrepancy. The credibility of Dr. Barie's opinion that in-person voting is not unduly risky is further undermined by his hearing testimony that 1 in 5 people infected with the Virus require hospitalization, with 25% of those hospitalized being "critical," and his admission that comorbidities increase the risk of infection and mortality. Finally, the Court finds Dr. Barie's minimization of the risks of the pandemic to be further belied by his own blog post, which described the Virus as "[s]tunning…in its virulence, its contagion, and its rapidly spreading pervasiveness."[86] "Protect your patients, yourselves, your families, and each other," he wrote.[87]

For the reasons set forth above, the Court finds that Dr. Barie's testimony lacks credibility. His claim that "the virus may have already substantially disappeared"[88] is contradicted by the current report of the Centers for Disease Control and Prevention, which reported 256,159 new infections in the seven days preceding the hearing.[89] Even

---

[82] Dr. Barie uses statistics compiled by http://wwww.covidusa.net, which in turn cites Johns Hopkins as one of its data sources.

[83] Johns Hopkins Coronavius Resource Center (9/9/2020) https://coronavirus.jhu.edu/region/us/louisiana

[84] Rec. Doc. No. 61-3, p. 8.

[85] https://coronavirus.jhu.edu/region/us/louisiana.

[86] Philip S. Barie, "Stunning," Surgical Infection Society https://www.sisna.org/blog-detail/stunning (March 26, 2020).

[87] At the hearing, Dr. Barie noted that his blog post was made in March (March 26, 2020, to be specific).

[88] Rec. Doc. No. 61-3, p. 8.

[89] Centers for Disease Control, CDC COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#cases (accessed September 10, 2020).

62304

assuming that 90% of those cases could be false positives, as Dr. Barie suggests, 25,615 new cases in seven days is hardly the mark of a "disappeared" Virus. Additionally, the Court notes that the false-positive rate does not account for individuals who may be infected but do not seek out testing because they are asymptomatic; Barie concedes that "many" infected persons are asymptomatic.[90]

Dr. Barie further opines that "[a]irborne transmission of [the Virus] is controversial" and rejects what he calls Dr. Reingold's "speculative suggestion"[91] that transmission through the air is cause for concern. Overall, in Dr. Barie's view, "the chance of a voter contracting COVID-19 at a polling place is minimal" as long as that voter "takes proper precautions such as maintaining social distance, wearing a face mask, using hand sanitizer, and refraining from touching his or her face."[92] Even if that is so, according to ample record evidence, the "precautions" that Dr. Barie recommends are not assured in November and December elections[93] and were not uniformly in place at polling locations in Louisiana's July and August elections. Again, the Court finds it telling that, even with "precautions" in place, Dr. Barie testified that he would be concerned for his own safety if he were standing in line at the polls behind a voter with tell-tale symptoms of the virus.[94]

Plaintiff Pogue testifies that her polling place can only be entered and exited via a long hallway that is "too narrow to allow six feet of distance between voters standing in line and those exiting."[95] At the hearing, Brandon Abadie, the Administrator of Elections

---

[90] Rec. Doc. No. 61-3, p. 13.

[91] *Id.* at p. 12.

[92] *Id.* at p. 17.

[93] Louisiana Commissioner of Elections Sherri Wharton Hadskey testified that masks are encouraged but not required. *See* also Rec. Doc. No. 52-17, p. 68 ("Voters are *highly encouraged* to wear cloth face coverings. . .") Abadie testified that it would be "tough" for voters at some polling places to maintain six-foot social distance.

[94] Hearing testimony; See also Rec. Doc. No. 85, p. 7.

[95] Rec. Doc. No. 31-7, p. 5.

62304

for the East Baton Rouge Clerk of Court, confirmed Pogue's description of her polling place and testified that social distancing is simply not possible at some polling places. Similarly, Secretary Ardoin has stated that, although mask-wearing is recommended for voters, the state cannot refuse to admit a maskless voter to the polling place.[96] Indeed, both Pogue and Harding observed people without masks at the polls in July and August.[97] Notably, Defendants attach *Declarations* from Doris Quiett, Chanda Leatherman, Rosalind Knighten, Roslyn Lacour, and Stephanie Sims – all of whom worked as Commissioners at polling places for the July and August elections, and all of whom attest that COVID-19 Guidelines were followed at their polling place.[98] The Court has considered this testimony, but observes that proper procedures being followed at one polling place is no guarantee that they will be followed at another. As Abadie testified, social distancing is simply impossible at some polling places.

Though the three medical experts are at odds in some respects (*e.g.*, over the likelihood of transmission via aerosolized droplets), the Court also finds significant accord among their testimony. For example, Dr. Reingold states that, according to early models, "COVID-19 will be present, nationally and in Louisiana, during the November and December 2020 elections."[99] Dr. Barie agrees that "this is likely."[100] Likewise, the underlying assumption of Dr. Kidd's report is that the Virus is present, even surging, in states throughout the country.

---

[96] Secretary Ardoin, Press Release of the Secretary of State, Statement by Secretary Kyle Ardoin on Administration of Louisiana's November and December Elections (Sept. 2, 2020) https://www.sos.la.gov/Pages/NewsAndEvents.aspx#faq278.
[97] Rec. Doc. No. 31-7, p. 5; Rec. Doc. No. 31-6, p. 7.
[98] Rec. Docs. No. 52-8, 52-9, 52-10, 52-11, 52-12.
[99] Rec. Doc. No. 60-1, p. 11.
[100] Rec. Doc. No. 61-3, p. 4.

62304

Dr. Kidd finds "no evidence to suggest that in-person voting leads to widespread Coronavirus outbreaks,"[101] and the Court finds that opinion has no bearing on the risk to an individual voting in person. Again, Plaintiffs do not claim that their right to vote is burdened by the possibility of a widespread outbreak arising out of in-person voting. They claim that the burden is the risk to "their own health and lives"[102] that arises from voting in person. As Dr. Reingold explains, "what matters is whether [voting in person] results in an incremental increase in risk to *individuals* required to go to a polling place to vote . . .[f]or the affected individuals, the impact is severe, even if the overall state numbers did not 'spike.'"[103] And, nothing in the testimony of Defendants' experts refutes the real risk presented by the Virus when people congregate in indoor places. Surge or spike correlative data has little bearing on the attendant risks to voters with comorbidities or voters who have caretaking responsibilities over persons of fragility. Even Dr. Barie, who is remarkably sanguine about the danger of the Virus in general, attests that "[t]hose at highest risk to succumb are elderly" (like Jennifer Harding's parents and grandmother) "and have chronic comorbidities such as heart or lung disease, or diabetes"[104] (like Jasmine Pogue).

Defendants are loath to consider Plaintiffs' contention that the statutory election scheme, conceived without COVID in mind, is unduly burdensome on certain voters.[105] And yet, Defendants' actions suggest that they do recognize a very real burden. Intervenor Defendant Attorney General Landry issued an opinion on September 1, 2020,

---

[101] Rec. Doc. No. 56-16, p. 29.
[102] Rec. Doc. No. 31, p. 3.
[103] Rec. Doc. No. 60-1, p. 21 (emphasis added).
[104] Rec. Doc. No. 61-3, p. 13.
[105] Referring to it as a "'burden' on the right to vote, such as it is. . ." Rec. Doc. No. 52, p. 6.

62304

recognizing that the pandemic "has had a significant impact on Louisiana"[106] and purporting to broaden the applicability of the statutory disability excuse for absentee by mail voting to "any voter with an underlying health condition known to be a comorbidity for COVID-19," provided the voter obtains a "certification from a medical professional that "the existence of the comorbidity presents an unreasonable risk for that voter to vote in person."[107]

Likewise, Secretary Ardoin proposed an "Emergency Election Plan" for the November and December elections that would have expanded early voting to ten days and permitted "any registered voter testing positive for COVID-19 during and after early voting but before election day"[108] to request an absentee by mail ballot. This is an obvious response to the burden on voters perceived by his office. A burden on both COVID-infected voters voting in person, and on everyone else, who would otherwise be subjected to the presence of infected voters at the polls. It cannot be emphasized enough that Secretary Ardoin's Emergency Election Plan for the summer went much further, offering thirteen days of early voting and Virus-related excuses for voting by mail. If in-person voting imposes no burden, why have Defendants taken action to allow certain voters to avoid it?

The District Court for the Northern District of Georgia stated it well: "Exposure to a deadly virus is a burden."[109] Just last week, the Fifth Circuit found that "[t]here are quite reasonable concerns about voting in person. . ."[110] Plaintiffs characterize the burden as

---

[106] Rec. Doc. No. 52-1, p. 2.
[107] Rec. Doc. No. 52-1, Attorney General Opinion 20-0104.
[108] Rec. Doc. No. 49-4, p. 13.
[109] *People First of Alabama v. Merrill*, No. 2:20-CV-00619-AKK, 2020 WL 3207824, at *14 (N.D. Ala. June 15, 2020).
[110] *Texas Democratic Party v. Abbott*, No. 20-50407, 2020 WL 5422917 at *17 (5th Cir. Sept. 10, 2020).
62304

"undue" and "increased."[111] Defendants counter that "Plaintiffs' claims *do not even implicate* the right to vote."[112] The Court finds that the statutory Excuse Requirement, as applied during the Pandemic, imposes at least a moderate burden on Plaintiffs' right to vote. The record before the Court indicates that the pandemic is ongoing in Louisiana and nationwide; that the risk of transmission is greater in public places where many people gather; and that there are individual voters, such as Plaintiffs, who reasonably do not wish to appear in public to vote, based on their own underlying health conditions that place them at higher risk of complications from the Virus, or out of a desire to protect family members with those conditions.

Like the facts recently reviewed by the Fifth Circuit in *Abbott*,[113] Louisiana is "taking the kind of precautions for voting that are being used in other endeavors during the pandemic," but "[n]one of them guarantees protection."[114] The Fifth Circuit recognized that "[t]here are quite reasonable concerns about voting in person. . ."[115] The record in this case demonstrates that, although state officials have attempted to implement precautions to make voting in person safer, even these well-intentioned efforts cannot ameliorate the risk. Masks will be encouraged, but not required; social distancing is aspirational but cannot be assured; and high anticipated voter turnout will produce long

---

[111] Rec. Doc. No. 31-1, p. 24.

[112] Rec. Doc. No. 86, p. 20 (emphasis added).

[113] *Abbott*, 2020 WL 5422917 (5th Cir. Sept. 10, 2020).

[114] *Id.* at *17.

[115] *Id.* Texas, like Louisiana, allows voters 65 and older to vote by mail without an excuse. After a Texas district court "entered a preliminary injunction requiring Texas officials to allow any Texan eligible to vote to do so by absentee ballot," the *Abbott* court was tasked with deciding whether "the vote-by-mail privilege for older voters is unconstitutional under the Twenty-Sixth Amendment's prohibition against denying or abridging the right to vote on account of age." The court concluded that conferring the privilege on one set of voters (those 65 and up) did not deny or abridge the right to vote for others. *Abbott* is distinguishable in the sense that it was not an equal protection case, but also because "all voters under age 65," generally speaking, face less risk from in-person voting than do Plaintiffs herein, who have demonstrated specific medical and social risk factors.

62304

lines.[116] The process of disinfecting the voting booth between voters will take an estimated 30 seconds per voter, which will cause voters to wait in line longer.[117] Overall, the Court finds that Defendants' adherence to the statutory Excuse Requirement, which fails to make provisions for voters with comorbidities or voters who care for the frail and the infirm to safely vote, imposes a burden on Plaintiffs' right to vote.

b. The State's Interest

The United States Supreme Court instructs that, when applying the *Anderson-Burdick* framework, "[h]owever slight [the] burden may appear . . .it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'"[118] Thus, the court examines the "precise interests put forward by the State as justifications for the burden imposed by its rule . . ."[119] Virus-related protections were offered for the July and August elections and then abruptly rolled back for November and December. Defendants proffer a list of four justifications for this roll-back: "(1) taking prophylactic steps to prevent voter fraud; (2) maintaining the integrity of its elections systems; (3) avoiding voter confusion; and (4) preserving public confidence in election results."[120] The Court will address these justifications in turn.

i.)    Voter fraud

Defendants argue that the "risk of voter fraud is especially pernicious here, where Plaintiffs seek unlimited and unrestricted absentee voting."[121] Citing a "compelling interest

---

[116] Hearing testimony of Sheri Hadskey, Louisiana Commissioner of Elections and Brandon Abadie, Administrator of Elections for the East Baton Rouge Clerk of Court.
[117] Hearing Testimony of Commissioner Hadskey.
[118] *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008)(quoting *Norman v. Reed,* 502 U.S., at 288–289).
[119] *Burdick*, 504 U.S. at 434 (citation omitted).
[120] Rec. Doc. No. 52, p. 13.
[121] Rec. Doc. No. 52, p. 8.

62304

21

in preventing voter fraud,'"[122] Defendants emphasize that "[e]laborate, empirical verification of weightiness is not required"[123] when assessing the strength of the state's interest.

Even under this standard, Defendants' evidence is woefully inadequate. First, they offer not a scintilla of evidence of fraud associated with voting by mail in Louisiana. Strikingly absent is even a *hint* of fraud in the July and August primaries, where expanded mail voting was available to voters with COVID-19 comorbidities, caretakers, and others. In fact, the Louisiana Commissioner of Elections, Sherri Wharton Hadskey ("Commissioner Hadskey" or "Hadskey"), testified that she was unaware of any incidents of voter fraud among mail voters in the July and August elections.[124] With utterly no evidence of voter fraud in Louisiana, the Defendants bolster their voter fraud justification with two exhibits: a 2012 Grand Jury Report from Miami-Dade County, Florida that identified vulnerabilities in Florida's absentee by mail voting process[125] and a 2019 Order from the North Carolina Board of Elections ordering a new election in North Carolina's Ninth Congressional District because the 2018 general election there was so "corrupted by fraud, improprieties, and irregularities so pervasive that its results are tainted. . ."[126]

Defendants glaringly fail to acknowledge that, according to Secretary Ardoin, Louisiana "absolutely, without a doubt" ranks among the top five states for election security and election integrity.[127] Asked about the prevalence of voter fraud in the state,

---

[122] *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). That interest, the Court noted, is "[c]ounter[ed] [by] plaintiffs' strong interest in exercising the 'fundamental political right' to vote."
[123] *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997).
[124] Hearing testimony of Sherri Hadskey.
[125] Joint Exhibit 13.
[126] Joint Exhibit 12.
[127] Sec of State Ardoin's April 15, 2020 testimony before the House and Governmental Affairs Committee, Louisiana House of Representatives (April 15, 2020)

62304

22

Ardoin stated that "it has not been widespread" and that he believes it to be "a rare occurrence."[128] When it has occurred, he explained, it has been in connection with "local races, small races." Ardoin demurred when asked if he knew the number of voter fraud prosecutions that have proceeded to trial in Louisiana, but stated that such trials are "very, very, very rare."[129] Likewise, former Secretary of State Tom Schedler in 2017 issued a statement that "Louisiana did not have any widespread irregularities or allegations of fraud"[130] during the 2016 presidential election. Also, as Plaintiffs note, the database on voter fraud maintained by the Heritage Foundation contains only four known instances of voter fraud in Louisiana, none of which is related to absentee by mail voting and only one of which occurred after 2005.[131]

Puzzling and left unexplained by the Defendants is why their concern over voter fraud presented no obstacle to the passage and implementation of the Emergency Election Plan for the July and August elections, which broadened the availability of mail ballots for COVID-19 reasons. Apparently Secretary Ardoin, the Louisiana legislature, and Governor Edwards were satisfied that expanding the availability of absentee by mail voting presented no grave threat when they approved the Plan on April 27, 2020, fewer than five months ago.[132]

---

https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2020/apr/0415_20_HG; See 18:25 – 21:00.

[128] *Id.*

[129] *Id.*

[130] AP News, "Elections chief says no evidence of voter fraud in Louisiana" (January 25, 2017) https://apnews.com/4cc1a8e3f93e4f7db12757bb7b8ef944.

[131] The Heritage Foundation, Election Fraud Cases: Louisiana https://www.heritage.org/voterfraud/search?state=LA

[132] Rachel Thomas, "Louisiana's emergency election plan approved" (April 21, 2020) https://www.wafb.com/2020/04/21/la-secretary-state-announces-emergency-election-plan/

62304

The Court is not persuaded by Defendants' conclusory assertion that their interest in preventing voter fraud – which Defendant Secretary Ardoin testified only four months ago is "a rare occurrence" – is weighty enough to justify their roll back of COVID-19-specific allowances for mail voting.[133] As the Supreme Court explains, when weighing the state's interest against the burden imposed, "the Court must not only determine the legitimacy and strength of each of those interests; it also must consider *the extent to which those interests make it necessary to burden the plaintiff's rights.* Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional."[134] As discussed *supra*, the threat of voter fraud did not make it necessary to maintain the statutory Excuse Requirement for the July and August elections. If, as Secretary Ardoin testified, Louisiana is ranked in the "top five" states for election security, why does a temporary expansion of absentee by mail voting present such a threat?

Moreover, as noted by former Secretary of State Schedler, Louisiana has "many layers of legal protection to shield us from voter fraud."[135] The application for an absentee by mail ballot requires the voter to sign, with two witnesses, certifying "that the statements made herein by me are true and correct and I may be subject to a fine of not more than $2,000 or imprisonment for not more than 2 years, or both, for knowingly making false statements."[136] Louisiana also has a detailed process for determining the validity of mail

---

[133] The Court makes this finding mindful of the Supreme Court's recognition that a state's interest in preventing voter fraud is "compelling" (*Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)) and that "[e]laborate, empirical verification of weightiness is not required". (*Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 352 (1997)).

[134] *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (emphasis added).

[135] AP News, "Elections chief says no evidence of voter fraud in Louisiana," (Jan. 25, 2017). https://apnews.com/4cc1a8e3f93e4f7db12757bb7b8ef944

[136] Joint Exhibit 25.

62304

ballots before they are tabulated, a process that involves members of the parish board of elections going ballot by ballot to confirm that the proper procedures for marking and submitting the ballot have been followed.[137]

The Court is underwhelmed by the argument that eliminating COVID-related mail voting and returning to the statutory Excuse Requirement is a significant bulwark against fraud, especially considering that Louisiana offers mail voting for reasons of mere convenience that require no proof whatsoever. As Governor Edwards points out, a voter may apply for an absentee by mail ballot on the premise that he or she "expects to be temporarily outside the territorial limits of the state or absent from the parish in which he is qualified to vote."[138] "Using this provision," the Governor argues, "a duck hunter residing in East Baton Rouge Parish could cross the Mississippi River to his hunting camp in West Baton Rouge Parish, leaving him absent (though not far) from his parish of residence on early voting days and election day. He would then be able to vote, by mail, absentee."[139] No documentation of the expected absence is required by the ballot application; only the dates of anticipated absence are required. If the voter votes absentee by mail based on the expectation that he or she will be absent and then, due to a change of plans, is no longer absent, the law proscribes no consequences.[140] How, then, can the state maintain that it is *necessary* to disallow any Virus-related excuses to prevent voter fraud? It cannot.

---

[137] La. R.S. 18:1313; Hearing testimony of Sherri Hadskey, Commissioner of Elections.
[138] Rec. Doc. No. 49, p. 7.
[139] *Id.*
[140] Similarly, voters who "expect to be . . .upon the waters of the state" working offshore during early voting and election day can simply check a box to receive an absentee by mail ballot; likewise, no proof is requested from voters who claim to have "moved . . . to another parish more than 100 miles from the parish seat of [their] former residence after the registration books closed." Joint Exhibit 25.

62304

The Excuse Requirement already provides excuses that are merely "for the convenience of voters" and those excuses "could reasonably be extended to fit the circumstances of this pandemic without . . . undermin[ing] the security of the election."[141] The line that has been drawn by Defendants is not a rational one,[142] and their assertion of its necessity is directly contradicted by the fact that, for an election conducted *one month ago*, these same state officials did not, apparently, feel that maintaining the strict statutory Excuse Requirement was necessary to avert voter fraud. While the state has a legitimate interest in preventing voter fraud, based on the record before the Court, as it relates to the Excuse Requirement, that interest does not necessitate the burdens imposed by the requirement during the pandemic, especially for vulnerable voters such as those with comorbidities of COVID-19 that place them at higher risk.

ii.)    Integrity of Elections Systems

The second justification asserted by Defendants for maintaining the strict adherence to the statutory Excuse Requirement is the state's need to "maintain[] the integrity of its elections systems."[143] "A State indisputably has a compelling interest in preserving the integrity of its election process."[144] Defendants argue that the integrity of the state's election process would be threatened by "unlimited vote by mail" because "it may be impossible for the local parish Boards and Registrars to change their procedures sufficiently in time for any election in 2020."[145]

---

[141] Rec. Doc. No. 49, p. 7.
[142] "[T]he Constitution does not require the [state] to draw the perfect line nor even to draw a line superior to some other line it might have drawn. It requires only that the line actually drawn be a rational line." *Texas Democratic Party v. Abbott*, 961 F.3d 389, 407 (5th Cir. 2020)(quoting *Armour v. City of Indianapolis*, 566 U.S. 673, 685 (2012).
[143] Rec. Doc. No. 52, p. 13.
[144] Rec. Doc. No. 52, p. 8 (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.,* 489 U.S. 214, 231 (1989)).
[145] *Id.* at p. 9.

62304

However, the Louisiana Commissioner of Elections testified at the hearing that the integrity of the state's election process is already threatened, even without any Virus-related expansion of mail balloting. Hadskey testified that the number of voters over the age of 65 who have requested a mail ballot has dramatically increased, resulting in enormous strain on the mail vote process. Commissioner Hadskey testified that historically, approximately 60,000 voters aged 65 and older request mail ballots in Presidential elections. The number of age 65-and-up mail ballot applications has surged to nearly 165,000 since the pandemic. The deadline to request an absentee by mail ballot is October 30, 2020, so the number of requests can be expected to increase. Because state election officials are not accustomed to or prepared for such large numbers of absentee by mail ballots, Hadskey stated that she is already "extremely concerned" about being able to have election results tabulated on November 3, Election Day.

Be that as it may, a potential expansion of mail voting to accommodate voters with comorbidities or caretakers has nothing whatsoever to do with the state's failure to be prepared to tabulate mail votes. Louisianans aged 65 and older have had the right vote by mail on the basis of age for thirteen years.[146] The right, so extended to the voters of the state, gives rise to an attendant duty on the state to facilitate that vote. Hadskey testified that her office began preparations for the Presidential election in February. She further testified that in March, her office knew that the pandemic would have severe affects on voting. The Secretary of State first declared an emergency with respect to voting on March 13, 2020 and certified that the state of emergency persists for the

---

[146] Act 124, introduced during the 2007 Regular Session of the Louisiana legislature, was signed by the Governor and became effective on August 15, 2007. http://legis.la.gov/legis/BillInfo.aspx?i=206986

62304

November and December elections.[147] According to the 2010 Census, more than 720,000

Louisianans are age 65 or older.[148] The state has been statutorily duty bound to have a

system in place that would facilitate potentially 720,000 mail votes.

According to the Secretary of State, in the July 2020 election "[a]bsentee by mail

voters accounted for 19% of voters."[149]  "Voters were given the opportunity to request an

absentee ballot for five COVID-19 related reasons."[150] Of the "164,296 voters who

requested an absentee ballot for the July 11, 2020 election, 2,810 of them used the

COVID-19 reasons for their request."[151] Ultimately, of the "99,075 voters who returned an

absentee ballot, only 1,863 (2%) voters utilized the COVID-19 emergency absentee ballot

application."[152] In other words, "COVID-19 voters made up less than 0.4%"[153] of the

overall ballots cast. The bulk of absentee by mail voting -- 92% -- came from voters using

the "senior citizen excuse", ie. voters 65 or older.[154] Based on those statistics, the notion

that implementing the same COVID-19-related excuses for November would be

"impossible" is not believable. Simple arithmetic indicates that a continuation of the

COVID-19 excuses for mail voting would result in an additional 8,400 mail ballots.[155] It is

hardly accurate for Defendants to insist that relaxing the Excuse Requirement to permit

---

[147]    "COVID-19 and Elections Update", Statement by Secretary Ardoin, https://www.sos.la.gov/OurOffice/PublishedDocuments/031320PressReleaseCOVID19.Final.pdf.
La. R.S. 18:401.3 authorizes the secretary to certify to the governor, the Senate Committee on Senate and Governmental Affairs, and the House Committee on House and Governmental Affairs that the emergency impairs the election and that an emergency election plan is necessary.
[148] https://www.census.gov/quickfacts/LA
[149] Defendant's Exhibit 4, p. 4.
[150] *Id.*
[151] *Id.*
[152] *Id.*
[153] *Id.*
[154] *Id.*
[155] Secretary Ardoin's office estimates that approximately 2.1 million votes will be cast in the November election. Defendant's Exhibit 4, p. 11. If COVID-19 absentee by mail voters make up 0.4% of the total vote as they did in the July 2020 election, (Note 149 *supra*), there would  be approximately 8,400 absentee by mail votes cast using the COVID-19 excuses.
62304

the same mail vote reasons offered in July and August would wreak havoc on the integrity of the system.

Although the Court is sympathetic to election officials' struggle to contend with the effects of the pandemic on voting patterns, it is not persuaded that the state's interest in "maintaining the integrity of its election systems" is any justification for the maintenance of the Excuse Requirement. Based on the record, a modest relaxation of the Excuse Requirement, such as the one in place for the July and August elections, would impose at the most a *de minimis* additional burden on the system and does not pose a legitimate threat to Louisiana's election integrity.[156]

iii.)    Voter confusion

Defendants' third asserted justification for rolling back COVID-19 absentee by mail voting provisions and adhering to the Excuse Requirement is the state's interest in "avoiding voter confusion."[157] This sounds quite rational, until one considers that voter confusion already exists with respect to the November and December elections as the direct result of Defendants' actions. The Secretary of State has been operating under a declared state of emergency since March 13, 2020. Yet, no plan for the November Presidential election was advanced until August 17, 2020, and that proposed Plan eliminated the previously implemented Virus-related excuses for mail-in voting. Secretary

---

[156] The Senate Judiciary Committee's Report accompanying the 1982 amendment of the Voting Rights Act suggested several factors for courts to consider when analyzing potential violations of Section 2 of the VRA. One of those factors was "lack of responsiveness on the part of elected officials to the particularized needs of minority group members." S.Rep. No. 97-417, 97th Cong., 2d Sess. (1982), pages 28-29.  Plaintiffs evince significant evidence that the Virus, and therefore the need to vote in person, imposes a disproportionate burden on Black voters in Louisiana. See, *e.g.,* Declaration of *Camara Phyllis Jones, M.D., M.P.H., Ph.D*, Rec. Doc. No. 31-4. Plaintiffs are not seeking an injunction with respect to their VRA claims. The Court simply notes that, in a related voting rights context, elected officials' failure to respond to the needs of minority groups is a factor to be considered by the court.
[157] Rec. Doc. No. 52, p. 13.

62304

29

Ardoin has repeatedly indicated that the Court will have to step in to *resolve* confusion over the plan for the November election. Secretary Ardoin has said he "would think the Court's going to have to order some sort of process"[158] and that an Emergency Election Plan "will [have to] be decided in court," including the "the critical mechanisms my office needs to administer the election in the extraordinary circumstances of a pandemic."[159] Likewise, when Governor Edwards rejected the proposed Plan for November and December, he observed that a "resolution will likely have to come from courts, which is unfortunate." Beyond a mere *interest* in avoiding voter confusion, in this Court's view, the state has an *obligation* to avoid voter confusion; an obligation that has not been fulfilled.

The Emergency Election Plan put in place for July and August, which added Virus-related excuses to vote by mail, was not broken; the bumbling attempts to fix what was not broken have brought us to today. Instead of leaving in place COVID-19 responsive mail voting opportunities, Secretary Ardoin proposed that "any registered voter testing positive for COVID-19 during and after early voting but before election day"[160] should be allowed to vote by mail. This eleventh hour proposal is itself confusing. "[D]oes it apply to someone who received a positive test result prior to early voting, but is still within the quarantine window during the early voting period? Does it apply to someone who submits to a COVID-19 test during or after early voting and before election day and is directed to

---

[158] WAFB Staff, "Sec. of State Discusses Nov. 3 Election Plan as La. Recovers from Hurricane Laura" (Sept. 3, 2020) https://www.wafb.com/2020/09/03/sec-state-discusses-nov-election-plan-la-recovers-hurricane-laura-continues-fight-covid-/; 1:35 mark *et seq.*

[159] Mark Ballard, "Louisiana's fight over mail-in ballots is headed to federal court; here are the next steps" (Aug. 31, 2020) https://www.theadvocate.com/baton_rouge/news/politics/legislature/article_37557c18-eafd-11ea-955d-4bf29cdb7e3e.html.

[160] https://www.sos.la.gov/OurOffice/PublishedDocuments/SOSProposedEmergencyElectionPlan.pdf

62304

quarantine, but has not yet received a positive test result? Does it apply to someone who took a test before early voting but receives a positive test result during early voting?"[161]

The legitimacy of Defendants' stated interest in avoiding voter confusion is further undermined by Attorney General Landry's freshly issued Opinion 20-0104. Landry urged dismissal of this case, arguing that "changing the method of absentee balloting at this stage will invite chaos into the system." Yet on September 1, 2020, Landry proposed to do just that. After intervening in this lawsuit, Landry penned a letter to the Tangipahoa Registrar of Voters stating that "a voter who is diagnosed with COVID-19 or is subject to a quarantine order while awaiting a COVID-19 diagnosis would qualify to vote absentee so long as a medical professional certifies the voter is disabled."[162] Landry further opines that "any voter with an underlying health condition known to be a comorbidity for COVID-19 will qualify for an absentee ballot if a medical professional certifies that . . .the existence of the comorbidity presents an unreasonable risk for that voter to vote in person to the point that it rises to a disability under [the statute]."[163]

For the July and August elections, voters with comorbidities were able to request an absentee by mail ballot by certifying that they suffer from diabetes, hypertension, or one of the other conditions identified by the CDC as placing them at higher risk. Now, those same voters are expected to be aware of and rely upon a letter from the Attorney General to the Tangipahoa Registrar of Voters that instructs them to go to the doctor and obtain a certification that they are "disabled." By the plain language of Landry's opinion, a voter can ask an optometrist for a note that says she is disabled because she was

---

[161] Defendant's Exhibit 5, p. 2.
[162] Rec. Doc. No. 52-1, p. 3.
[163] Id.

62304

tested for COVID-19 but has not yet received the results.[164] The situation is an absurdity and yet, is specifically permitted by the Attorney General's Opinion.[165] Ironically, Defendants' expert witness, Dr. Barie, testified at the hearing that, as a medical clinician, he would not certify a patient awaiting COVID-19 diagnosis as disabled.

Meanwhile, the Attorney General urged the Court to dismiss this case because the state is already "on the eve of the election," and "changing the method of absentee balloting at this stage will invite chaos into the system and harm more people through voter confusion than any court-ordered remedy would help."[166] Defendants' offer of "voter confusion" as a justification for maintaining the Excuse Requirement lacks credibility in light of the evidence that revisions to important forms for the fall elections are still underway.[167]

The question before the Court is whether the state's asserted interest in avoiding voter confusion is sufficiently weighty to justify the burden imposed on Plaintiffs by their rule. Defendants have articulated no reason why maintaining the statutory Excuse Requirement has the effect of avoiding voter confusion, especially in light of the multifarious pronouncements from different state officials about what rules will govern the November and December election.  The Court finds that, based on the record before the

---

[164] Rec. Doc. No. 52-1, p. 3, n. 1.

[165] In addition to essentially enlisting doctors to write certifications that are *contra* both legal and medical norms, the Attorney General's opinion arguably imposes an additional, and more constitutionally fraught, burden of its own. An appointment with a medical professional is generally not free and may be quite expensive, depending on one's insurance status. By forcing voters who want to vote by mail into using the disability excuse to get a doctor's note, the Opinion may put voters in the position of having to incur costs in order to exercise their right. Plaintiffs analogized this to a poll tax. The Court need not, and does not, conclude as much, but finds the argument worth considering.

[166] Rec. Doc. No. 56-1, p. 31.

[167] Commissioner Hadskey testified that the disability excuse application form presently in use is being revised in keeping with the September 1, 2020 Attorney General Opinion. The Commissioner estimated that the new forms necessitated by the A.G.'s Opinion would not be ready for 2 more weeks.

62304

Court, the state's interest in avoiding voter confusion – confusion that already exists due to Defendants' actions – does not outweigh the burden on Plaintiffs' rights created by the application of the statutory Excuse Requirement under pandemic circumstances. The amorphous threat of unspecified voter confusion simply does not carry more weight than the very real risk of exposure to a dangerous Virus that Plaintiffs face if they vote in person.

iv.)     Public confidence in election results

The final state interest that Defendants cite as justification for maintaining the Excuse Requirement is the state's need to ensure public confidence in election results.[168] Defendants do not elaborate on how maintaining the statutory Excuse Requirement allegedly serves to preserve public confidence. As far as the Court can tell, the public confidence argument overlaps with Defendants' asserted interest in maintaining the integrity of Louisiana's election systems. At the hearing, Commissioner Hadskey testified that universal mail-in voting would result in delays in tabulating the results on election night due to the increased number of absentee by mail ballots.[169] In previous elections, she explained, late election results have caused voters to question the legitimacy of the vote count or the overall result. To be clear, Hadskey also stated that the likelihood of having election results on election night is already remote because of the surge in voters requesting absentee by mail ballots under the "senior citizen" excuse for voters 65 and older. In that sense, maintaining the Excuse Requirement (i.e. letting fewer people vote

---

[168] The Fifth Circuit has recognized "promoting public confidence in the voting process" as a legitimate state motive. See *Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016).
[169] As previously noted, state election officials should have had systems in place to accommodate the more than 700,000 voters, aged 65 or older, who have had the right to mail vote for more than a decade.

62304

by mail) does not ensure timely results, which, thanks to pandemic voting circumstances driving a huge increase in elderly absentee voting, are likely already out of reach.

If the Virus-related excuses from the summer election Plan are made available for the fall, based on the Secretary of State's data, the likely total number of additional mail ballots requested would be in the neighborhood of 9,000.[170] It seems implausible that such a meager fraction of the 2.1 million votes anticipated would change the timing for vote tabulation, and certainly not to a degree that it would be responsible for undermining public confidence. Weighed against the burden on 9,000 prospective absentee by mail voters, the incidental effect that the additional ballots have on the vote tabulation process is not a legitimate reason to maintain the burden. Public confidence is not a rational reason to draw the line between who can and cannot vote absentee by mail in this manner.

The Court finds no credible evidence that the need for public confidence in elections necessitates maintaining the Excuse Requirement during a pandemic. Defendants may not have considered that their insistence on the maintenance of the Excuse Requirement may itself have a negative effect on the public's confidence in the election results. Virus-related protections were offered for the July and August elections and then abruptly rolled back for November and December, with only the explanation that this was the only plan that would pass the legislature.[171] For state officials to reverse course and, as they do here, insist that the same protections that were offered in the

---

[170] See *supra*, n. 156.

[171] See Defendant's Exhibit 5 (Letter from Governor Edwards to Secretary Ardoin) ("[Y]ou presented me with your plan, claiming it is the only plan you would be able to get through the legislative process. It was clear than that you had already made this decision after discussion with members of the legislature. While legislative approval is certainly a required element of La. R.S. 18:401.3, it should not be your primary goal in developing a safe elections plan").

62304

summer suddenly present an unacceptable risk of voter fraud and mass electoral chaos can only have the effect of eroding public confidence in the administration of Louisiana elections. Plaintiff Jasmine Pogue avers that:

> If I had the opportunity to vote by absentee ballot, I would take it unquestionably. I have participated in elections since I became eligible to vote at 18 years old, and it is important to me that my voice is heard in our political system. I am devastated that my right to vote and my need to protect my health are put in tension by Louisiana's refusal to extend vote by mail opportunities for voters like me.[172]

In the Court's view, the perceived unfairness of eliminating Virus-related protections that were perfectly acceptable to state officials for the summer elections is more detrimental to public confidence in the elections than a modest increase in mail-in voting.

### c. Early Voting: Burden and State Interest

Plaintiffs also seek to enjoin "the reduction of the 13-day early voting period that was established for the July and August 2020 elections to a seven-day early voting period for the November and December elections."[173] According to Plaintiffs, this curtailment of early voting imposes an undue burden on their right to vote. They explain that "additional days of early voting will allow for effective social distancing and reduce the risk of crowds gathering in lines to enter a polling place and inside the polling place."[174] Plaintiffs ask the Court to "direct Defendants to provide a 13-day early voting period," arguing that the state has "no valid justification" for its failure to do so.[175] As it did for the Excuse Requirement

---

[172] Rec. Doc. No. 31-7, p. 6.

[173] Rec. Doc. No. 31, p. 2.

[174] Rec. Doc. No. 31-1, p. 25.

[175] Plaintiffs' discussion of early voting refers to both the "November and December elections" collectively (*See, e.g.* Rec. Doc. No. 84, p. 17). But their request for an expanded period of early voting is premised on the "anticipated considerable increase in voter turnout," which, based on the record, is applicable only to the November election. Plaintiffs' early voting claim with respect to the December election is not abandoned, *per se*, but the Court finds that their argument and evidence is primarily focused on relief with respect to early voting in November.

62304

above, the Court must weigh the burden created by the reduction of the early voting period against "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'"[176]

The burden imposed by a limited period of early voting is the same as the burden imposed by restricted access to absentee by mail voting: it increases the risk that Plaintiffs will be exposed to the Virus, in this case by distributing the large presidential turnout over only seven days instead of ten (as Secretary Ardoin proposed) or thirteen (as was offered for the summer elections). This curtailment can only have the effect of creating more crowded polling places, both during early voting and on Election Day, when voters who did not have an opportunity to vote during early voting will have to appear, in person, at their polling place. Neither in their briefs nor in the evidence presented at the injunction hearing have Defendants identified the risk of voter fraud as a justification for limiting early voting. Indeed, the Defendants quote the 2016 Fifth Circuit case *Veasey v. Abbott* for the proposition that "the potential and reality of fraud is *much greater* in the mail-in ballot context than with in-person voting."[177] In fact, although Defendants argue against Plaintiffs' request for an expanded period of early voting in their *Opposition*, it is a matter of record that Secretary Ardoin, in his proposed Emergency Election Plan, sought a ten-day period of early voting for the November election.[178] And Commissioner Hadskey

---

[176] *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).
[177] *Veasey v. Abbott*, 830 F.3d 216, 239 (5th Cir. 2016)(emphasis added).
[178] https://www.sos.la.gov/OurOffice/PublishedDocuments/SOSProposedEmergencyElectionPlan.pdf, p. 7.

62304

testified at the hearing that a ten-day period of early voting could feasibly be implemented by her office and the parish Registrars of Voters.[179]

To the extent that Defendants oppose an expanded period of early voting at all, their opposition is based on the logistical challenges and administrative demands that they claim would arise from fitting an expanded early voting period of more than ten days into an already cramped election calendar. To that end, Defendants offer testimony from Commissioner Hadskey, who attests that as much as Plaintiffs may want thirteen days of early voting, "it is not possible to do so."[180] Why not? Because, Hadskey explains, the last day for a citizen to register and be allowed to vote in the November 3rd election is October 13, 2020.[181] If this Court were to order that early voting is to take place over thirteen days, as it did for the July and August elections, early voting would begin on October 13th – the same day as the deadline for voter registration. Hadskey avers that "information regarding new voters must be entered by the appropriate registrar into ERIN, the state's electronic information network, in order to allow these newly registered voters to vote during early voting."[182] That process is "too cumbersome and too critical a process for registrars across the state to complete accurately and timely before the start of early voting," she adds, especially since Louisiana has "historically received greater numbers of last minute registrations than usual when there is a presidential election."[183]

---

[179] Hearing testimony of Commissioner Hadskey.
[180] Rec. Doc. No. 52-17, p. 5.
[181] *Id.* at p. 6 (October 13th is the deadline for online registration through the Geaux Vote portal on the Secretary of State's website. The deadline to complete a voter registration in person or by mail is October 5, 2020 (See Rec. Doc. No. 52-17, p. 21, Hadskey Exhibit A).
[182] Rec. Doc. No. 52-17, p. 6.
[183] *Id.*

62304

Additionally, Hadskey attests that the state's ERIN system generates a "one line poll list" for each registered voter, which contains the voter's name, address, and the style of ballot to be provided to the voter.[184] For the July 2020 election, when the first day of early voting and the last day of online voter registration both fell on Saturday, July 11, the "one poll list" was not complete until the following Tuesday, July 14th, resulting in what Hadskey describes as "chaos" and "confusion," requiring the "registrars, deputy registrars, and Secretary of State employees . . . to work on the weekend holidays to accomplish this."[185]

The above-described issues with processing new voter registrations notwithstanding, Commissioner Hadskey unequivocally testified that a ten-day period of early voting could feasibly be implemented by her office and the parish Registrars of Voters for the November election.[186] And Secretary Ardoin proposed ten days of early voting for November in his Emergency Election Plan, which, though not approved by the Governor, has since earned the approval of the majority of the Louisiana legislature.[187] Although they have brought forth evidence that thirteen days of early voting would be unmanageable by state elections officials, Defendants have not identified a state interest

---

[184] Rec. Doc. No. 52-17. At p. 7.

[185] *Id.* at p. 8.

[186] The same cannot be said for the December election; the Court finds that the logistical and timing-related challenges attested to by Hadskey for that election make an expansion of early voting unworkable. As it stands, there are already only seventeen days between November 3 and the start of December early voting on November 20. Because the December ballot includes runoff elections from November, the fact that a ballot cannot be prepared sooner, especially in light of the likelihood of delayed results in November, is sufficient justification for maintaining seven days of early voting for December. The Court further notes that December poses less risk to voters because it will be a lower-turnout, non-presidential election.

[187] Mark Ballard, "In federal court, Louisiana elections officials unsure if mail ballots can be counted on time," The Advocate (Sept. 9, 2020). https://www.theadvocate.com/baton_rouge/news/politics/elections/article_e58b258e-f2ec-11ea-a2d3-271a06a7292a.html ("On a largely party-line vote, the Louisiana House on Wednesday approved of Ardoin's latest emergency plan on a vote of 62-32 and the state Senate said yes on a 27-11 vote. The ballots were delivered by mail").

62304

that justifies limiting early voting to the seven-day period prescribed by statute. In fact, Defendants scarcely appear to oppose a ten-day period of early voting at all. Based on the record before the court, a curtailed period of early voting imposes a burden on Plaintiffs that is not justified by any legitimate state interest.

## 2. Irreparable Injury

In addition to showing a likelihood of success on the merits, Plaintiffs must also show that there exists a substantial threat that they will suffer irreparable injury in the absence of an injunction. To that end, Plaintiffs cite the Supreme Court's holding in *Elrod v. Burns* that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[188] The *Elrod* Court was clear that irreparable injury arises whether one's First Amendment freedoms "were either threatened or in fact being impaired."[189] Plaintiffs argue that if the challenged provisions of Louisiana election law are not enjoined, they will have to choose between exercising their right to vote and risking their health by voting in person. Likewise, the organizational Plaintiffs, the Louisiana NAACP and Power Coalition, face irreparable injury. Courts have held that a "voting-rights organization is [] irreparably harmed when the right to vote is wrongfully denied or abridged—whether belonging to its membership or the electorate at large."[190] Defendants contend that Plaintiffs cannot make a showing of irreparable injury

---

[188] *Elrod v. Burns*, 427 U.S. 347, 373 (1976). See also *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).

[189] *Id.*

[190] *N. Carolina State Conference of NAACP v. Cooper*, 430 F. Supp. 3d 15, 51 (M.D.N.C. 2019)(citing *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270, 1295 (N.D. Ga. 2018). The North Carolina court also held that "[o]rganizations with core voter-advocacy missions . .  case, are irreparably harmed when 'the defendant's actions 'perceptibly impair[ ]' the organization's programs, making it more difficult to carry out its mission." This Court found in its Ruling on the Motion to Dismiss in this case that the Louisiana NAACP and Power Coalition have suffered impairment or frustration of their missions due to the actions of Defendants.

62304

in the absence of an injunction because their alleged harms are too speculative. This Court already considered and rejected that argument in its *Ruling* on the *Motion to Dismiss*. The Court concludes that Plaintiffs have shown a likelihood of irreparable injury in the absence of an injunction.

   3.   *Balance of Hardships*

The Fifth Circuit instructs that a court should issue a preliminary injunction if the movant establishes, in addition to the other three elements of the test, that "the threatened injury if the injunction is denied outweighs any harm that will result in the injunction is granted."[191] It is true, as Defendants point out, that the Fifth Circuit in *Texas Democratic Party v. Abbott*, staying a lower court injunction, found irreparable injury to the state of Texas caused by the injunction, writing that "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."[192] This prong of the injunction analysis calls for a *balancing.* The Court concludes that the ineffable, abstract injury of being unable to effectuate a statute, that was modified and relaxed by the legislature to meet nearly identical circumstance only months ago carries more weight than the Plaintiffs risk of exposure to a dangerous Virus. The facts – and therefore the balance of hardships – in this case are distinguishable from *Abbott*. First, the hardships on Plaintiffs here are weightier and more severe than in Abbott, where the plaintiffs sought to expand the excuse-free mail in voting offered to 65-year-olds and up to all voters, regardless of age. Here, Plaintiffs are not merely younger than 65; they have demonstrated specific medical and medical-social reasons why

---

[191] *Robinson v. Hunt Cty., Texas*, 921 F.3d 440, 451 (5th Cir. 2019), reh'g denied (May 16, 2019).
[192] *Texas Democratic Party v. Abbott*, 961 F.3d 389, 411 (5th Cir. 2020).

appearing in person at the polls presents them, and their families, with heightened risk. Thus, the harm to them in the absence of an injunction would be more acute than the harm to all voters under age 65, generally speaking. Moreover, Plaintiffs ask that "at a minimum" for the previous Emergency Election Plan to be applied to the fall elections. Inasmuch as that plan had legislative approval, the state's legislative prerogative would not be meaningfully impaired.

As the District Court for the Middle District of Pennsylvania put it, "there can be no injury more irreparable" than a "risk of serious, lasting illness or death."[193] Even though Plaintiffs' serious illness or death is not an *inevitable* result of voting in person, on balance, the increased risk of such is still more detrimental than the abstract injury the state would suffer if this Court enjoined its statutes. Thus, the Court finds that this factor presents no obstacle to injunctive relief.

### 4.  Public Interest

Lastly, the Court must inquire as to whether the grant of an injunction will serve the public interest. Because granting Plaintiffs' requested injunctive relief would result in expanded voting opportunities for Louisiana voters, the Court concludes that it would. It is well settled that citizens have a "strong interest in exercising the 'fundamental political right' to vote,'"[194] "[t]he public interest therefore favors permitting as many qualified voters to vote as possible. Defendants assert that "the public interest favors conducting the elections under restrictions *less* or as restrictive as Louisiana's normal election procedures,"[195] which the Court can only assume was

---

[193] *Thakker v. Doll*, No. 1:20-CV-480, 2020 WL 1671563, at *4 (M.D. Pa. Mar. 31, 2020).
[194] *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).
[195] Rec. Doc. No. 52, p. 27.

62304

a misstatement on their part, since the entire premise of their *Opposition* to the injunction is that instituting a less restrictive election regime would unleash chaos. Defendants also argue that the public interest would be disserved by an injunction because "Louisiana's system is not set up or equipped to process that volume of ballots."[196] On that point, the Court can only agree that the apparent inadequacy of Louisiana's election system is, indeed, not in the public interest. But as the Supreme Court has held, "administrative convenience"[197] is not adequate justification for burdening fundamental rights.

In their *Post Hearing Brief*, Defendants imply that an injunction by this Court would impermissibly invade the legislative sphere, wondering "why would any elected official engage in the hard work required to pass a law, when they can convince a federal court to do 'whatever it chooses to do'? The work of Louisiana's lawmakers, even when that work bears little fruit, should not be so cavalierly cast aside."[198] The Court rejects the insulting notion that the significance of the issues presented are in anyway treated cavalierly. Although determining the "Times, Places and Manner of holding Elections"[199] is undeniably left to the States, it is equally true that it is the Court's duty to determine the constitutionality of state action. Defendants admit that Louisiana lawmakers' efforts to regulate the fall elections have "borne little fruit." The Court will go a step further: Plaintiffs have shown that the state's failure to provide accommodation for pandemic-affected voters is likely unconstitutional because it imposes an undue burden on Plaintiffs' right to vote. Based on the record before the Court, Plaintiffs have demonstrated a likelihood of

---

[196] *Id.* at p. 28.
[197] *Taylor v. Louisiana*, 419 U.S. 522, 535 (1975).
[198] Rec. Doc. No. 86, p. 1 (internal citations omitted).
[199] U.S. Const. art. I, § 4, cl. 1.

62304

42

success on the merits, irreparable injury, a balance of interest in their favor and service of the public interest.

### B.  Injunctive Relief

"Crafting a preliminary injunction is an exercise of discretion and judgment."[200] "A court 'need not grant the total relief sought by [the plaintiffs] but may mold its decree to meet the exigencies of the particular case.'"[201] The Court is, however, bound to consider "the overall public interest."[202] Thus, for the above-stated reasons, and after careful consideration of the record, the court will GRANT in part and DENY in part Plaintiffs' *Motion for Preliminary Injunction,* as follows*:*

- The Court DENIES Plaintiffs' *Motion* for injunctive relief to increase the period of early voting for the November 3, 2020 Presidential General and Open Congressional Primary Election to thirteen days. The Court GRANTS more limited injunctive relief as to early voting and shall order that the period of early voting for the November 3, 2020 Presidential General and Open Congressional Primary Election be increased to a ten-day period which shall run from Friday, October 16, 2020 to Tuesday, October 27, 2020, (excluding Sunday, October 17 and Sunday, October 25), from 8:00am to 7:00pm each day.

- The Court DENIES Plaintiffs' *Motion* for injunctive relief to increase the period of early voting for the December 5, 2020 Open General/Congressional/Republican State Central Committee (RSCC) Election.

---

[200] *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017).
[201] *Id.*
[202] *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 26 (2008).

62304

- The Court DENIES the Plaintiffs' *Motion* for injunctive relief to enjoin entirely the operation of the Excuse Requirement set forth in Louisiana Revised Statute §18:1303.

- The Court GRANTS Plaintiffs' alternative *Motion* for injunctive relief to make available the COVID-19 Ballot Application that was used during the July and August 2020 elections and to supply absentee by mail ballots to voters who validly request absentee ballots via COVID-19 Ballot Application in both the November 3, 2020 Presidential General and Open Congressional Primary Election and the December 5, 2020 Open General/Congressional/Republican State Central Committee (RSCC) Election.

    **IT IS SO ORDERED**.

    Signed in Baton Rouge, Louisiana on <u>September 16, 2020</u>.


**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

62304

44